**Exhibit C**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| ENER1, INC., | Case No.: 12- |
| Debtor. | |

## DISCLOSURE STATEMENT IN CONNECTION WITH THE PREPETITION SOLICITATION OF VOTES IN RESPECT OF THE PREPACKAGED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

NO CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE HAS YET BEEN COMMENCED. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY ANY U.S. BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.

REED SMITH LLP
599 LEXINGTON AVENUE
22ND FLOOR
NEW YORK, NY 10022
Telephone: (212) 521 5400
Facsimile: (212) 521 5450

*Proposed Counsel for the Debtor*

THIS DISCLOSURE STATEMENT FOR THE PREPETITION SOLICITATION OF VOTES IN RESPECT OF THE PREPACKAGED PLAN OF REORGANIZATION OF ENER1, INC. UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE, THE ACCOMPANYING BALLOTS, AND RELATED MATERIALS DELIVERED HEREWITH ARE BEING PROVIDED BY THE DEBTOR TO KNOWN HOLDERS OF CLAIMS PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE IN CONNECTION WITH THE DEBTOR'S SOLICITATION OF VOTES TO ACCEPT THE PLAN.

ALL CREDITORS ENTITLED TO VOTE THEREON ARE URGED TO VOTE IN FAVOR OF THE PLAN, WHICH IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.

A SUMMARY OF THE VOTING INSTRUCTIONS IS SET FORTH IN ARTICLE II OF THIS DISCLOSURE STATEMENT. ADDITIONAL INSTRUCTIONS ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO CREDITORS ENTITLED TO VOTE ON THE PLAN (THE "BALLOTS").

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY 5:00 P.M., PREVAILING EASTERN STANDARD TIME, ON FEBRUARY 10, 2012 (THE "VOTING DEADLINE"), UNLESS EXTENDED IN WRITING BY THE DEBTOR.

US_ACTIVE-107697579.42

IN THE EVENT THE DEBTOR DETERMINES TO COMMENCE THE CHAPTER 11 CASE, THE PLAN CAN BE CONFIRMED BY THE BANKRUPTCY COURT AND THEREBY MADE BINDING UPON YOU IF IT IS ACCEPTED BY THE HOLDERS OF TWO-THIRDS IN AMOUNT AND MORE THAN ONE-HALF IN NUMBER OF CLAIMS IN EACH CLASS OF CLAIMS THAT IS ENTITLED TO VOTE THAT VOTES ON THE PLAN, OR IF THE PLAN OTHERWISE SATISFIES THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE.

THE DEBTOR HAS NOT AT THIS TIME TAKEN ANY ACTION TO COMMENCE A CASE UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  IF YOU VOTE IN FAVOR OF THE PLAN, YOUR VOTE ON THE PLAN CAN BE USED BY THE DEBTOR IN CONNECTION WITH A FUTURE BANKRUPTCY FILING.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF.

**THE EFFECTIVENESS OF THE PROPOSED PLAN IS SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED, OR WAIVED BY THE RELEVANT PARTIES.  SEE ARTICLE X.B.**

NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION

**THIS DISCLOSURE STATEMENT AND THE RELATED DOCUMENTS SUBMITTED HEREWITH ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF ITS PROPERTY OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT.  HOLDERS OF CLAIMS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.**

**THERE HAS BEEN NO INDEPENDENT AUDIT OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT EXCEPT AS MAY BE EXPRESSLY INDICATED HEREIN.  THIS DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR FROM NUMEROUS SOURCES AND IS BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.  HOLDERS OF CLAIMS MUST RELY ON THEIR OWN EXAMINATION OF THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.  BEFORE SUBMITTING BALLOTS, HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS TO BOTH DOCUMENTS IN THEIR ENTIRETY.**

**FOR THE CONVENIENCE OF HOLDERS OF CLAIMS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN BUT DOES NOT CONTAIN ALL OF ITS TERMS AND PROVISIONS.  ALL PARTIES WHO ARE ENTITLED TO VOTE ON THE PLAN ARE STRONGLY ADVISED TO REVIEW THE PLAN IN ITS ENTIRETY BEFORE VOTING ON THE PLAN.  TO THE EXTENT OF ANY INCONSISTENCY BETWEEN THE PLAN OR ANY PLAN DOCUMENT AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE PLAN DOCUMENT ARE CONTROLLING.**

**THE DISCUSSION OF THE DEBTOR'S BUSINESS IN THIS DISCLOSURE STATEMENT REFERS TO, AND INCORPORATES, THE OPERATIONS OF THOSE SUBSIDIARIES ON A COLLECTIVE BASIS.**

US_ACTIVE-107697579.42

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE (IN CONJUNCTION WITH A REVIEW OF THE PLAN) WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.  THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED. CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY THEIR NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.  THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.

US_ACTIVE-107697579.42

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................1

   A. Why You Are Receiving This Document ..............................................9

   B. Plan Overview.......................................................................................13
      1. Purpose.........................................................................................13
      2. Summary of Plan Treatment ........................................................14
      3. Executory Contracts and Unexpired Leases ...............................15

   C. Voting and Confirmation .....................................................................15
      1. Confirmation Hearing Procedures ...............................................15

   D. Risk Factors and Disclaimer ...............................................................16

II. VOTING PROCEDURES AND REQUIREMENTS......................................18

   A. Classes Entitled to Vote ......................................................................18

   B. Vote Required for Acceptance by a Class ...........................................19

   C. Classes Not Entitled to Vote ...............................................................19

   D. Solicitation Procedures ........................................................................19
      1. Solicitation Package.....................................................................19
      2. Distribution of the Solicitation Package .....................................20

   E. Voting Procedures................................................................................20
      1. Change of Vote ............................................................................21
      2. Non-voting or Voting Errors........................................................21
      3. Fiduciaries and Other Representatives.........................................22
      4. Agreements upon Furnishing Ballots...........................................22
      5. Further Information, Additional Copies .......................................22

III. CONFIRMATION OF THE PLAN...............................................................23

   A. Confirmation Hearing for the Plan ......................................................23

   B. Any Objections to Confirmation of the Plan .......................................24

IV. EVENTS LEADING TO THE PROPOSED PLAN ......................................25

   A. The Debtor ...........................................................................................25

   B. Management and Employee Changes...................................................27

   C. The Debtor's Business .........................................................................28
      1. Itochu Corporation ......................................................................31
      2. Wanxiang EV Co. Ltd..................................................................31
      3. JSC Mobile GTES.........................................................................33

US_ACTIVE-107697579.42

D.   Federal Government Contracts and Grants..........................................................34
    1.   Development Contracts..............................................................................34
    2.   Electric Drive Vehicle Battery and Component Manufacturing
         Initiative ....................................................................................................35

E.   State Initiatives......................................................................................................35

F.   Intense Competition..............................................................................................36

G.   Think Global and Think Holdings ........................................................................36

H.   Restatement of Financial Statements ....................................................................38

I.   Shareholder Class Actions ....................................................................................39

J.   Delisting of Common Stock...................................................................................39

K.   Plan Support Agreement and DIP Facility............................................................40

V.   SUMMARY OF THE PLAN.............................................................................................42

A.   Overview of Chapter 11 ........................................................................................42

B.   Purpose of the Plan ...............................................................................................45

VI.  CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS .....................................45

A.   Unclassified Claims ..............................................................................................45

B.   Classified Claims and Interests.............................................................................45
    1.   General........................................................................................................45
    2.   Classification..............................................................................................46

C.   Identification of Classes Impaired and Not Impaired by the Plan........................46
    1.   Voting Classes: Classes of Claims Entitled to Vote ..................................46
    2.   Unimpaired Classes of Claims and Interests Not Entitled to Vote............47
    3.   Impaired Classes of Claims or Interests Deemed to Reject the Plan
         and Not Entitled to Vote ............................................................................47

VII. TREATMENT OF CLAIMS AND INTERESTS ..............................................................47

A.   Unclassified Claims ..............................................................................................47
    1.   DIP Claims..................................................................................................47
    2.   Administrative Claims ................................................................................48
    3.   Statutory Fees.............................................................................................48
    4.   Professional Claims ....................................................................................48
    5.   Priority Tax Claims.....................................................................................49

B.   Classified Claims ..................................................................................................49
    1.   Class 1 (Priority Non-Tax Claims) .............................................................49
    2.   Class 2 (Bridge Loan Claims).....................................................................50
    3.   Class 3 (Senior Note Claims)......................................................................50
    4.   Class 4 (Convertible Note Claims) .............................................................50
    5.   Class 5 (Line of Credit Claims) ..................................................................51
    6.   Class 6 (General Unsecured Claims) ..........................................................51

US_ACTIVE-107697579.42

7.    Class 7 (Interests)......................................................................52

VIII.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..........52

A.    Assumption and Rejection of Contracts and Leases.............................................52
1.    Amendments to Schedule 2: Rejected Executory Contracts and
Unexpired Leases..................................................................................53
2.    Cure Payments; Adequate Assurance of Performance .............................53
3.    Approval of Rejection; Rejection Damages Claims ..................................55

B.    Indemnification Agreements...................................................................................55

IX.    MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN ....................56

A.    Exit Funding............................................................................................................56

B.    Issuance of New Notes............................................................................................59

C.    Issuance of New Common Stock and New Preferred Stock...................................61

D.    No Fractional Shares...............................................................................................64

E.    Record Date for Distributions.................................................................................65

F.    Continuation of Automatic Stay .............................................................................65

G.    Post-confirmation Operations .................................................................................65

H.    Effectiveness of Securities, Instruments, Agreements and By-laws of the
Reorganized Debtor.................................................................................................66

I.    Restructuring of the Reorganized Debtor ...............................................................66

J.    Corporate Action.....................................................................................................66

K.    Exemption from Securities Laws............................................................................67

L.    Avoidance Actions..................................................................................................67

M.    Post-Effective Date Reporting ................................................................................67

N.    Procedures for Treating Disputed Claims Under the Plan......................................67

O.    Objections to Claims...............................................................................................68

P.    No Distributions Pending Allowance .....................................................................68

Q.    Distributions After Allowance................................................................................68

X.    CONDITIONS PRECEDENT ........................................................................................69

A.    Conditions to Confirmation ....................................................................................69

B.    Conditions to the Effective Date.............................................................................69

C.    Waiver of Conditions Precedent .............................................................................70

D.    Termination of Plan for Failure to Become Effective ...........................................70

E.    Notice of Effective Date .........................................................................................70

US_ACTIVE-107697579.42

XI.    EFFECT OF CONFIRMATION .................................................................................71
    A.    Entry of Confirmation Order ..............................................................................71
    B.    Binding Effect ....................................................................................................71
    C.    Exculpation ........................................................................................................71
    D.    Discharge of Debtor ...........................................................................................71
    E.    Waiver of Avoidance Actions ............................................................................72
    F.    Compromise, Global Settlement, Injunction and Related Provisions..................72
        1.    Compromise and Settlement .................................................................72
        2.    Satisfaction of Claims and Termination of Interests...............................73
        3.    Releases by the Debtor...........................................................................74
        4.    Mutual Releases by the Plan Support Parties ..........................................75
        5.    Injunctions ............................................................................................76

XII.    RETENTION OF JURISDICTION ........................................................................77
    A.    Post Effective-Date Jurisdiction ........................................................................77
    B.    Jurisdiction Prior to the Effective Date...............................................................77

XIII.    MISCELLANEOUS PROVISIONS.........................................................................77
    A.    Modification of the Plan .....................................................................................77
    B.    Release of the Liens of the Bridge Lenders ........................................................78
    C.    Filing of Additional Documents .........................................................................78
    D.    No Admissions ...................................................................................................78
    E.    Severability of Plan Provisions ..........................................................................78
    F.    Exemption from Certain Transfer Taxes .............................................................79
    G.    Preservation of Rights of Setoffs .......................................................................79
    H.    Defenses with Respect to Unimpaired Claims.....................................................80
    I.    No Injunctive Relief...........................................................................................80
    J.    Governing Law ...................................................................................................80
    K.    Computation of Time ..........................................................................................80
    L.    Successors and Assigns.......................................................................................80
    M.    Closing of the Chapter 11 Case ..........................................................................81
    N.    Waiver or Estoppel .............................................................................................81
    O.    Section 1125(e) of the Bankruptcy Code ............................................................81
    P.    Expedited Tax Determination .............................................................................81
    Q.    Fees and Expenses of Plan Support Parties .........................................................82

US_ACTIVE-107697579.42

XIV.    FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST ..........................82

    A.    Feasibility of the Plan .........................................................................................84

    B.    Best Interests Test ..............................................................................................87
        1.    Generally ..................................................................................................87
        2.    Best Interests of Creditors Test: Liquidation Analysis ............................89

    C.    Feasibility: Projections ......................................................................................89

XV.    Confirmation Without Acceptance by All Impaired Classes: The 'Cramdown'
Alternative .....................................................................................................................92

    A.    Cram Down of Interests Generally .....................................................................93

    B.    Cram Down of Interests and Valuation ..............................................................94

    C.    Application of the "Best Interests" Test to the Liquidation Analysis and
the Valuations ..................................................................................................104

XVI.    IMPORTANT CONSIDERATIONS AND RISK FACTORS.....................................104

    A.    The Debtor Has No Duty To Update ................................................................104

    B.    No Representations Outside This Disclosure Statement Are Authorized ..........105

    C.    Information Presented Based On Debtor's Books And Records; No Audit
Performed.........................................................................................................105

    D.    All Information Was Provided By Debtor And Was Relied Upon By
Professionals ...................................................................................................105

    E.    Projections And Other Forward-Looking Statements Not Assured ...................105
        1.    Projections...............................................................................................106

    F.    No Legal Or Tax Advice Is Provided By This Disclosure Statement ................106

    G.    No Admissions ..................................................................................................106

    H.    Risk Factors .....................................................................................................107
        1.    Business Factors And Competitive Conditions .......................................107
        2.    Impact of Interest Rates ..........................................................................110

    I.    Bankruptcy Law Risks and Considerations .......................................................110
        1.    Confirmation of the Plan is Not Assured ................................................110
        2.    The Plan May Be Confirmed Without the Approval of All Classes
Through So-Called "Cramdown" ............................................................110
        3.    The Effective Date Might Be Delayed or Never Occur............................111

    J.    Tax Considerations ...........................................................................................111

XVII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........111

    A.    Federal Tax Consequences to the Debtor ..........................................................113
        1.    Cancellation of Indebtedness Income Generally .....................................113

US_ACTIVE-107697579.42

2.      Bankruptcy Exception and the Reduction of Tax Attributes
Generally...............................................................................................114
3.      Net Operating Losses – Section 382.......................................................116

B.    Federal Tax Consequences to the Holders in Voting Classes.............................117
1.      Exchange of Voting Class Instruments under the Plan.........................117
2.      Consequences of Holding New Notes and New Common Stock
Received under the Plan........................................................................118

C.    Information Reporting and Backup Withholding ...............................................120

XVIII. ALTERNATIVES TO THE PLAN ...............................................................................121

A.    Liquidation Under Chapter 7 ...........................................................................121

B.    Dismissal .........................................................................................................122

C.    Alternative Plan ...............................................................................................122

XIX.   DEFINITIONS AND INTERPRETATION ..................................................................122

A.    Scope of Definitions ........................................................................................122

B.    Definitions........................................................................................................122

C.    Rules of Interpretation .....................................................................................123

XX.    CONCLUSION.............................................................................................................125

Schedule 1 .................................................................................................................................. i

US_ACTIVE-107697579.42

## TABLE OF SCHEDULES AND EXHIBITS

Schedule 1      Glossary of Defined Terms

Exhibit 1       The Plan

Exhibit 2       Plan Support Agreement

Exhibit 3       Reorganized Debtor's Financial Projections

Exhibit 4       Liquidation Analysis

Exhibit 5       Historical Financials

Exhibit 6       Pro Forma Balance Sheet

US_ACTIVE-107697579.42

## I.   INTRODUCTION

Ener1, Inc. ("Ener1" or the "Debtor")[1] is a holding company, which engages in business

through the ownership of its direct and indirect operating subsidiaries.  The Debtor has

negotiated a restructuring with all of its debt holders and intends to implement it by filing a

"prepackaged Chapter 11" case under Title 11, United States Code, 11 U.S.C. §§ 101 *et seq.* (the

"Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New

York (the "Bankruptcy Court") and seeking Bankruptcy Court approval of the Debtor's

Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan"),

annexed to this Disclosure Statement as Exhibit 1.  The Plan is the product of substantial

negotiations between the Debtor and its long-term debt holders which resulted in the execution

of a Plan Support Agreement among these parties.  A copy of the Plan Support Agreement is

annexed to this disclosure statement relating to the Debtor's Prepackaged Plan of Reorganization

under Chapter 11 of the Bankruptcy Code ("Disclosure Statement") as Exhibit 2.

The purpose of the restructuring is to deleverage the Debtor's balance sheet in light of the

substantial loss in value and revenue it recently experienced.  The enterprise value of the Debtor

is lower than the Debtor's liabilities.  The Plan accomplishes the goal of de-leveraging by

reducing the amount of the Debtor's funded debt from approximately $91 million to

approximately $45.98 million on the Effective Date of the Plan, with the current debt holders

receiving newly issued debt and newly issued common equity of the Reorganized Debtor.

Moreover, one of the Debtor's existing debt and stockholders, Bzinfin, S.A. ("Bzinfin") has

committed to provide the Debtor with a postpetition financing facility in the aggregate principal

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in
the Plan or in the Bankruptcy Code.  For ease of reference, a glossary of defined terms is also
annexed to this Disclosure Statement as Schedule 1.

- 1 -

US_ACTIVE-107697579.42

amount of up to $20 million, as well as an exit equity commitment,[2] and has agreed that the

funds it is putting into the Debtor in the form of postpetition financing and exit financing should

be payable in preferred stock rather than in cash.  Aside from the restructured long-term debt, the

claims of general unsecured creditors are unimpaired and will be paid by the Debtor in full

pursuant to the Plan.  The primary debt obligations of the Debtor consist of:

- Bridge Loan Claims, pursuant to a secured term loan, dated November 16, 2011 from Liberty Harbor Special Investments, LLC, Goldman Sachs Palmetto State Credit Fund, L.P. ("GSAM Investors") and Bzinfin, each as a lender, and Bzinfin, as agent, in the principal amount of $4.5 million ("Bridge Loan Agreement") plus accrued and unpaid interest, fees, and costs pursuant to the terms thereof, which credit facility was subsequently increased to a principal amount of $6.5 million on December 30, 2011.

- Senior Note Claims, which are in connection with the Tranche A 8.25% Senior Notes, due July 1, 2013, in the principal amount of $28,094,214, and (ii) the Tranche B 8.25% Senior Notes, due July 1, 2013, in the principal amount of $29.25 million, which were issued pursuant to the Waiver, Amendment, and Exchange Agreement, dated September 9, 2011, by and among Ener1, Inc., Liberty Harbor Special Investments, LLC, Goldman Sachs Palmetto State Credit Fund, L.P., Whitebox Multi Strategy Partners, L.P., Whitebox Concentrated Convertible Arbitrage Partners L.P., Pandora Select Partners, L.P., Whitebox Credit Arbitrage Partners, L.P., and Whitebox Special Opportunities Fund LP, Series B (collectively "Whitebox" and together with GSAM Investors, "GSAM/Whitebox Investors"), as may have been amended or supplemented, in each case, plus all accrued interest thereon and all other obligations due thereunder, for the approximate aggregate outstanding principal balance, plus accrued and unpaid interest, of $62.0 million;

- Convertible Note Claims, which consists of claims arising in connection with the 6% Senior Convertible Notes, due August 27, 2015, issued by the Debtor pursuant to a Note Purchase Agreement, dated August 27, 2010, in the aggregate outstanding principal balance, plus accrued and unpaid interest, of $10.3 million, and held by ITOCHU Corporation ("ITOCHU"); and

- Line of Credit Claims, pursuant to a line of credit agreement, dated June 29, 2011, ("LOC Agreement") as amended, by and between Ener1 and Bzinfin, S.A., which established a line of credit for the Debtor in the aggregate principal amount of

---

[2]       The aggregate amount of this equity commitment is $81 million less the amount funded under the DIP Loan.

US_ACTIVE-107697579.42

$15,000,000 in the current aggregate outstanding principal balance, plus accrued and unpaid interest, of $12.1 million;

The Plan classifies claims against, and interests in, the Debtor as follows:

Class 1:  Priority Non-Tax Claims, if any.

Class 2:  Claims of the Bridge Lenders under the Bridge Loan.

Class 3:  Senior Note Claims.

Class 4: Convertible Note Claims.

Class 5:  Line of Credit Claims.

Class 6:  General Unsecured Claims not otherwise classified.

Class 7:  Interests.[3]

The table below sets forth a brief summary of the classification and general treatment of

Claims and Interests under the Plan.[4]

| Class/ Description | Impairment Treatment | Proposed Treatment | Accept/ Reject | Estimated Total Recovery (%) |
|---|---|---|---|---|
| Class 1 Priority Non-Tax Claims | Unimpaired | Holders of Allowed Priority Non-Tax Claims shall receive, on the Effective Date or as soon thereafter as is reasonably practicable, either (i) cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim, or (ii) such treatment as to which the Debtor and the holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. | Deemed to Accept. Not entitled to vote. | 100% |

---

[3]     As defined by the Plan, Interests means "equity security", as defined in section 101(16) of the Bankruptcy Code, and includes all issued shares of common stock and preferred stock of the Debtor as of the Petition Date, all Warrants, options, or other rights, contractual or otherwise, to acquire any such equity interest in the debtor, or the right to purchase, sell, or subscribe to a share, security, or interest specified in subparagraph (A) or (B) of section 101(16) of the Bankruptcy Code, and any subordinated claim which arises pursuant to section 510(b) of the Bankruptcy Code.  Plan §1.48.

[4]     Article 2 of the Plan provides, in accordance with section 1123(a)(1) of the Bankruptcy Code, that DIP Claims, Administrative Claims, Intercompany Claims, Statutory Fees, Professional Claims, and certain other priority Claims, are not classified and thus are excluded from the Classes of Claims set forth in Article 3 of the Plan.

US_ACTIVE-107697579.42

| Class/ Description | Impairment Treatment | Proposed Treatment | Accept/ Reject | Estimated Total Recovery (%) |
|---|---|---|---|---|
| Class 2<br><br>Bridge Loan Claims | Unimpaired | The Bridge Loan Claims shall be repaid in full (including principal, accrued prepetition and postpetition interest through the date of payment, and all other amounts due under the Bridge Loan Documents) by the Debtor as an initial draw under the DIP Facility, subject to approval of the Bankruptcy Court. If the Bridge Loan Claims are outstanding on the Effective Date, such Claims shall be paid in full (including principal, accrued prepetition and postpetition interest through the date of payment, any adequate protection payments required in connection therewith and all other amounts due under the Bridge Loan Documents) in cash on the Effective Date and upon such payment the Liens granted to the Bridge Lenders pursuant to the Bridge Loan Documents shall terminate and be deemed released. | Deemed to Accept.<br><br>Not entitled to vote. | 100% |

US_ACTIVE-107697579.42

| Class/ Description | Impairment Treatment | Proposed Treatment | Accept/ Reject | Estimated Total Recovery (%) |
|---|---|---|---|---|
| Class 3<br><br>Senior Note Claims | Impaired | Each holder of a Senior Note Claim will receive its *pro rata* allocation of (i) on the Effective Date (a) Cash in the amount of $2,717,708.76 million, (b) New Notes with a principal amount equal to (1) 75% of the principal amount of the Senior Notes (plus accrued interest through the Effective Date) minus (2) $8,153,126.28 million, and (c) a number of shares of New Common Stock equal to 10,000,000 multiplied by the quotient of the Senior Note Claims New Common Stock Amount divided by the Total New Common Stock Calculation Amount; (ii) on the date that is four months after the Effective Date, Cash in the amount of $2,717,708.76, together with interest thereon accruing from the Effective Date through the date of payment at the interest rate that is 7 percent per annum to be paid in Cash; and (iii) on the date that is eight months after the Effective Date, Cash in the amount of $2,717,708.76, together with interest thereon accruing from the Effective Date through the date of payment at the interest rate that is 7 percent per annum to be paid in Cash. The four and eight month Cash payments set forth above in clauses (ii) and (iii) shall have the benefit of the collateral and guarantees provided for in the New Notes Loan Agreement and shall be (x) pari passu with the payments with respect to the Convertible Note Claims, and (y) senior in right of payment to the principal and interest payments under the New Notes Loan Agreement, on terms set forth in the New Notes Loan Agreement. | Voted to Accept. | 86.2% |

US_ACTIVE-107697579.42

| Class/ Description | Impairment Treatment | Proposed Treatment | Accept/ Reject | Estimated Total Recovery (%) |
|---|---|---|---|---|
| Class 4  Convertible Note Claims | Impaired | Each holder of a Convertible Note Claim will receive its *pro rata* allocation of (i) on the Effective Date (a) Cash in the amount of $448,957.91 and (b) a number of shares of New Common Stock equal to 10,000,000 multiplied by the quotient of the Convertible Note Claims New Common Stock Amount divided by the Total New Common Stock Calculation Amount,  (ii) on the date that is four months after the Effective Date, Cash in the amount of $448,957.91, together with interest thereon accruing from the Effective Date through the date of payment at the interest rate that is 7 percent per annum to be paid in Cash, and (iii) on the date that is eight months after the Effective Date, Cash in the amount of $448,957.91, together with interest thereon accruing from the Effective Date through the date of payment at the interest rate that is 7 percent per annum to be paid in Cash.  The four and eight month Cash payments set forth above in clauses (ii) and (iii) shall have the benefit of the collateral and guarantees provided for in the New Notes Loan Agreement and shall be (x) pari passu with the payments with respect to the Senior Note Claims, and (y) senior in right of payment to the principal and interest payments under the New Notes Loan Agreement, on terms set forth in the New Notes Loan Agreement. | Voted to Accept. | 52.1% |
| Class 5  Line of Credit Claims | Impaired | On the Effective Date, each holder of a Line of Credit Claim will receive its *pro rata* allocation of a number of shares of New Common Stock equal to 10,000,000 multiplied by the quotient of the Line of Credit Claims New Common Stock Amount divided by the Total New Common Stock Calculation Amount. | Voted to Accept. | 44.9% |

US_ACTIVE-107697579.42

| Class/ Description | Impairment Treatment | Proposed Treatment | Accept/ Reject | Estimated Total Recovery (%) |
|---|---|---|---|---|
| Class 6<br><br>General Unsecured Claims | Unimpaired | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed General Unsecured Claim in Class 6 (General Unsecured Claims) shall be paid in full in Cash on the Effective Date, or, otherwise rendered Unimpaired.    Without limiting the generality of the foregoing, if a General Unsecured Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business or (ii) pursuant to an executory contract or unexpired lease that has not been rejected, the holder of such General Unsecured Claim shall be paid in Cash pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such General Unsecured Claim. | Deemed to Accept.<br><br>Not entitled to vote. | 100% |
| Class 7<br><br>Interests and Claims under 11 U.S.C. § 510 | Impaired | All Interests shall be cancelled and extinguished and the holders of Interests shall not receive or retain any property on account of such Interests. | Deemed to Reject.<br><br>Not entitled to vote. | 0% |

As of the Effective Date, the Debtor's capital structure will consist of:

- Approximately $39.65 million in New Notes, the terms of which are set forth in the New Notes Loan Agreement, attached to the Plan as Schedule 1, and summarized in this Disclosure Statement at IX.B.

- New Preferred Stock which will be issued to Bzinfin under the Plan, with a liquidation preference in the amount of the DIP Loan outstanding on such date and any amounts funded under the Exit Funding on such date; *provided, however*, that Bzinfin shall receive additional shares of New Preferred Stock as it advances funds post-Effective Date under the Equity Commitment Agreement.  The terms of the New Preferred Stock are described in the New Organization Documents, attached to the Plan as Schedule 5 and summarized in this Disclosure Statement at IX.C.

- 7 -

US_ACTIVE-107697579.42

- New Common Stock which will be issued on the Effective Date to holders of Senior Note Claims, holders of Convertible Note Claims and holders of Line of Credit Claims.  The New Common Stock will be subject to and governed by the New Organization Documents.  Moreover, the rights of the holders of the New Common Stock will be subject to the provisions of the Stockholders Agreement and Registration Rights Agreement, attached as Exhibits 3 and 6, respectively, to the Plan.

If the Plan is not confirmed, the Debtor believes it may be forced to liquidate under Chapter 7 of the Bankruptcy Code.  In such event, the Debtor believes that Creditors would realize a less favorable distribution of value, or, in certain cases, none at all, for their Claims.  See Article XIV.B.2.a, *infra*, and the values set forth in the Liquidation Analysis attached hereto as Exhibit 4.

None of the Debtor's subsidiaries are expected to be debtors in the bankruptcy case.  The sole filing entity will be Ener1.  Its subsidiaries will continue to operate their businesses in the ordinary course and it is anticipated that those operations will not be affected by the commencement of a bankruptcy case by Ener1.  Nevertheless, Ener1 believes that its subsidiaries will benefit from the infusion of up to $81 million[5] of new capital which will be effected through the consummation of the Plan.

The Debtor is the proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code.  Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan of reorganization that proposes how to treat claims against, and interests in, such debtor.  The confirmation of a plan, which is the vehicle for satisfying the rights of holders of claims against and interests in a debtor, is the overriding purpose of a Chapter 11 case. Upon confirmation of the plan, it becomes binding on the debtor and all of its creditors and stakeholders, and the

---

[5] This amount is the aggregate of the DIP Loan and the Exit Funding.

US_ACTIVE-107697579.42

obligations owed by the debtor to those parties are compromised and exchanged for the obligations specified in the plan.

As of the date hereof, the Debtor **_has not filed_** a Chapter 11 case. If a legally sufficient amount and number of impaired Claims vote in favor of the Plan, the Debtor intends to file a Chapter 11 case and seek confirmation of the Plan.

No solicitation materials other than this Disclosure Statement and any schedules and exhibits attached hereto or referenced herein, or otherwise enclosed in the solicitation package with this Disclosure Statement, have been authorized by the Debtor for use in soliciting acceptances of the Plan.

### A.    Why You Are Receiving This Document

The Debtor is providing this Disclosure Statement to all Creditors who are being solicited to vote to accept or reject the Plan. This Disclosure Statement summarizes the Plan's content and provides information relating to the Plan and the process the Bankruptcy Court will follow in determining whether to confirm the Plan. This Disclosure Statement also describes the negotiation of the Plan, discusses the events leading to the Debtor's filing its Chapter 11 Case, and, finally, summarizes and analyzes the Plan. This Disclosure Statement also describes certain U.S. Federal income tax consequences of the Plan to the Debtor and holders of Claims and Interests, voting procedures and the confirmation process.

The Bankruptcy Code requires that, in connection with soliciting creditors and interest holders, the party proposing a Chapter 11 plan must provide the creditors and interest holders with "adequate information." When the solicitation occurs after the commencement of a Chapter 11 case, the proponent is required to prepare and file with the bankruptcy court a document called a "disclosure statement," which the Bankruptcy Code mandates must contain sufficient information to enable parties who are affected by the plan to vote knowingly for or against the

US_ACTIVE-107697579.42

plan, or object to the plan, as the case may be. Ordinarily, the plan proponent is permitted to disseminate the plan and disclosure statement and solicit creditors and interest holders only after the bankruptcy court finds that the proposed disclosure statement contains such information.

Here, however, because the Debtor's solicitation is occurring prior to the commencement of a Chapter 11 case, there is no requirement that this Disclosure Statement be reviewed or approved by the bankruptcy court **prior** to the solicitation. The Debtor is proposing a "pre-packaged Chapter 11," which is a form of consensual Chapter 11 that enables a debtor to solicit acceptances and rejections of a plan **prior** to filing a bankruptcy petition. In a pre-packaged Chapter 11, prior to filing a Chapter 11 petition, a debtor negotiates with key creditors and/or interest holders to develop a plan. The debtor then solicits votes on that plan prior to filing a Chapter 11 petition. If the debtor obtains the required acceptances, it then files its Chapter 11 petition simultaneously with the plan and disclosure statement. The Debtor reserves the right to file its Chapter 11 Case once all the ballots have been returned. The Bankruptcy Court thereafter conducts a hearing to review the adequacy of this Disclosure Statement and may then confirm the Plan. Section 1126(b) of the Bankruptcy Code provides that a Holder of a Claim or Interest that has voted to accept or reject the plan before the commencement of a case will be deemed to have accepted or rejected such plan, as the case may be, if either the pre-petition solicitation was in compliance with applicable nonbankruptcy law governing the adequacy of disclosure in connection with such solicitation or, if there is not any such law, the solicitation occurred after disclosure to such Holders of adequate information, as defined in Section 1125(a) of the Bankruptcy Code. Here, there is no applicable nonbankruptcy law governing the solicitation of the holders of Claims. Accordingly, if a Chapter 11 Case is commenced, the Debtor will ask the Bankruptcy Court to make a finding that this Disclosure Statement provided those holders who

US_ACTIVE-107697579.42

are being solicited with adequate information, as defined in Section 1125(a) of the Bankruptcy Code.

The terms of the reorganization that are embodied in the Plan, were negotiated over a period of several months and thereafter agreed upon by the Debtor and certain of the Debtor's Creditors, who are denominated as the Plan Support Parties. This agreement is reflected in the Plan Support Agreement. The signatories thereto have agreed to support confirmation of the Plan subject to certain terms and conditions. The Debtor believes that those terms and conditions will be met and therefore, the parties to the Plan Support Agreement will be required to vote in favor of and/or otherwise support and facilitate confirmation of the Plan. For this reason, the Debtor expects that the Plan will be accepted by the requisite number and amount of holders of Class 3, Class 4, and Class 5 Claims.

If the requisite number and amount of holders of Class 3, Class 4 and Class 5 Claims vote to accept the Plan, the Debtor will file the Plan as part of a "prepackaged" bankruptcy filing. Holders of Interests in Class 7 will not receive any distribution nor retain any property under the Plan on account of such Interests and, pursuant to Section 1126(g) of the Bankruptcy Code, are conclusively deemed to reject the Plan. Accordingly, the Debtor will not solicit acceptances or rejections of the Plan from holders of Interests in Class 7 and will seek to confirm the Plan notwithstanding the deemed rejection of such Class pursuant to Sections 1129(b)(1) and (2)(C) of the Bankruptcy Code.

Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and section 14.1 of the Plan, the Debtor expressly reserves the right to alter, amend, modify, revoke or withdraw the Plan prior to its consummation.

US_ACTIVE-107697579.42

This Disclosure Statement has been compiled by the Debtor to accompany the Plan.  The factual statements, projections, financial information, and other information contained in this Disclosure Statement have been taken from documents prepared by the Debtor.  The information provided in this Disclosure Statement represents the Debtor's best information regarding facts and financial information and is true to the best of its knowledge.  Nothing contained in this Disclosure Statement shall have any preclusive effect against any party (whether by waiver, admission, estoppel or otherwise) in any cause or proceeding that may currently exist or occur in the future.  This Disclosure Statement shall not be construed as or deemed to constitute an acceptance of fact or an admission by any party with regard to any of the statements made herein.  This Disclosure Statement contains statements which constitute the Debtor's view of certain facts and events.  All such disclosures should be read as assertions by the Debtor only and not by any other party.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein, and neither delivery of this Disclosure Statement nor any exercise of rights granted in connection with the Plan, should be read to imply that there has been no change in the information set forth herein since the date of this Disclosure Statement.

Certain of the information contained in this Disclosure Statement, by its nature, is forward-looking, contains estimates and assumptions which may prove to be inaccurate, and contains projections which may prove to be wrong, or which may be materially different from actual future results.  Each party reviewing this Disclosure Statement should independently verify the information contained herein and in the Plan and Plan documents, as well as the effect of the Plan, and may wish to consult its individual attorney and accountant.  Your rights may be affected, even if you are not a holder of a Claim against the Debtor.

US_ACTIVE-107697579.42

*All Creditors should carefully review both this Disclosure Statement and the Plan before voting to accept or reject the Plan.  Indeed, Creditors should not rely solely on the Disclosure Statement but should also read the Plan.  The Plan provisions will govern if there are any inconsistencies between the Plan and the Disclosure Statement.*

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

B.     **Plan Overview**

THE FOLLOWING IS A VERY BRIEF SUMMARY OF THE PROVISIONS OF THE PROPOSED PLAN.  ALL PARTIES ARE ENCOURAGED TO READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. IF THE BANKRUPTCY COURT CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CLAIM HOLDERS AND INTEREST HOLDERS, REGARDLESS OF WHETHER OR HOW SUCH CREDITOR OR INTEREST HOLDER VOTED.

1.     Purpose

The purpose of the Plan is to provide for the reorganization of the Debtor's business and assets.  The Debtor believes that the restructuring of its debt and capital structure will enable the businesses of its subsidiaries to continue without interruption while enabling the Debtor to provide the working capital these businesses require.  As such, the Debtor believes that the restructuring contemplated by the Plan is in the best interests of all of its Creditors.

If the Plan is not confirmed, the Debtor believes that it will be forced either to develop an alternate plan of reorganization or to liquidate under either Chapter 7 or Chapter 11 of the Bankruptcy Code.  In either event, the Debtor believes that the Debtor's Creditors would realize

US_ACTIVE-107697579.42

a less favorable distribution of value, or, in certain cases, none at all, for their Claims. Moreover, value is insufficient to provide a recovery to Interest holders.

2.     Summary of Plan Treatment

Subject to the foregoing, Claims against and Interests in the Debtor are classified in the Plan as follows:

**Class 1: Priority Non-Tax Claims.**  Class 1 shall consist of any Priority Non-Tax Claims.

**Class 2:  Bridge Loan Claims.**  Class 2 shall consist of all Bridge Loan Claims.

**Class 3:  Senior Note Claims.**  Class 3 shall consist of all Senior Note Claims.

**Class 4:  Convertible Note Claims.**  Class 4 shall consist of all Convertible Note Claims.

**Class 5:  Line of Credit Claims.**  Class 5 shall consist of all Line of Credit Claims.

**Class 6:  General Unsecured Claims.**  Class 6 shall consist of all General Unsecured Claims.

**Class 7:  Interests.**  Class 7 shall consist of all Interests.

The Plan's provisions with respect to the treatment of Claims are fully described in section VII of this Disclosure Statement.

The pre-packaged Plan provides for a restructuring of the Debtor's long-term debt and the infusion of up to $81 million of new capital, with the first $50 million being provided by Bzinfin (the "Bzinfin Contribution") and the balance of $31 million (the "Contribution Balance") being provided by Bzinfin and the GSAM/Whitebox Investors.  This new capital will support the restructuring and continued operation of the Debtor's subsidiaries.  Aside from the restructured long-term debt, the claims of general unsecured creditors are unimpaired and will be paid by the Debtor in full pursuant to the Plan.  All of the Debtor's common stock will be cancelled and new stock will be issued to, allocated among, the long-term debt holders and the provider of the exit funding

.

US_ACTIVE-107697579.42

3.    Executory Contracts and Unexpired Leases

Except as otherwise provided herein, on the Effective Date, the Debtor shall be deemed to have assumed each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed or rejected by the Debtor, (ii) previously expired or terminated under its own terms prior to the Effective Date, (iii) is the subject of a motion to reject filed by the Debtor on or before the Confirmation Date, or (iv) is identified as being rejected in Schedule 2 to the Plan, as it may be amended or supplemented prior to the Confirmation Hearing.  Nothing in the terms of the Plan constitutes an admission by the Debtor that a contract or lease is an executory contract or unexpired lease or that any Debtor or its successors and assigns has any liability thereunder.

C.    **Voting and Confirmation**

Each Class of Claims that is entitled to vote shall have accepted the Plan if (i) the holders of at least two-thirds in dollar amount of the Allowed Claims actually voting in each such Class have voted to accept the Plan, and (ii) the holders of more than one-half in number of the Allowed Claims actually voting in each such Class have voted to accept the Plan.

1.    Confirmation Hearing Procedures

Assuming the requisite acceptances are obtained, the Debtor intends to file its Chapter 11 petition and immediately seek confirmation of the Plan at a confirmation hearing which will be scheduled by the Bankruptcy Court.

This Disclosure Statement sets forth the deadlines, procedures and instructions for voting to accept or reject the Plan and the applicable standards that will be utilized for tabulating ballots.  *See* Article II, *infra*.

US_ACTIVE-107697579.42

D.    **Risk Factors and Disclaimer**

Prior to deciding whether and how to vote on the Plan, each holder of a Claim should carefully read this Disclosure Statement, with all attachments and enclosures, in its entirety, and consult with its own advisors, in order to formulate an informed opinion as to the manner in which the Plan affects any Claim(s) they may hold against the Debtor or any other parties and to determine whether to vote to accept the Plan.  Holders of Claims should particularly consider the risk factors described in Article XV below.

Holders of Claims should also read the Plan carefully and in its entirety.  This Disclosure Statement contains a summary of the Plan for convenience, but the terms of the Plan supersede and control the summary.

In formulating the Plan, the Debtor relied on financial data derived from its books and records.  The Debtor represents that everything stated in this Disclosure Statement is true to the best of its knowledge.  The Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement.

The discussion in this Disclosure Statement regarding the Debtor may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "believe," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology.  The reader is cautioned that all-forward looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.  Any forward-looking statements are qualified in their entirety by reference to the factors

US_ACTIVE-107697579.42

discussed throughout this Disclosure Statement. The liquidation analysis, distribution projections, and other information described herein are estimates only, and the timing and amounts of actual distributions to Creditors may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

Nothing contained in this Disclosure Statement is, or shall be deemed to be, an admission or statement against interest by the Debtor for purposes of any pending or future litigation matter or proceeding.

Although the attorneys, advisors and other professionals employed by the Debtor have assisted in preparing this Disclosure Statement based upon factual information and assumptions respecting financial, business and accounting data found in the books and records of the Debtor, they have not independently verified such information and make no representations as to the accuracy thereof. The attorneys, advisors and other professionals employed by the Debtor shall have no liability for the information in this Disclosure Statement.

The Debtor and its professionals also have made a diligent effort to identify in this Disclosure Statement, and in the Plan, pending litigation claims and projected Causes of Action and objections to Claims. However, no reliance should be placed on the fact that a particular litigation Claim or projected Cause of Action or objection to a Claim is, or is not, identified in this Disclosure Statement or the Plan. The Debtor or the Reorganized Debtor, as applicable, may seek to investigate, file and prosecute litigation Claims and projected Causes of Action and objections to Claims, in the manner contemplated by the provisions of the Plan, after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement or the Plan identifies any such Claims, Causes of Action or objections to Claims. The

US_ACTIVE-107697579.42

Debtor is not currently aware of any Claims or Causes of Action that it might have, however, such Claims or Causes of Action may have arisen as a result of facts or events of which the Debtor is not fully aware or may in the future arise in the ordinary course of the Debtor's business.

While these factors could affect the value of distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not affect the validity of the vote of the Impaired Classes entitled to vote to accept or reject the Plan (the "<u>Voting Classes</u>") or require a re-solicitation of the votes of the holders of Claim in such Voting Classes.

## II.    VOTING PROCEDURES AND REQUIREMENTS

### A.    Classes Entitled to Vote

The following Classes are the Voting Classes, which are the only Classes entitled to vote to accept or reject the Plan:

| Class | Claim | Estimated Amount[6] |
|-------|-------|---------------------|
| 3 | (Senior Note Claims) | $ 62,067,230.33 |
| 4 | (Convertible Note Claims) | $ 10,253,333.33 |
| 5 | (Line of Credit Claims) | $ 12,081,177.28 |

If your Claim or Interest is not included in Class 3, 4 or 5, you are not entitled to vote and you will not receive a complete solicitation package ("<u>Solicitation Package</u>"), which is comprised of: (i) this Disclosure Statement, (ii) all exhibits to the Disclosure Statement including the Plan, and, (iii) the Class-specific Ballot. If your Claim is in Class 3, 4 or 5, you should receive a complete Solicitation Package, and you should read the documents provided and

---

[6]    This is the Debtor's estimate of the aggregate of all Claims that it believes, as of the Petition Date, in each of the identified Voting Classes. The Debtor intends to Schedule these amounts if they commence the Chapter 11 Case.

US_ACTIVE-107697579.42

follow the instructions listed on the Ballot and Ballot Instructions carefully.  Please use only the Ballot that accompanies this Disclosure Statement as each Voting Class has a distinct Ballot.

### B.    Vote Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan by a Class of Claims is determined by calculating both the number and the dollar amount of Claims voting to accept, based on the actual total allowed Claims voting in such class.  Acceptance by a Class requires an affirmative vote of more than one-half in number and two-thirds in amount of the total allowed Claims voting in such Class.

### C.    Classes Not Entitled to Vote

Under the Bankruptcy Code, Creditors are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no distribution of property under the Plan. Based on this standard, the following Classes of Claims or Interests will not be entitled to vote on the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | (Priority Non-Tax Claims) | Unimpaired | Deemed to accept; not entitled to vote |
| 2 | (Bridge Loan Claims) | Unimpaired | Deemed to accept; not entitled to vote |
| 6 | (General Unsecured Claims) | Unimpaired | Deemed to accept; not entitled to vote |
| 7 | (Interests) | Impaired | Deemed to reject; not entitled to vote |

### D.    Solicitation Procedures

#### 1.    Solicitation Package

The following materials shall constitute the complete Solicitation Package provided to Creditors entitled to vote on the Plan:

a.    this Disclosure Statement;

US_ACTIVE-107697579.42

b.      all exhibits to the Disclosure Statement, including the Plan; and

c.      the Class-specific Ballot.

2.      <u>Distribution of the Solicitation Package</u>

The solicitation period for eligible Creditors to vote to accept or reject the Plan will commence prior to the Petition Date.  The Debtor intends to distribute the Solicitation Packages in advance of the Voting Deadline, as described below.  *See*, "Voting Procedures", *infra* at II.E.

The Disclosure Statement will be served, together with a form of the applicable Ballots, *via* first class mail, overnight mail, or hand delivery upon the holders of Claims that comprise each Voting Class as of January 26, 2012, which is the voting record date (the "<u>Voting Record Date</u>").

**E.**      **<u>Voting Procedures</u>**

The Voting Record Date, as defined above, is the date for determining (1) which holders of Claims are entitled to vote to accept or reject the Plan and therefore receive the Solicitation Package and (2) whether Claims have been properly assigned or transferred to an assignee such that the assignee can vote as the holder of a Claim.  The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

Under the Plan, holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan.  In order for the holder of a Claim in the Voting Classes to have such holder's Ballot counted as a vote to accept or reject the Plan, such holder's Ballot must be properly completed, executed and delivered by either:

(i) electronic mail to mvenditto@reedsmith.com; or

US_ACTIVE-107697579.42

(ii) hand delivery to: [7]

> Michael J. Venditto, Esq.
> Reed Smith, LLP
> 599 Lexington Avenue
> New York, NY 10022

TO BE COUNTED, THE DEBTOR MUST RECEIVE – AS THE CASE MAY BE --THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN **NO LATER THAN 5:00 P.M., PREVAILING EASTERN TIME, ON FEBRUARY 9, 2012** (THE "VOTING DEADLINE").  IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, AND IF THE VOTING DEADLINE IS NOT EXTENDED, IT WILL NOT BE COUNTED UNLESS THE DEBTOR DETERMINES OTHERWISE IN ITS REASONABLE DISCRETION AND IN CONSULTATION WITH THE REQUISITE CONSENTING LENDERS.

The Debtor intends to file the Chapter 11 Case on the earlier of: (i) the day after the Voting Deadline, or (ii) the date when all Creditors who are eligible to vote have returned Ballots.

1.    Change of Vote

Whenever a holder of a Claim in a Voting Class casts more than one Ballot voting the same Claim prior to the Voting Deadline, the last Ballot physically received by the Debtor prior to the Voting Deadline shall be deemed to reflect the voter's intent and thus shall supersede and replace any prior cast Ballot(s), and **any prior cast Ballot(s), shall not be counted**.

2.    Non-voting or Voting Errors

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of an existing Claim who actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Debtor by the Voting

---

[7]    If a Ballot is sent via electronic mail, the Debtor requests that the voter send the signed original via mail or courier to Michael Venditto, Esq., Reed Smith LLP, 599 Lexington Avenue, New York, NY 10022; the failure to return the signed original prior to the Voting Deadline will not affect the validity or timeliness of the Ballot.

US_ACTIVE-107697579.42

Deadline will be deemed to constitute an abstention by such holder with respect to voting on the

Plan and such abstentions will not be counted as votes for or against the Plan.

**ANY EXECUTED BALLOT OR COMBINATION OF BALLOTS REPRESENTING CLAIMS IN THE SAME CLASS HELD BY THE SAME HOLDER THAT DOES NOT IN EACH CASE CONSISTENTLY INDICATE EITHER ACCEPTANCE OR REJECTION OF THE PLAN, OR THAT INDICATES BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN, SHALL NOT BE COUNTED.**

       3.     <u>Fiduciaries and Other Representatives</u>

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact,

officer of a corporation, receiver, or a person or entity acting in a fiduciary or representative

capacity, such person should indicate such capacity when signing, and may be required, upon

request, to promptly submit proper evidence satisfactory to the Debtor of authority to so act.

Authorized signatories should submit the separate Ballot of each Claim holder for whom they are

voting.

ANY UNSIGNED BALLOT SHALL **NOT** BE COUNTED.  ALL BALLOTS MUST BE SIGNED BY THE HOLDER OF AN EXISTING CLAIM OR ANY PERSON WHO ON SUCH DATE OF EXECUTION IS AUTHORIZED TO ACT IN A REPRESENTATIVE CAPACITY; HOWEVER, SUCH SIGNATURE NEED NOT BE AN ORIGINAL SIGNATURE, IF THE BALLOT IS SUBMITTED TO THE DEBTOR VIA ELECTRONIC MAIL.

       4.     <u>Agreements upon Furnishing Ballots</u>

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will

constitute the agreement of the creditor(s) with respect to such Ballot to accept (i) all of the terms

of, and conditions to, this solicitation of votes to accept or reject the Plan and (ii) the terms of the

Plan, including the exculpations and releases set forth in sections 11.3 and 12.3 therein.

       5.     <u>Further Information, Additional Copies</u>

If you have any questions or require further information about the voting procedures for

voting your Claims or about the Solicitation Package you received, or if you wish to obtain an

US_ACTIVE-107697579.42

additional copy of the Plan or any exhibits to such documents, please contact the Debtor's

counsel.

IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH
BALLOT, AS APPROPRIATE, WHEN SUBMITTING A VOTE.

## III.    CONFIRMATION OF THE PLAN

### A.    <u>Confirmation Hearing for the Plan</u>

The Debtor believes that the solicitation of acceptance or rejection of the Plan as

contemplated herein will satisfy the requirements of Sections 1125(g) and 1126(b) of the

Bankruptcy Code because the solicitation documents contain adequate information and

disclosure in accordance with any applicable non-bankruptcy law and Section 1125(a) of the

Bankruptcy Code.  In the event the Debtor determines to commence a case under Chapter 11 of

the Bankruptcy Code, it intends to seek approval of the Disclosure Statement and the solicitation

process at the Confirmation Hearing.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of

the applicable requirements of Section 1129 of the Bankruptcy Code for confirmation are met.

Among such requirements are that, among other things, the Plan: (1) is accepted by the requisite

holders of Claims and in each Impaired Class under the Plan; (2) provides that each Creditor in

the Impaired Classes will receive as much as it would if the Debtor were instead liquidated

pursuant to Chapter 7 of the Bankruptcy Code; and (3) is not likely to be followed by the

liquidation, or need for further financial reorganization, of the Debtor.

The "cramdown" provisions of Section 1129(b) of the Bankruptcy Code permit

confirmation of a Chapter 11 plan of reorganization in certain circumstances even if the Plan is

not accepted by all impaired classes of Claims and Interests.  The Debtor intends to request

US_ACTIVE-107697579.42

Confirmation, pursuant to the cramdown provisions of the Bankruptcy Code, notwithstanding the deemed rejection by Class 7 Interests.

If the Debtor commences its Chapter 11 Case and seeks confirmation of the Plan, the Bankruptcy Court will schedule the Confirmation Hearing to consider whether to confirm the Plan and to consider objections to Confirmation, if any.  Notice of the Confirmation Hearing will be sent to all Creditors in the manner required by the Bankruptcy Rules.  The Confirmation Hearing may be continued from time to time, without notice, other than an announcement of a continuance date at such hearing or a continued hearing, or by posting such continuance on the Court's docket.

### B.    Any Objections to Confirmation of the Plan

Any responses or objections to confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court with a copy to the Court's Chambers, together with a proof of service thereof, and served on counsel for the Debtor and the Office of United States Trustee on or before such deadline as the Bankruptcy Court may fix.  Bankruptcy Rule 3020 governs the form of any such objection.

**Parties on whom objections must be served are:**

Counsel for the Debtor
Reed Smith LLP
599 Lexington Avenue
22nd Floor
New York, NY 10022
Attn: Michael J. Venditto
Telephone: (212) 521-5400
Facsimile: (212) 521-5450

Office of The United States Trustee
33 Whitehall Street, 21st Floor
New York, NY 10004

Securities and Exchange Commission
New York Regional Office
3 World Financial Center, Suite 400
New York, NY 10281-1022
Attn: George S. Canellos, Esq.

Office of the United States Attorney
for the Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

- 24 -

(212) 336-1100.

Counsel to Bzinfin, S.A
Greenberg Traurig, LLP
333 SE 2nd Avenue
Suite 4400
Miami, FL 33131
Attn: Andrew E. Balog
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

Counsel to Goldman Sachs Palmetto
State Credit Fund, L.P., and Liberty
Harbor Special Investments, LLC
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:  Gary Holtzer
          Ronit Berkovich
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

Greenberg Traurig, LLP
200 Park Avenue
New York, NY 33131
Attn: John H. Bae
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

Whitebox Advisors,
3033 Excelsior Boulevard
Minneapolis, MN 55416

Itochu Corporation
Tokvu Section, 5-1
Kita-Aoyama 2-Chome, Minato-Ku,
Tokyo 107-8077, Japan
Attn: Hiroaki Murase

**THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF ALL OF ITS CREDITORS AS A WHOLE.  THE DEBTOR THEREFORE RECOMMENDS THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE SUBMIT BALLOTS TO ACCEPT THE PLAN.**

**IV.    EVENTS LEADING TO THE PROPOSED PLAN**

**A.    The Debtor**

In the event that a Chapter 11 case is commenced to seek confirmation of the Plan, Ener1 will be the sole debtor in the case.

The discussion of the Debtor's business in this Disclosure Statement refers to, and incorporates, the operations of those subsidiaries on a collective basis.

US_ACTIVE-107697579.42

The Debtor is a holding company that is incorporated in Florida and headquartered in New York City. The Debtor was formed in 1985 and was then known as Boca Research Corp. [8] The Debtor pursues multiple alternative energy applications through several foreign and domestic subsidiaries and a joint venture. If the Plan is confirmed, it is not contemplated that there will be a need for any of these subsidiaries to commence a bankruptcy case.

The stock of Ener1 is publicly held and until October 28, 2011, was traded on NASDAQ. The primary debt obligations of Ener1 are the following:

(i) Tranche A and Tranche B 8.25% senior unsecured notes due July 1, 2013 in the aggregate outstanding principal balance, plus accrued and unpaid interest, of $62.0 million, plus fees, costs, and all other obligations, pursuant to the terms of such notes. These are classified as Senior Note Claims under the Plan.

(ii) 6% senior convertible notes due August 26, 2015 held by ITOCHU in the aggregate outstanding principal balance, plus accrued and unpaid interest, of $10.3 million, plus fees and costs, to the extent provided for, pursuant to the terms of such notes. These are the Convertible Note Claims under the Plan.

(iii) advances under the LOC Agreement, in the aggregate outstanding principal balance, plus accrued and unpaid interest, of $12.1 million, plus fees and costs pursuant to the terms of such line of credit agreement, which debt, pursuant to that certain Subordination Agreement, dated September 12, 2011, is subordinated to the 8.25% senior unsecured notes. These are the Line of Credit Claims under the Plan.

(iv) $6.5 million, under the Bridge Loan Agreement, plus accrued and unpaid interest, fees, and costs pursuant to the terms thereof. These are the Bridge Loan Claims under the Plan.

---

[8]    The corporate name was changed to Ener1, Inc. in 2002.

US_ACTIVE-107697579.42

B.       **Management and Employee Changes**

The current officers of the Debtor are as follows: (i) Alex Sorokin, Interim Chief Executive Officer, (ii) Nicholas Brunero, Interim President and General Counsel, and (iii) Dale Parker, Interim Chief Financial Officer.

The current directors of the Debtor are as follows:

**Thomas J. Snyder** is the President of Ivy Tech Community College of Indiana, the nation's largest singly-accredited statewide community college system and the largest institution of higher education in Indiana.

**Kenneth R. Baker** is the former president and chief executive officer Altarum Institute, a nonprofit research institute that conducts research in the areas of national defense, healthcare, homeland security and the environment. Prior to that, he was an executive at General Motors for 30 years, including tenures as vice president of global research and development and program manager of electric vehicles.

**Nora Mead Brownell** is the co-founder of Espy Energy Solutions, LLC, an energy consulting firm.  Ms Brownell served as Commissioner of the Federal Energy Regulatory Commission from 2001–2006 under the administration of President George W. Bush.  She is also the former President of the National Association of Regulatory Utility Commissioners.

**Elliot Fuhr** is a senior managing director in the FTI Consulting Corporate Finance/Restructuring practice and is based in New York.

**William James** is the managing general partner of RockPort Capital Partners.

**Greg Kasagawa** is the chief operating officer of the aerospace and industrial systems division of ITOCHU.

**Stanislav Shekshnia** is a professor of entrepreneurial leadership at INSEAD Business School, Fontainebleau, France.

US_ACTIVE-107697579.42

**Boris Zingarevicha** is a director, and former executive, of Ilim Pulp Enterprises.  He is also an indirect beneficial owner of Bzinfin, and holds dispositive and voting power over the common stock held by Bzinfin, which is the owner of Ener1 Group, Inc. ("Ener1 Group").  As of December 31, 2001, Bzinfin and Ener1 Group collectively owned approximately 55.8% of the Debtor's outstanding common stock. Bzinfin directly held approximately 7.9% of the Debtor's outstanding common stock, while Ener1 Group directly held approximately 47.9% of the Debtor's outstanding common stock.

### C.    The Debtor's Business

The Debtor is a holding company with subsidiaries in the field of alternative energy and energy storage.  The Debtor's subsidiaries design, develop, and manufacture high-performance, prismatic, rechargeable lithium-ion batteries and battery pack systems for utility grid, transportation, and industrial applications.  The Debtor does not have any employees.  All services required to manage the Debtor's assets and businesses are provided by employees of EnerDel.

US_ACTIVE-107697579.42



EnerDel, a wholly-owned subsidiary of Ener1, is a Delaware corporation which operates from three locations in and around Indianapolis, Indiana.  EnerDel is one of the only U.S. manufacturers producing large-scale, lithium-ion, automotive battery systems.

The Debtor also conducts research and development activities on fuel cells and nano coating processes through other subsidiaries.  NanoEner, Inc., located in Fort Lauderdale, Florida, is building prototype equipment that utilizes a proprietary vapor deposition and solidification process for depositing materials onto battery electrodes as part of the battery cell manufacturing process.  The planned products are still under development and require additional, significant testing and research.  EnerFuel, Inc., a Delaware corporation, located in West Palm Beach, Florida, is working on developing a hydrogen fuel cell range extender for PEVs[9] and has

---

[9]    "PEV" refers to plug-in hybrid vehicles, which use both an electric motor powered by electricity supplied by externally charged batteries and a gasoline powered internal combustion engine.

US_ACTIVE-107697579.42

created a high temperature fuel cell stack which was incorporated into an EV based on the Scion xB platform.  Other planned products are in early stages of development and completion of prototypes will require additional time, effort and funding.

The Debtor, through its subsidiaries, TVG Saehan Holdings and TVG SEI Holdings, owns 94% of Ener1 Korea, Inc. ("Ener1 Korea"), a South Korean based manufacturer of flat or prismatic batteries that are used in EnerDel's battery packs.  Ener1 Korea supplies EnerDel with battery cells, based on EnerDel's design of lithium-ion batteries.  Ener1 Korea operates a 145,000 square foot lithium-ion battery manufacturing plant and production equipment in South Korea.

In 2005, EnerDel began working on the development of lithium titanate ("LTO") based chemistry for HEV batteries under a program sponsored by the United States Advanced Battery Consortium LLC ("USABC"), whose members are Chrysler Group LLC, Ford Motor Company and General Motors, with funding provided by the U.S. Department of Energy ("DOE").  EnerDel is also developing an LTO battery to be used in PEVs, utilizing a different cathode material, under an award from the DOE which is being managed by the USABC.

In early 2007, independent test results confirmed the efficacy of the Debtor's LTO battery design, due to its high power capability, high C rate,[7] and its performance in cold temperatures.  The C rate and cold temperature characteristics are particularly advantageous for HEVs, whereas PEVs and electric vehicles ("EVs") require higher energy density to provide longer lasting energy.  As a result of these positive test results, in June 2007, EnerDel began to commercialize the designs, and develop and enhance the Indiana production facilities of its EnerDel subsidiary.

---

[7]    C rate is a measure of the rate at which a battery is discharged relative to its maximum capacity.

US_ACTIVE-107697579.42

The Debtor places particular importance on its strategic relationships with foreign companies, which enable the Debtor to build upon existing technology and manufacturing platforms. Relationships in research, development, and manufacturing include ITOCHU, Wanxiang EV Co. Ltd. ("Wanxiang EV"), and JSC Mobile GTES ("MGTES").

### 1. Itochu Corporation

ITOCHU, one of the largest Japanese trading companies, is involved in the import/export and overseas trading of various products, including textile, information and communications technology, machinery, energy, metals, minerals, chemicals, forest products, general merchandise, food, construction, realty, finance, insurance, and logistics services, as well as business investment in Japan and overseas. ITOCHU is a long-term strategic partner and seed investor in the Debtor. In addition to being the Debtor's sales and marketing partner in Asia, ITOCHU is also the largest global reseller of manufacturing equipment for lithium-ion battery production, providing EnerDel with access to specialized equipment and material markets. As of the Petition Date, the Debtor had outstanding unsecured debt obligations consisting of approximately $10.3 million in 6.0% Senior Convertible Notes held by ITOCHU.

### 2. Wanxiang EV Co. Ltd.

In January 2011, the Debtor and Wanxiang EV, which operates the EV division of the Chinese automotive manufacturer Wanxiang Group, entered into a Sino-Foreign Joint Venture Contract (the "Joint Venture Agreement"). Under the Joint Venture Agreement, the parties have formed Zhejiang Wanxiang Ener1 Power Systems Co., Ltd. (the "Wanxiang JV"), a Sino-foreign equity joint venture existing as a limited liability company under the laws of the People's Republic of China, to design, manufacture, sell, and service lithium-ion battery cells and lithium-ion battery packs, primarily in China, Hong Kong, Taiwan, and Macau.

US_ACTIVE-107697579.42

The Joint Venture Agreement provides that Wanxiang EV will contribute $72 million and own 60% of the equity of the joint venture and the Debtor would contribute $48 million and own 40% of the equity of the joint venture.  The Joint Venture Agreement permits the initial ownership percentages to be changed based on future equity contributions made by the parties or by any new investor in the joint venture.  However, under the Joint Venture Agreement, Wanxiang EV must maintain a minimum 51% equity stake in the joint venture.

The Debtor was unable to make its initial contribution of $24 million when it was required to do so in October, 2011.  Thereafter, the Debtor entered into negotiations with Wanxiang International Investment Corporation ("Wanxiang International"), an affiliate of Wanxiang EV, and Bzinfin regarding financing for the Debtor's equity contributions under the Joint Venture Agreement.

On December 30, 2011, the Debtor accepted a Loan Commitment from Wanxiang International, an affiliate of Wangxiang EV.  Pursuant to the Loan Commitment, Wanxiang International agreed to provide the Debtor with a $40 million term loan in two installments of $20 million each, with the first loan installment to be paid upon receipt of a floating rate secured note (the "Note" and together with the Loan Commitment, the "Wanxiang International Loan Agreement"), and the second loan installment to be paid on a future date as set by the board of directors of the Wangxiang JV.  Each loan installment will mature on the fourth anniversary of the date on which Wanxiang International advances the proceeds of each such loan installment, and will bear interest at a floating rate determined on the first business day of each month equal to the prime rate plus 5% per annum; provided that the applicable interest rate will not be less than 9%.  The Debtor's obligations under the Wanxiang International Loan Agreement will be non-recourse as to the principal amount of each loan installment (but not interest and other

US_ACTIVE-107697579.42

charges under Wanxiang International Loan Agreement) but are secured by the Debtor's equity interests in Wangxiang JV.

The Wanxiang International Loan Agreement was conditioned upon the Debtor placing the balance of its initial contribution (*i.e.*, $4 million of the total $24 million contribution) in escrow with counsel for Wanxiang EV, the Chicago law firm of Barack Ferrazzano Kirschbaum & Nagelberg LLP ("Barack Ferrazzano").  On December 30, 2011, the Debtor paid $4 million to Barack Ferrazzano, which it is currently holding pursuant to an Escrow Agreement, dated December 30, 2011, among the Debtor, Wanxiang International, and Barack Ferrazzano, as escrow agent.  The $4 million payment paid into escrow (the "Escrow Funds") was funded, in part, with the proceeds of the second amendment to the Bridge Loan Agreement.   Pursuant to the terms of the Escrow Agreement, upon the Effective Date of the Plan, the Escrow Funds will be released to the Joint Venture and Wanxiang will fund the loan commitment.  In the event that the Plan is not confirmed, the Escrow Funds will be released to Wanxiang EV as a termination payment and the Joint Venture Agreement will be terminated.

### 3.    JSC Mobile GTES

In November 2010, the Debtor signed a $40 million energy storage supply contract with MGTES, a wholly-owned subsidiary of the Russian Federal Grid Company.  Under this contract, the Debtor will provide backup storage systems for sites in St. Petersburg and Sochi, official sites of the XXII Winter Olympic Games in 2014.

As part of the subsequent and larger phase in this alliance, in June 2011, the Debtor and MGTES signed a strategic framework agreement that contemplates the manufacture of lithium-ion based uninterruptible power supply systems as part of a five-year engineering and framework agreement.  The proposed systems, which the companies anticipate will have an initial total

US_ACTIVE-107697579.42

capacity of 27.8 megawatts, will provide back-up power for internal substation needs for one hour, including switchgear, lighting, communications, and other needs.

### D.    Federal Government Contracts and Grants

The Debtor's subsidiary, EnerDel, has participated in both development contracts with, and grants from, agencies of the federal government.  Since EnerDel will not be a party to the bankruptcy case to be commenced by the Debtor, it is not anticipated that these government contracts and grant agreements will be directly affected by the proposed reorganization or confirmation of the Plan, although EnerDel is contractually obligated pursuant to certain of these contracts and grant agreements to keep the governmental counterparties informed about the Debtor's reorganization and progress in connection with any bankruptcy case that may be commenced.

### 1.    Development Contracts

EnerDel is currently working to complete three Defense Logistics Agency ("DLA") funded release programs.  DLA is the Department of Defense's largest logistics combat support agency, providing worldwide logistics support.  The programs include two UAV battery material programs and a Phase II award for further development of an asset tracking battery system. EnerDel anticipates submitting a final report on each of the programs by the end of January 2012.

In 2009, EnerDel was awarded $1.3 million in funding from the Tank Automotive Research Development Engineering Center for development and delivery of battery systems designed for a research platform version of the High Mobility Multi-Purpose Wheeled Vehicle, the XM-1124.  EnerDel has delivered three of the four requisite hardware deliverables, and expects to deliver the final hardware and the submission of a final report during 2012.

US_ACTIVE-107697579.42

Also in 2009, EnerDel began work on a $6.6 million, three year cooperative development agreement with the DOE and Argonne National Laboratory for a redox shuttle electrolyte additive.  Additional work has been included in this project with a completion date set for the end of the first quarter in 2013.  Redox shuttle electrolyte additives are used to prevent battery overcharging and could simplify cell overcharge protection circuitry.

2.    Electric Drive Vehicle Battery and Component Manufacturing Initiative

On January 29, 2010, the DOE awarded EnerDel a grant of $118.5 million to help finance EnerDel's United States battery plant capacity expansion under the Electric Drive Vehicle Battery and Component Manufacturing Initiative (the "EV Battery Initiative").  The EV Battery Initiative provides grants to support the construction of U.S. based battery manufacturing infrastructure for lithium-ion and other advanced batteries to be used in EVs.  The goal of this initiative is to create a domestic battery manufacturing capability to support the implementation of new HEVs and EVs.

Under this grant, the Debtor's EnerDel subsidiary can be reimbursed for up to one-half of its investment in battery manufacturing infrastructure.  Through September 23, 2011, EnerDel had received aggregate reimbursements from the DOE under these terms of $54,964,322.00, which represents a portion of EnerDel's investment in manufacturing engineering, building improvements, manufacturing equipment, and application engineering expenditures.

**E.    State Initiatives**

Indiana state and local government authorities have provided EnerDel with grants and tax offsets which allowed EnerDel to purchase equipment, expand its operations, and create jobs in Indiana.

US_ACTIVE-107697579.42

## F.    Intense Competition

A series of events and various market factors led to the intended commencement of the Chapter 11 Case.  The market for advanced rechargeable batteries is at a relatively early stage of development.  Competition in the battery industry has been, and is expected to remain, intense. This competition ranges from development stage companies to major Fortune 500 domestic and international companies, many of which have significant financial, technical, marketing, sales, manufacturing, distribution, and other resources.  Toyota, the industry leader in the production of HEVs, and other battery manufacturers, such as NEC Corporation, Johnson Controls, A123 Systems, Hitachi, and Compact Power have significant development programs for lithium-ion batteries for automotive manufacturers.  There are also battery developers in China and Korea, such as LG Chem, which generally have a lower cost manufacturing base than other manufacturers due to low labor costs, lower raw materials cost, and increased use of automatic manufacturing processes.

The Debtor's business plan has been premised upon consumers adopting the use of EVs, which would in turn increase the demand for lithium-ion batteries.  The demand for EVs, however, did not develop as quickly as anticipated, which in turn harmed the Debtor's business, operating results, financial condition, and prospects.  In addition, the volatility in the debt and equity markets adversely affected the Debtor's ability to procure future financing, which further harmed the Debtor.

## G.    Think Global and Think Holdings

The Debtor's prospects were further eroded as a result of the insolvency of Think Holdings AS ("Think Holdings"), a Norwegian limited liability company, and the resulting demise of EnerDel operating subsidiary, Think Global, an electric car company located in Oslo,

US_ACTIVE-107697579.42

Norway, which manufactured cars under the TH!NK brand.  Think Global stopped producing vehicles in March 2011 and Think Holdings filed for bankruptcy in Norway on June 22, 2011.

Think Global was a major customer of the Debtor's operating subsidiaries.  In addition to the loss of business, the bankruptcy resulted in the write-off of the Debtor's investment in Think Holdings.  In 2007, EnerDel began developing a lithium-ion battery pack designed specifically for the "Think City" EV.  Think Global refinanced its operations in August 2009 after reorganizing under Norwegian law.  In September 2009, EnerDel and Think Global amended their 2007 supply agreement which provided EnerDel with, among other rights, an exclusive right to supply battery packs for a certain period of time and a right of first refusal if Think Global sought to purchase batteries from other battery suppliers.  In May 2010, EnerDel commenced commercial production and shipment of lithium-ion battery packs for the Think City EV.  During 2010, EnerDel shipped over 1,000 battery packs to Think Global.

During 2009 and 2010, the Debtor also made investments in Think Holdings, including acquiring shares of Series B Convertible Preferred Stock and extending credit to Think Holdings through a line of credit and short-term working capital loans.

However, in January 2011, after demand for Think EVs did not meet expectations, Think Global directed EnerDel to temporarily stop supplying battery packs.  As of March 31, 2011, the Debtor controlled approximately 48% of the outstanding voting power in Think Holdings.  On May 9, 2011, the Debtor surrendered to Think Holdings, for no consideration, all shares of Think Holdings' voting equity held by the Debtor, including, without limitation, all shares of Series B Convertible Preferred Stock based on the determination that its investment in Think Holdings was impaired and written down to zero.

US_ACTIVE-107697579.42

## H.    Restatement of Financial Statements

On June 22, 2011, the Debtor concluded that a material charge was required under generally accepted accounting principles related to the loans receivable of Think Holdings and accounts receivable of Think Global, which impeded the Debtor's ability to attract additional financing.  The Debtor concluded a material charge was required based on Think Global's announcement that, following an extended and ultimately unsuccessful search for long-term financing, it would file bankruptcy proceedings in the Norwegian courts on June 22, 2011.  The Debtor estimated that the amount of the charge was $35.4 million.

On August 9, 2011, the Debtor reported that it needed additional time to assess certain accounting matters related to the material charge as to the loans receivable of Think Holdings and accounts receivable of Think Global, and the impairment charge to write off its investment in Think Holdings, including the timing of the recognition of the material charge and impairment charge.  The Debtor delayed filing its quarterly report for the quarter ended June 30, 2011.

On August 10, 2011, the Debtor determined that its financial statements for the year ended December 31, 2010 and for the quarterly period ended March 31, 2011 should no longer be relied upon and should be restated.  Specifically, the Debtor concluded that it was necessary to amend its Annual Report on Form 10-K for the year ended December 31, 2010 and its Quarterly Report on Form 10-Q for the quarter ended March 31, 2011 in order to restate its financial statements to (a) reflect as of December 31, 2010 the impairments of (i) the Debtor's investment in Think Holdings (which had previously been recorded in the first quarter of 2011), (ii) the Debtor's  accounts receivable with Think Global, and (iii) the Debtor's loans receivable with Think Holdings, including accrued interest, (b) reflect the corrected accounting for revenue recognized in connection with transactions with Think Holdings and Think Global during the year ended December 31, 2010 and the three months ended March 31, 2011, (c) reflect the

US_ACTIVE-107697579.42

impact these adjustments have on the fair value of financial instruments, and (d) adjust the elimination of certain intercompany receivables.  The Debtor concluded that these adjustments were the result of one or more material weaknesses in internal controls over financial reporting.

## I.    Shareholder Class Actions

The Debtor's problems were further exacerbated when on August 18, 2011, two putative class action lawsuits were filed against the Debtor and certain of its officers and directors in the United States District Court for the Southern District of New York (*Beckman v. Ener1, Inc. et al.*, No. 11-CV-5794 (S.D.N.Y.); and *Neufeld v. Ener1, Inc.*, et al., No. 11-CV-5795 (S.D.N.Y.)). On August 26, 2011, a third putative class action lawsuit was filed against the same defendants in the United States District Court for the Southern District of New York (Foster v. Ener1, Inc., et al., No. 11-CV-6040 (S.D.N.Y.)).  Pursuant to section 510(b) of the Bankruptcy Code, the claims asserted in each of these litigations, which seek damages arising from the purchase or sale of securities, are subordinated and treated as common stock  and therefore are not entitled to any recovery.

The complaints in each of these actions seek damages on behalf of persons who purchased Ener1 securities between January 10, 2011 and August 15, 2011.  The complaints assert claims under the Securities Exchange Act of 1934 for alleged material misrepresentations and omissions in the Debtor's public disclosures during the putative class period, and in particular disclosures relating to the Debtor's loans to, and receivables with, Think Holdings.  On October 17, 2011, three competing motions for appointment of lead plaintiff were filed.  Each of the proposed lead plaintiff groups has also requested that the three lawsuits be consolidated.

## J.    Delisting of Common Stock

On October 19, 2011, the Debtor received a Staff Determination Letter from NASDAQ indicating that the Debtor did not comply with NASDAQ's filing requirements for continued

US_ACTIVE-107697579.42

listing as set forth in Listing Rules 5250(c)(1) (regarding timely filing of periodic financial reports with the Securities and Exchange Commission) because the Debtor had failed to file its quarterly report for the period ended June 30, 2011 on a timely basis, and had failed to submit a plan to NASDAQ to regain compliance.

On October 28, 2011, the trading of the Debtor's common stock was suspended, and a Form 25-NSE was subsequently filed with the SEC to remove the common stock from listing and registration on NASDAQ. Effective at the opening of the trading session on December 12, 2011, NASDAQ removed the Debtor's common stock from listing.

### K.    Plan Support Agreement and DIP Facility

During the Fall of 2011, the Debtor experienced a lack of liquidity that left it unable to service its existing debt obligations and properly fund the operations of its subsidiaries. The capital markets and traditional lending sources were not available due to the absence of current financial statements. While the Debtor pursued other options, including the possibility of selling assets or attracting capital from strategic investors, the Debtor initiated a restructuring process that focused on reduction of costs, changes in management personnel, the development of a long-range business plan and the engagement of professionals with experience in business reorganizations.

As part of this restructuring process, the Debtor initiated negotiations with the holders of the Senior Notes, Bzinfin, and ITOCHU regarding restructuring its debt obligations and obtaining additional financing.[10] After several months of discussions and negotiations, on

---

[10]    During the course of these discussions and negotiations, Mike Zoi, the beneficial owner of approximately 9% of the Debtor's stock, contacted the Debtor. In a letter dated January 4, 2012, but delivered on January 7, 2012, Mr. Zoi requested that the Debtor's Board submit a proposal for his acquisition of an interest in Ener1 that would result in his "holding a majority controlling ownership stake for an amount that is fair value to Ener1 and that will provide sufficient financing for Ener1 to avoid being forced to file for Chapter 11 protection." The letter did not

Continued on following page

US_ACTIVE-107697579.42

January 26, 2012, the Plan Support Parties entered into the Plan Support Agreement.  The Plan

Support Agreement provides for the consensual financial restructuring of the Debtor on the terms

and conditions set forth in the Plan.

The Plan Support Agreement also provides that Bzinfin would provide a DIP Facility for

general working capital and operational expenses.  The DIP Facility is subject to Bankruptcy

Court approval, which the Debtor will seek immediately upon the filing of the Chapter 11 Case.

The proceeds of the loans under the DIP Facility are to be used by the Debtor for the limited

purposes of (i) paying all reasonable fees and costs of the DIP Lenders incurred in connection

with the DIP Credit Facility, the Case and the enforcement of any rights or remedies under the

DIP Loan Documents, as more fully set forth in the DIP Loan Agreement; (ii) repaying the Pre-

Petition Obligations; and (iii) for general working capital and operational expenses, in

accordance with the thirteen week budget.

---

Continued from previous page

make any proposal nor offer with respect to any such hypothetical investment.  Upon receipt of the letter, the Debtor
prepared a non-disclosure and confidentiality agreement which it e-mailed to Mr. Zoi on January 11, 2012.  Having
no response, the Debtor sent the agreement to Mr. Zoi by overnight delivery on January 12, 2012.  On January 16,
2012, counsel for Mr. Zoi telephoned the Debtor to discuss generally the possibly of entering into the proposed
agreement in order to facilitate discussions regarding any possible investment by Mr. Zoi.  Following this
conversation, the Debtor has not had further communications from Mr. Zoi or his counsel.  On Friday, January 20,
2012, the Debtor wrote to Mr. Zoi's counsel to inquire whether Mr. Zoi had any interest in entering into the
confidentiality agreement and pursuing discussions.  To date, Mr. Zoi has not responded to the Debtor nor otherwise
attempted to pursue any transaction.

US_ACTIVE-107697579.42

## V.    SUMMARY OF THE PLAN

### A.    <u>Overview of Chapter 11</u>

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and interest holders.  Another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against, and interests in, a debtor.  Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person or entity acquiring property under the plan and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (i) is impaired under the plan, (ii) has voted to accept the plan or (ii) receives or retains any property under the plan.  Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

A Chapter 11 plan may specify that the legal, contractual and equitable rights of the holders of claims or interests in classes are to remain unaltered by the reorganization effectuated

US_ACTIVE-107697579.42

by the plan.  Such classes are referred to as "unimpaired" and, because of such favorable treatment, creditors holding such claims are deemed to accept the plan.  Accordingly, it is not necessary to solicit votes from the holders of claims or equity interests in such classes.  A Chapter 11 plan also may specify that certain classes will not receive any distribution of property or retain any claim against a debtor.  Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan.  Any classes that are receiving a distribution of property under the plan but are not "unimpaired" will be solicited to vote to accept or reject the plan.

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and equity interest holders.  In compliance therewith, the Plan divides Claims and Interests into various Classes and sets forth the treatment for each Class.  The Debtor is also required under Section 1122 of the Bankruptcy Code to classify Claims and Interests into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Classes.  The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code.

The Debtor (and its agents, directors, officers, advisors and attorneys) has, and upon confirmation of the Plan will be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the securities under the Plan, and therefore are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

US_ACTIVE-107697579.42

ARTICLES VII, VIII, IX, AND X HEREOF PROVIDE A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS TO AND DEFINITIONS IN THE PLAN).

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO IN THE PLAN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO IN THE PLAN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS INCORPORATED INTO THE PLAN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR, THE DEBTOR'S ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER

US_ACTIVE-107697579.42

OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

### B.    Purpose of the Plan

The Plan provides for an infusion of equity into the Debtor and a reorganization of the Debtor's debts.  The Debtor believes that the Plan provides the best and most prompt possible recovery to Creditors.

If the Plan is confirmed by the Bankruptcy Court, on the Effective Date or as soon as practicable thereafter, the Debtor will utilize the proceeds to make distributions in respect of certain Classes as provided in the Plan.  The Classes of Claims against, and Interests in, the Debtor created under the Plan, the treatment of those Classes under the Plan, and distributions to be made under the Plan are described below.

## VI.    CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

### A.    Unclassified Claims

Article 2 of the Plan provides, in accordance with Section 1123(a)(1) of the Bankruptcy Code, that DIP Claims, Administrative Claims, Intercompany Claims, Statutory Fees, Professional Claims, and certain other priority Claims, are not classified and thus are excluded from the Classes of Claims set forth in Article 3 of the Plan.  The treatment of these Claims is described in Article VIII below.

### B.    Classified Claims and Interests

#### 1.    General

Pursuant to Section 1122 of the Bankruptcy Code, Article 3 of the Plan designates Classes of Claims and Interests in the Debtor.  A Claim or Interest is placed in a particular Class only to the extent that such Claim or Interest falls within the description of that Class.  A Claim is also placed in a particular Class for purposes of receiving a distribution under the Plan, but

- 45 -

US_ACTIVE-107697579.42

only to the extent such Claim is an Allowed Claim or Interest and has not been paid, released, or

otherwise settled prior to the Effective Date.  Except as otherwise expressly set forth in the Plan,

a Claim which is not an Allowed Claim shall not receive any payments, rights or distributions

under the Plan.

2.    <u>Classification</u>

The Plan classified Claims against and Interests in the Debtor as follows:

        a.    Class 1:  Priority Non-Tax Claims.  Class 1 shall consist of all Priority Non-Tax Claims.

        b.    Class 2:  Bridge Loan Claims.  Class 2 shall consist of all Bridge Loan Claims.

        c.    Class 3:  Senior Note Claims.  Class 3 shall consist of all Senior Note Claims.

        d.    Class 4:  Convertible Note Claims.  Class 4 shall consist of all Convertible Note Claims.

        e.    Class 5:  Line of Credit Claims.  Class 5 shall consist of all Line of Credit Claims.

        f.    Class 6:  General Unsecured Claims.  Class 6 shall consist of all General Unsecured Claims.

        g.    Class 7:  Interests.  Class 7 shall consist of all Interests.

**C.    <u>Identification of Classes Impaired and Not Impaired by the Plan</u>**

1.    <u>Voting Classes: Classes of Claims Entitled to Vote</u>

Article 4 of the Plan identifies the following Classes as Impaired by the Plan and holders

of Claims in each of these Classes are entitled to vote to accept or reject the Plan:

Class 3 (Senior Note Claims)

Class 4 (Convertible Note Claims)

Class 5 (Line of Credit Claims)

US_ACTIVE-107697579.42

2.     Unimpaired Classes of Claims and Interests Not Entitled to Vote

Section 4.2 of the Plan identifies the following Classes as not Impaired by the Plan and holders

of Claims in this Class are not entitled to vote to accept or reject the Plan:

Class 1 (Priority Non-Tax Claims)

Class 2 (Bridge Loan Claims)

Class 6 (General Unsecured Claims)

Pursuant to Section 1126(f) of the Bankruptcy Code, Classes 1, 2, and 6 are deemed to have

accepted the Plan and these Classes will not be solicited.

3.     Impaired Classes of Claims or Interests Deemed to Reject the Plan and
       Not Entitled to Vote

Section 4.3 of the Plan provides that holders of Interests in Class 7 (Interests) will not

receive any distribution nor retain any property under the Plan on account of such Interests and,

pursuant to Section 1126(g) of the Bankruptcy Code, are conclusively deemed to reject the Plan.

Accordingly, the Debtor will not solicit acceptance or rejections of the Plan from holders of

Interests in Class 7 and will seek to confirm the Plan notwithstanding the deemed rejection of

such Class.

## VII.    TREATMENT OF CLAIMS AND INTERESTS

Other than as specifically set forth herein, the treatment of and consideration to be

received by holders of Claims pursuant to the Plan shall be in full satisfaction, settlement, release

and discharge of such holder's respective Claim.

### A.    **Unclassified Claims**

1.     DIP Claims

The DIP Facility will terminate and all obligations thereunder will be due and payable in

full on the Effective Date.    The principal amount due under the DIP Facility will be fully

- 47 -

satisfied with shares of New Preferred Stock having an aggregate liquidation preference equal to the principal amount due under the DIP Facility.  All other obligations under the DIP Facility, including accrued and unpaid interest and default interest, if any, shall be paid either in Cash on the Effective Date or upon such other terms as may be agreed to by the Debtor and the DIP Lenders; provided, however, that the Requisite Consenting Lenders consent to any such other terms.

2.    Administrative Claims

On the Effective Date or as soon thereafter as is practicable, each holder of an Allowed Administrative Claim shall receive on account of such Allowed Administrative Claim and in full satisfaction, settlement and release of and in exchange for such Allowed Administrative Claim, (i) Cash equal to the unpaid portion of such Allowed Administrative Claim, or (ii) such other treatment as to which the Debtor and the holder of such Allowed Administrative Claim have agreed upon in writing, provided, however, that Administrative Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Chapter 11 Case shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreement or course of dealing relating thereto (or such other treatment as to which the Debtor and the holder of such Allowed Administrative Claim have agreed) and Professional Claims shall be paid in accordance with section 2.4 of the Plan.

3.    Statutory Fees

On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid in full, in Cash.

4.    Professional Claims

All Professionals seeking compensation for services rendered or reimbursement of expenses in connection with a Professional Claim, other than professionals retained in the

US_ACTIVE-107697579.42

ordinary course of business, shall (i) file, on or before the date that is ninety (90) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) receive payment in full, in Cash, of any unpaid portion as soon as practicable after Bankruptcy Court approval thereof. Professionals retained by the Debtor in the ordinary course of business that are not required to submit applications for reimbursement shall be paid in accordance with section 2.1 hereof.

> 5. <u>Priority Tax Claims</u>

Except to the extent that a holder of an Allowed Priority Tax Claim against the Debtor agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall, in full satisfaction, release, and discharge of such Allowed Priority Tax Claim: (i) to the extent such Claim is due and owing on the Effective Date, be paid in full, in Cash, on the Effective Date; (ii) to the extent such Claim is not due and owing on the Effective Date, be paid in full, in Cash, in accordance with the terms of any agreement between the Debtor and such holder, or as may be due and owing under applicable non-bankruptcy law, or in the ordinary course of business; or (iii) be treated on such other terms and conditions as are acceptable to the Debtor and the holder of such Claim.

> **B.    Classified Claims**

The following Classes of Claims and Interests shall be treated as follows, in full settlement, discharge, release and satisfaction of their Claims against, or Interests in, the Debtor:

> 1. <u>Class 1 (Priority Non-Tax Claims)</u>.

With respect to each Allowed Priority Non-Tax Claim, on the Effective Date or as soon thereafter as is reasonably practicable, the holder of an Allowed Priority Non-Tax Claim shall receive, (i) Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim, or

US_ACTIVE-107697579.42

(ii) such other treatment as to which the Debtor and the holder of such Allowed Priority Non-Tax Claim have agreed upon in writing.

2.    Class 2 (Bridge Loan Claims)

The Bridge Loan Claims shall be repaid in full (including principal, accrued prepetition and postpetition interest through the date of payment, and all other amounts due under the Bridge Loan Documents) by the Debtor as an initial draw under the DIP Facility, subject to approval of the Bankruptcy Court.  If the Bridge Loan Claims are outstanding on the Effective Date, such Claims shall be paid in full (including principal, accrued prepetition and postpetition interest through the date of payment, any adequate protection payments required in connection therewith and all other amounts due under the Bridge Loan Documents) in cash on the Effective Date and upon such payment the Liens granted to the Bridge Lenders pursuant to the Bridge Loan Documents shall terminate and be deemed released.

3.    Class 3 (Senior Note Claims)

Each holder of a Senior Note Claim will receive its *pro rata* allocation of:

(i)    On the Effective Date, (a) Cash in the amount of $2,717,708.76, (b) New Notes with a principal amount equal to (1) 75% of the principal amount of the Senior Notes (plus accrued interest through the Effective Date) minus (2) $8,153,126.28, and (c) a number of shares of New Common Stock equal to 10,000,000 multiplied by the quotient of the Senior Note Claims New Common Stock Amount divided by the Total New Common Stock Calculation Amount;

(ii)    On the date that is four months after the Effective Date, Cash in the amount of $2,717,708.76, together with interest thereon accruing from the Effective Date through the date of payment at the interest rate of 7 percent per annum to be paid in Cash; and

(iii)    On the date that is eight months after the Effective Date, Cash in the amount of $2,717,708.76, together with interest thereon accruing from the Effective Date through the date of payment at the interest rate of 7 percent per annum to be paid in Cash.

4.    Class 4 (Convertible Note Claims)

US_ACTIVE-107697579.42

Each holder of a Convertible Note Claim will receive its *pro rata* allocation of:

(i)     On the Effective Date (a) Cash in the amount of $448,957.91 and (b) a number of shares of New Common Stock equal to 10,000,000 multiplied by the quotient of the Convertible Note Claims New Common Stock Amount divided by the Total New Common Stock Calculation Amount;

(ii)    On the date that is four months after the Effective Date, Cash in the amount of $448,957.91, together with interest thereon accruing from the Effective Date through the date of payment at the interest rate of 7 percent per annum to be paid in Cash; and

(iii)   On the date that is eight months after the Effective Date, Cash in the amount of $448,957.91, together with interest thereon accruing from the Effective Date through the date of payment at the interest rate of 7 percent per annum to be paid in Cash.

5.      Class 5 (Line of Credit Claims)

On the Effective Date, each holder of a Line of Credit Claim will receive its pro rata allocation of a number of shares of New Common Stock equal to 10,000,000 multiplied by the quotient of the Line of Credit Claims New Common Stock Amount divided by the Total New Common Stock Calculation Amount.

6.      Class 6 (General Unsecured Claims)

Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment or has been paid prior to the Effective Date, each Allowed General Unsecured Claim in Class 6 (General Unsecured Claims) shall be paid in full in Cash on the Effective Date, or, otherwise rendered Unimpaired. Without limiting the generality of the foregoing, if a General Unsecured Claim arises (i) based on liabilities incurred in, or to be paid in, the ordinary course of business or (ii) pursuant to an executory contract or unexpired lease that has not been rejected, the holder of such General Unsecured Claim shall be paid in Cash pursuant to the terms and conditions of the particular transaction and/or agreement giving rise to such General Unsecured Claim. Notwithstanding the provisions of section 5.6 of the Plan, the Debtor reserves the right to dispute in the Bankruptcy Court, or any other court with jurisdiction,

- 51 -

US_ACTIVE-107697579.42

the validity of any General Unsecured Claim at any time prior to the date fixed pursuant to section 8.2 of the Plan.  On the Effective Date, any guarantees of the Debtor and Intercompany Claims will be reinstated in accordance with their terms and shall not be discharged, satisfied nor released.  After the Effective Date, Intercompany Claims shall be treated in the ordinary course of business or eliminated in the ordinary course of business.

> 7.    Class 7 (Interests)

All Interests shall be cancelled and extinguished on the Effective Date and the holders of Interests shall not receive or retain any property on account of such Interests.

## VIII.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Contracts and Leases

Except as otherwise provided for in the Plan, as of the Effective Date, the Debtor shall be deemed to have assumed each executory contract and unexpired lease to which it is a party, unless such contract or lease (i) was previously assumed or rejected by the Debtor, (ii) previously expired or terminated under its own terms prior to the Effective Date, (iii) is the subject of a motion to reject filed by the Debtor on or before the Confirmation Date or (iv) is identified as being rejected in Schedule 2 to the Plan, as it may be amended or supplemented prior to the Confirmation Hearing.

Unless otherwise specified, each executory contract and unexpired lease to be rejected shall include any and all modifications, amendments, supplements, restatements or other agreements made directly or indirectly by any agreement, instrument or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Schedule 2 to the Plan.  Nothing in the terms of the Plan shall constitute an admission by any Debtor that a contract or lease is an executory contract or unexpired lease or that any Debtor or its successors and assigns has any

- 52 -

liability thereunder.   The Confirmation Order shall constitute an order of the Bankruptcy Court

pursuant to Section 365 of the Bankruptcy Code approving all such assumptions and rejections

described in Article 6 of the Plan as of the Effective Date.

   1.  <u>Amendments to Schedule 2: Rejected Executory Contracts and Unexpired
Leases</u>

   Except as provided in section of the Plan, the Debtor reserves the right, with the consent

of the Requisite Consenting Lenders, to amend Schedule 2 to the Plan not later than fourteen

(14) days prior to the Confirmation Hearing either to:  (i) delete any executory contract or lease

listed therein and provide for its assumption; or (ii) add any executory contract or lease to

Schedule 2 to the Plan, thus providing for its rejection.  The Debtor shall provide notice of any

such amendment of such Schedule 2 to the Plan to (i) the parties to the executory contract or

lease affected thereby and (ii) the Requisite Consenting Lenders not later than fourteen (14) days

prior to the Confirmation Hearing.

   2.  <u>Cure Payments; Adequate Assurance of Performance</u>

   Any monetary defaults under each executory contract and unexpired lease to be assumed

under the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, in either

of the following ways: (i) by payment of the default amount in Cash, in full on the Effective

Date; or (ii) by payment of the default amount on such other terms as may be agreed to by the

Debtor and the non-Debtor parties to such executory contract or unexpired lease.  In the event of

a dispute regarding (i) the amount or timing of any cure payments, (ii) the ability of the Debtor to

provide adequate assurance of future performance under the contract or lease to be assumed, or

(iii) any other matter pertaining to assumption of the contract or lease to be assumed, an

objection must be Filed and served within the same deadline and in the same manner established

for the Filing and service of objections to Confirmation of the Plan and the Debtor or the

US_ACTIVE-107697579.42

Reorganized Debtor shall pay all required amounts promptly following the later of the entry of a

Final Order resolving the dispute or the Effective Date; provided, however, notwithstanding any

other provision of the Plan, (i) with the written agreement of the counterparty to an executory

contract or unexpired lease or (ii) upon written notice to the counterparty, in each case with the

consent of the Requisite Consenting Lenders, the Debtor or the Reorganized Debtor may add any

executory contract or lease to the list of rejected contracts if the Debtor determines, in its sole

discretion, that it is not in its best interests to assume the executory contract or unexpired lease

considering the cure amount or any other terms of assumption as determined by the Bankruptcy

Court in a Final Order.  Failure to timely assert an objection to (i) the amount or timing of any

cure payments, (ii) the ability of the Debtor to provide adequate assurance of future performance

under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption of

the contract or lease to be assumed shall constitute consent to the proposed assumption and cure

on the terms and conditions provided herein, including an acknowledgement that the proposed

assumption provides adequate assurance of future performance and that any amounts identified

for "cure" is the amount necessary to cover any and all outstanding defaults under the executory

contract or unexpired lease to be assumed, as well as an acknowledgement and agreement that no

other defaults exist under such contract or lease.  Notwithstanding any other provision of the

Plan, (i) with the written agreement of the counterparty to an executory contract or unexpired

lease or (ii) upon written notice to the counterparty, in each case with the consent of the

Requisite Consenting Lenders, the Debtor or the Reorganized Debtor may remove any executory

contract or lease to the list of rejected contracts and provide for its assumption if the Debtor

determines, in its sole discretion, that it is not in its best interests to reject the executory contract

US_ACTIVE-107697579.42

or unexpired lease considering the potential rejection damages Claim or any other terms of rejection as determined by the Bankruptcy Court in a Final Order.

3.    Approval of Rejection; Rejection Damages Claims

Any Rejection Damage Claim must be filed by the applicable Rejection Damage Claim Bar Date.  Any timely filed Rejection Damage Claim, will be a General Unsecured Claim to the extent it is Allowed.   Any Rejection Damage Claim that is not Filed prior to the Rejection Damage Claim Bar Date shall be forever barred from assertion against the Reorganized Debtor, the Debtor, its Estate, or its property or the Holder of such Rejection Damage Claim shall be conclusively deemed to (i) have waived such Rejection Damage Claim and (ii) release the Debtor with respect thereto.   The Rejection Damage Claim Bar Date will be on the thirtieth (30th) day following the later of (i) the Effective Date or (ii) the date on which the Debtor serves a written notice of entry of an order granting a motion to reject that has been entered by the Bankruptcy Court prior to the Confirmation Date in accordance with section 6.1 of the Plan.

## B.    **Indemnification Agreements**

Notwithstanding any other provisions of the Plan with regard to executory contracts, from and after the Effective Date, the obligations of the Debtor or Reorganized Debtor to indemnify any Person who is serving or has served as one of its directors, officers or employees as of the Petition Date by reason of such Person's prior or future service in such a capacity or as a director, officer or employee of any Non-Debtor Affiliates, to the extent provided in the applicable articles or certificates of incorporation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor or Non-Debtor Affiliates, will be deemed and treated as of the Effective Date, as executory contracts that are assumed by the Debtor or Reorganized Debtor pursuant to the Plan and Section 365 of the Bankruptcy Code.  Accordingly, the obligations of the Debtor to defend, indemnify, reimburse,

- 55 -

or limit the liability relating to any claims or obligations against its present and former directors,

officers or employees who served as directors, officers and employees, respectively, on or after

the Petition Date, pursuant to the Debtor's articles of incorporation or bylaws, applicable state

law, or any combination of the foregoing, shall survive confirmation of the Plan, remain

unaffected thereby, and not be discharged, irrespective of whether indemnification, defense,

reimbursement or limitation is owed in connection with an event occurring before, on or after the

Petition Date.

## IX.    MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

### A.    <u>Exit Funding</u>

The Plan provides for the infusion of up to $81 million of new capital to support the

Debtor's business.  This financing will be made available initially in the form of the DIP Facility

to be provided shortly after the filing of the Bankruptcy Case.  The balance of the capital will be

in the form of equity to be provided on and after confirmation pursuant to the terms of the Equity

Commitment Agreement, substantially in the form annexed as Schedule 4 of the Plan.  The

aggregate funding to be provided under the Equity Commitment Agreement will equal up to $81

million minus the outstanding principal balance under the DIP Loan Facility on the Effective

Date.  Funding under the Equity Commitment Agreement will be provided periodically, with the

Bzinfin Contribution being provided over the 24 months following the Effective Date and the

Contribution Balance being provided through 2015.  As explained below, the commitment to

provide this funding is from Bzinfin and (a) Liberty Harbor Special Investments, LLC and

Goldman Sachs Palmetto State Credit Fund, L.P. (collectively, the "<u>GSAM Investors</u>") and (b)

Whitebox Credit Arbitrage Partners, L.P., Pandora Select Partners, L.P., Whitebox Concentrated

Convertible Arbitrage Partners, L.P., Whitebox Multi Strategy Partners, L.P. and Whitebox

US_ACTIVE-107697579.42

Special Opportunities Fund, LP, Series B (the "Whitebox Investors") (collectively with GSAM the "GSAM/Whitebox Investors"), each of whom is a Plan Support Party.

Bzinfin will also provide the Debtor with a senior secured working capital credit facility in an amount of up to $6.9 million for a term of eighteen months beginning in or about July 2012.

On the Effective Date, Bzinfin will contribute to the Debtor the Initial Equity Contribution (as defined in the Equity Commitment Agreement as the initial capital contribution in an amount sufficient to fund the Debtor's capital requirements for (i) the remaining portion, if any, of the month in which the Effective Date occurs and (ii) the first and second months after the Effective Date.) in exchange for which the Debtor will issue to Bzinfin or its designee (subject to compliance with the Stockholders Agreement) shares of Preferred Stock.  Thereafter, on the first Business Day of each of the second calendar month, the third calendar month and the fourth calendar month after the Effective Date (each, a "Funding Date"), Bzinfin will make additional contributions, the amounts of which the Debtor has determined to be sufficient to fund the Debtor's capital requirements for the following calendar month, provided, however, that obligation to fund each contribution is subject to the Debtor's satisfaction of the conditions set forth in section 4(a) of the Equity Commitment Agreement on each applicable Funding Date. The Debtor shall issue additional Preferred Shares in consideration of each such contribution.

Beginning with the fifth (5th) day (if such day is not a Business Day then the next Business Day) of the fourth calendar month after the Effective Date and continuing with the first fifth (5th) day (if such day is not a Business Day then the next Business Day) of each calendar month thereafter until the Termination Date (each, a "Monthly Funding Date"), Bzinfin will contribute further amounts based on the applicable 12-Month Rolling Budget and as requested by the Debtor in an Equity Requisition Certificate duly authorized by the Company's Board of

US_ACTIVE-107697579.42

Directors and delivered to the Equity Contributor on the twenty-fifth (25th) day (if such day is not a Business Day then the next Business Day) of the month immediately preceding the applicable Monthly Funding Date (each, a "Testing Date"). Each Equity Requisition Certificate shall be dated the Testing Date and specify, *inter alia*, the amount of funding requested and the uses of such funds for the immediately following month.  In addition, the Equity Requisition Certificate must include as an attachment a certification from the Debtor's chief financial officer (x) reporting and certifying the Company's Consolidated EBITDA and Working Capital Turnover Ratio (as defined in the Equity Commitment Agreement) for the applicable Test Period and (y) certifying that (i) Consolidated EBITDA for such Test Period is not less than the lesser of (a) eighty percent (80%) of the applicable Consolidated EBITDA Milestone for such Test Period or (b) the applicable Consolidated EBITDA Milestone for such Test Period minus $1,000,000 and (ii) Consolidated Working Capital Turnover Ratio for the Test Period is not more than one hundred twenty percent (120%) of the applicable Working Capital Turnover Ratio Milestone for such Test Period (all as defined in the Equity Commitment Agreement).  Upon acceptance of the monthly request and the Equity Requisition Certificate, Bzinfin will fund the amount requested provided that the conditions set forth in section 4(a) of the Equity Commitment Agreement have been met.  The Debtor will issue additional preferred stock upon receipt of each such funding.

In addition to the foregoing funding, section 9 of the Equity Commitment Agreement commits Bzinfin and the GSAM/Whitebox Investors severally to invest their respective pro rata shares (as described therein) of up to $31 million through the purchase of Preferred Stock from time to time during 2013 through 2015 (the "Additional Commitment Period").  The commitment of the GSAM/Whitebox Investors will remain in effect only if and so long as such GSAM/Whitebox Investors' Term Loans (as defined below) remain outstanding and such

US_ACTIVE-107697579.42

Commitment shall be funded solely as set forth in section 9(c) of the Equity Commitment

Agreement, pursuant to which such amounts shall be funded (a) by Bzinfin, in cash and (b) by

the GSAM/Whitebox Investors, at their election, either in cash or by authorizing the Debtor to

apply amortization payments due to them under the Term Loans (as defined below) against the

applicable amount required to be funded by the Holders.  In addition, GSAM/Whitebox Investors

shall not be obligated to fund during the Commitment Period unless and until Bzinfin has funded

its Maximum Equity Amount under section 2.  Funding during the Commitment Period will be

subject to the same monthly funding dates, testing periods, testing dates, procedures and

conditions that govern the funding by Bzinfin under section 2(c) of the Equity Commitment

Agreement.

The Debtor believes that the amounts committed under the Equity Commitment

Agreement will be sufficient to provide the liquidity required under its business plan for the

period through 2015.

### B.    **Issuance of New Notes**

On the Effective Date, the Senior Notes will be canceled and the holders of the Senior

Note Claims will receive New Notes which will be issued by the Reorganized Debtor pursuant to

the New Notes Loan Agreement.  Plan § 7.2.  Under the New Notes Loan Agreement, which will

be entered on the Effective Date by the Reorganized Debtor, Wilmington Trust, National

Association, as administrative agent and collateral agent ("Agent") and each holder of a Senior

Note Claim (each defined therein as a "Lender") each such Lender will be deemed to have made

a term loan to the Reorganized Debtor in the amount set forth on Appendix A to the New Notes

Loan Agreement (each a "Term Loan").  The Debtor has agreed to secure all of its obligations

under the New Notes Loan Agreement by granting the Agent, liens on substantially all of the

US_ACTIVE-107697579.42

Reorganized Debtor's assets for the benefit of the Lenders.  Certain of the Debtor's subsidiaries

will guarantee the Reorganized Debtor's obligations under the New Notes Loan Agreement and

will grant the Agent liens on certain of the guarantor's assets.

If requested by a Lender two days prior to the Effective Date, the Reorganized Debtor

will deliver a promissory note to evidence such Lender's Term Loan.

Each Term Loan will bear interest at 7% *per annum* on the unpaid principal amount from

the Effective Date through repayment; provided that prior to March 31, 2013 the accrued interest

shall be capitalized with and added to the principal amount of the Term Loan and thereafter it

shall either continue to be capitalized or, to the extent the Reorganized Debtor meets certain ratio

set forth in the New Notes Loan Agreement, the accrued interest will have to be paid in cash.

Upon the occurrence and during the continuance of an event of default (as defined in the New

Notes Loan Agreement), interest will be payable on demand at a rate that is 2% *per annum* in

excess of the interest rate otherwise payable.

The principal amounts of each Term Loan will be repaid in consecutive installments and

at a final maturity in the aggregate amounts set forth in the New Notes Loan Agreement.  Subject

to certain exceptions, all amounts owed with respect to the Term Loans shall be paid in full no

later than the earlier of (a) the sixth anniversary of the Effective Date and (b) the date on which

all Term Loans shall become due and payable in full under the New Notes Loan Agreement,

whether by acceleration or otherwise.  The Reorganized Debtor may prepay any Term Loan in an

aggregate amount of $1 million and integral multiples of $50,000 in excess of that amount.  The

Reorganized Debtor must prepay the Term Loans, subject to the terms and conditions in the New

Notes Loan Agreement, upon the receipt by the Reorganized Debtor or its subsidiaries of any net

proceeds from the sale of assets, net proceeds from a casualty insurance policy, or cash proceeds

US_ACTIVE-107697579.42

from the incurrence of any indebtedness, or the occurrence of a change in control, as is more completely specified in the New Notes Loan Agreement.  The New Notes Loan Agreement also contains additional terms, conditions and covenants, including a liquidity covenant, some of which are typical Of this type of secured notes and others of which have been specifically negotiated between the company and the holders of the Senior Note Claims.

<b>C.    <u>Issuance of New Common Stock and New Preferred Stock</u></b>

On the Effective Date, all authorized or issued Interests in the Debtor will be canceled and extinguished, and the holders of the Interest will not retain any rights thereunder,  Plan §7.3.

Also on the Effective Date, the Reorganized Debtor will issue the New Common Stock and the New Preferred Stock.  The Amended and Restated Articles of Incorporation (the "<u>Articles of Incorporation</u>") will provide that after the Effective Date, the Debtor will have the authority to issue (i) shares of common stock, par value $0.01 per share ("<u>Common Stock</u>"), and (ii) shares of preferred stock, par value $0.01 per share ("<u>Preferred Stock</u>") with the conversion rights and liquidation preferences set forth in the Articles of Incorporation.  Each holder of Common Stock will have one vote in respect of each share of common stock.

Upon the issuance of the New Common Stock and the New Preferred Stock, each holder of a Claim who accepts delivery of such shares of New Common Stock or New Preferred Stock (each, a "<u>Stockholder</u>") will be deemed to have consented and agreed to the terms of, and will thereby be deemed to have become a party to, the Stockholders Agreement and the Registration Rights Agreement regardless of whether such party actually executes the Stockholders Agreement or the Registration Rights Agreement.  Plan §7.3.

Pursuant to the Stockholders Agreement, ITOCHU shall have the right to appoint one member of the Board of Directors (the "<u>Board</u>") of the Reorganized Debtor, so long as ITOCHU beneficially owns at least two-thirds of the shares of New Common Stock issued to ITOCHU on

- 61 -

the Effective Date.  The GSAM Investors shall not have the right to appoint any members of the Board, but shall have the right to designate an individual to attend all meetings of the Board in a non-voting observer capacity.

The Stockholders Agreement will provide that no Stockholder may transfer any stock beneficially owned by such Stockholder except in compliance with the provisions of the Stockholders Agreement.

In addition, so long as the GSAM Investors beneficially own, in the aggregate, at least two-thirds of the shares of the New Common Stock issued on the Effective Date (including any Drag Along Shares and Call Shares sold by them) and Bzinfin, either (i) solely in its capacity as a holder of shares of New Preferred Stock, has the right to appoint a majority of the Board or (ii) beneficially owns, in the aggregate, at least 35% of the shares of New Preferred Stock beneficially owned by Bzinfin on the Effective Date, the Reorganized Debtor may not, among other things, without prior consent of the GSAM Investors: enter into Related Party Transactions (as defined therein), except as provided for section 11.01 of the Stockholders Agreemen; alter or change the rights, preferences or privileges of the shares of the New Preferred Stock, including by amendment to the Articles of Incorporation, or by merger, consolidation or otherwise; increase or decrease the number of authorized shares of New Common Stock or New Preferred Stock; create (by reclassification or otherwise) any new class or series of stock; amend the Articles of Incorporation; or redeem or repurchase or take any action that results in the redemption or repurchase of, any shares of New Common Stock (except for repurchases of  Put Shares pursuant to Article VIII of the Stockholders Agreement) or any series of shares of preferred stock of the Reorganized Company, except for the New Preferred Stock at a price not to exceed its liquidation value.

US_ACTIVE-107697579.42

The Articles of Incorporation provide that preferred stock may be designated and issued from time to time in one or more series.  The Articles of Incorporation grant the Board of Directors of the Reorganized Debtor authority to designate and issue the preferred stock in one or more series by resolution or resolutions providing for the designation and issuance of the shares thereof, to determine and fix such voting powers, full or limited, or no voting powers and such designations, preferences and relative, participating, optional or other special rights, and qualifications, limitations and restrictions thereof, including, dividend rights, conversion rights, redemption privileges and liquidation preferences.  The resolutions may provide that such series of preferred stock will be superior or rank equally or be junior to the preferred stock of any other series.  No vote of the holders of preferred stock or common stock will be required for the designation and issuance of any shares of any series of preferred stock authorized by and complying with the conditions of the Articles of Incorporation.

Under the Articles of Incorporation, 80,000 shares of the authorized and unissued Preferred Stock will be designated "Series A Cumulative Convertible Preferred Stock" (the "New Preferred Stock").  Subject to certain exceptions, the New Preferred Stock shall vote together with the New Common Stock and not as a separate class, at any annual or special meeting of shareholders of the Debtor, and may act by written consent in the same manner as the New Common Stock, in either case upon the following basis:  each holder of New Preferred Stock shall be entitled to such number of votes as shall be equal to the whole number of shares of New Common Stock into which such holder's aggregate number of shares of New Preferred Stock are convertible at the close of business on the record date fixed for such meeting or the effective date of such written consent.

US_ACTIVE-107697579.42

The New Preferred Stock will be issued pursuant to the Plan to (i) the DIP Lender, and (ii) the Exit Funder.  The Total New Preferred Stock Amount (as defined in Plan § 1.85) to be issued is not known at this time and will depend on the aggregate liquidation value of the New Preferred Stock to be issued on the Effective Date in an amount equal to the sum of the principal amount outstanding under the DIP Facility on the Effective Date and the amount of the Exit Funding provided as of the Effective Date.

As long as more than 50% of the shares of New Preferred Stock issued on the first date of issuance of New Preferred Stock are outstanding, holders of New Preferred Stock, voting separately as one class, will be entitled to elect a majority of the Reorganized Debtor's Board of Directors.  At any meeting (or in a written consent in lieu thereof) held for the purpose of electing directors, the presence in person or by proxy (or the written consent) of the holders of at least a majority in interest of the then outstanding shares of New Preferred Stock will constitute a quorum of the New Preferred Stock for the election of directors to be elected solely by the holders.  A vacancy in any directorship elected by the holders shall be filled by vote or written consent of only the holders of at least a majority interest of the then outstanding shares of New Preferred Stock, consenting or voting, as the case may be, separately as one class.

### D.    No Fractional Shares

No fractional shares of New Common Stock or New Preferred Stock shall be distributed pursuant to the Plan.  When any distribution on account of an Allowed Claim pursuant to the Plan would otherwise result in the issuance of a number of shares of New Common Stock or New Preferred Stock that is not a whole number, the actual distribution of shares of New Common Stock and New Preferred Stock shall be rounded as follows: (i) fractions of ½ or greater shall be rounded to the next higher whole number and (ii) fractions of less than ½ shall be rounded to the next lower whole number.  The total number of shares of New Common Stock

US_ACTIVE-107697579.42

and New Preferred Stock to be distributed pursuant to the Plan shall be adjusted as necessary to account for the rounding provided in section 7.4 of the Plan.

###    E.    Record Date for Distributions

Other than with respect to any publicly held securities, the record date for purposes of making distributions under the Plan on account of Allowed Claims shall be the Effective Date.

###    F.    Continuation of Automatic Stay

In furtherance of the implementation of the Plan, except as otherwise provided therein, all injunctions or stays provided for in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect and apply to all holders of Claims against, or Interests in, the Debtor and the Estate until the Effective Date; provided, however, that nothing in the Plan shall be deemed to extend the scope of any such injunction or stay beyond the provisions of Section 362 of the Bankruptcy Code.

###    G.    Post-confirmation Operations

Following Confirmation and prior to the occurrence of the Effective Date, the then-current officers and directors of the Debtor shall continue in their respective capacities and shall execute such documents and take such other action as is necessary to effectuate the transactions provided for in the Plan.  On and after the Effective Date, all directors shall be deemed to have resigned and the New Directors shall serve as the directors of the Reorganized Debtor in accordance with the organizational documents of the Reorganized Debtor.  On and after the Effective Date, the management, control and operation of the Reorganized Debtor shall become the responsibility of the New Board of Directors.  The New Directors shall continue to serve as the New Board of Directors in accordance with the terms of the New Organization Documents.

US_ACTIVE-107697579.42

**H.**    **Effectiveness of Securities, Instruments, Agreements and By-laws of the
Reorganized Debtor**

The New Organizational Documents for the Reorganized Debtor are included in

Schedule 5 to the Plan.  On the Effective Date, all agreements entered into or documents issued

pursuant to the Plan, including, the New Notes, the New Common Stock, the New Preferred

Stock and/or any agreement entered into or instrument or document issued in connection with

any of the foregoing, as applicable, shall become effective and binding upon the parties thereto

in accordance with their respective terms and conditions and shall be deemed to become

effective simultaneously.  From and after the Effective Date, the Reorganized Debtor, as

restructured under the Plan, shall (i) continue in possession, custody and control of all the

Debtor's assets, books, records, rights and privileges, and (ii) be solely responsible for the

management of its affairs and the operation of its business, subject only to the jurisdiction of the

Bankruptcy Court to enforce the provisions of the Plan.

**I.**    **Restructuring of the Reorganized Debtor**

On or after the Effective Date, the Reorganized Debtor may merge, consolidate or

reorganize and/or combine with any Non-Debtor Affiliates in such manner as the Reorganized

Debtor may deem prudent with a view toward minimizing the cost of conducting their respective

businesses to the extent permitted under the Reorganized Debtor's governance documents and

debt agreements.

**J.**    **Corporate Action**

On the Effective Date, all matters provided for under the Plan that would otherwise

require approval of the stockholders or directors of the Debtor or the Reorganized Debtor or their

successors in interest under the Plan, including, the authorization to issue or cause to be issued

the New Common Stock and the New Preferred Stock and documents relating thereto, the New

US_ACTIVE-107697579.42

Notes and documents relating thereto, the adoption of the New Organization Documents and the

election of the New Directors pursuant to the Plan, shall be deemed to have occurred and shall be

in full force and effect from and after the Effective Date without any requirement of further

action by the stockholders or directors of the Debtor or the Reorganized Debtor.  On the

Effective Date, the Reorganized Debtor shall file its amended articles of incorporation with the

secretary of state of the State of Florida, in accordance with the applicable corporation law of

such state.

### K.    Exemption from Securities Laws

The issuance of the New Common Stock, the New Preferred Stock, and the New Notes,

and any other securities pursuant to the Plan and any subsequent sales, resales, or transfers, or

other distributions of any such securities shall be exempt from any federal or state securities laws

registration requirements to the fullest extent permitted by Section 1145 of the Bankruptcy Code,

or (in the case of the New Notes and New Preferred Stock issued under the Equity Commitment

Agreement) Section 4(2) of the Securities of 1933.

### L.    Avoidance Actions

Except to the extent released pursuant to Article 12 of the Plan or as otherwise provided

therein, effective on and after the Effective Date, all Avoidance Actions and Causes of Action

shall be preserved for the benefit of the Reorganized Debtor.

### M.    Post-Effective Date Reporting

As promptly as practicable after the Effective Date, the Reorganized Debtor shall File

with the Bankruptcy Court and serve on the United States Trustee the closing report required by

the Bankruptcy Rules.

### N.    Procedures for Treating Disputed Claims Under the Plan

US_ACTIVE-107697579.42

Holders of Claims need not file proofs of claim with the Bankruptcy Court. In the event

that a Holder of a Claim elects to file a proof of claim with the Bankruptcy Court, it will be

deemed to have consented to the exclusive jurisdiction of the Bankruptcy Court for all purposes

with respect to the determination, liquidation, allowance or disallowance of such Claim.

If the Debtor disputes any Claim as to which no proof of claim has been filed, such

dispute shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the

Chapter 11 Case had not been commenced and shall survive the Effective Date as if the Chapter

11 Case had not been commenced, <u>provided</u>, <u>however</u>, that the Reorganized Debtor may elect, at

its sole option, to object under Section 502 of the Bankruptcy Code to any claim or any proof of

claim filed by or on behalf of a holder of a Claim.

### O.    Objections to Claims

Except insofar as a Claim is Allowed under the Plan, the Debtor, the Reorganized Debtor,

and any other party in interest shall be entitled to object to Claims. Any objections to Claims

shall be served and filed (i) on or before the ninetieth (90th) day following the later of (a) the

Effective Date and (b) the date that a proof of Claim is filed or amended or a Claim is otherwise

asserted or amended in writing by or on behalf of a holder of such Claim, or (ii) such later date

as ordered by the Bankruptcy Court.

### P.    No Distributions Pending Allowance

If an objection to a Claim is filed as set forth in section 8.2 of the Plan, no payment or

distribution provided under the Plan shall be made on account of such Claim unless and until

such Disputed Claim becomes an Allowed Claim.

### Q.    Distributions After Allowance

US_ACTIVE-107697579.42

To the extent that a Disputed Claim ultimately becomes an allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the holder of such Claim shall receive the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required under applicable bankruptcy law.

## X.    CONDITIONS PRECEDENT

### A.    Conditions to Confirmation

The following is a condition to entry of the Confirmation Order:  the Confirmation Order shall be in form and substance reasonably satisfactory to the Debtor and the Requisite Consenting Lenders.

### B.    Conditions to the Effective Date

The Plan shall not become effective and the Effective Date shall not occur unless and until:

1.    The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor and the Requisite Consenting Lenders;

2.    All documents, instruments and agreements provided for under the Plan or necessary to implement the Plan shall be in form and substance reasonably satisfactory to the Debtor and the Requisite Consenting Lenders and have been executed and delivered by the parties thereto, unless such execution or delivery has been waived by the parties benefited thereby;

- 69 -

US_ACTIVE-107697579.42

3.      The payments required pursuant sections 2.3 and 2.4 of the Plan have been paid in full or have been reserved;

4.      The Exit Financing shall be made available to the Reorganized Debtor pursuant to the terms of the Equity Commitment Agreement; and

5.      The Confirmation Order shall be in full force and effect and no stay thereof shall be in effect.

**C.      Waiver of Conditions Precedent**

Each of the conditions precedent in sections 10.1 and 10.2 of the Plan may be waived, in whole or in part, by the Debtor with the consent of the Requisite Consenting Lenders, without notice or order of the Bankruptcy Court.

**D.      Termination of Plan for Failure to Become Effective**

If the Effective Date shall not have occurred on or prior to the date that is sixty (60) days after the Confirmation Date, then the Plan shall terminate and be of no further force or effect unless the provisions of section 10.4 of the Plan are waived in writing by the Debtor and the Requisite Consenting Lenders; provided, however, that section 10.4 of the Plan shall not modify or supersede the terms of the DIP Facility or any Event of Default thereunder.

**E.      Notice of Effective Date**

On the Effective Date, or as soon thereafter as is reasonably practicable, the Debtor shall file with the Bankruptcy Court "Notice of Effective Date" in a form reasonably acceptable to the Debtor in its sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective.  A courtesy copy of the Notice of Effective Date may, but is not required to, be sent by first class mail, postage prepaid (or at the Company's option, by courier or facsimile) to those Persons who have filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

US_ACTIVE-107697579.42

## XI.    EFFECT OF CONFIRMATION

### A.    Entry of Confirmation Order

Entry of a Confirmation Order shall mean that any modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### B.    Binding Effect

Except as otherwise provided in Section 1141(d) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against or Interest in the Debtor and its successors and assigns, whether or not the Claim or Interest of such holder is Impaired under the Plan and whether or not such holder has accepted the Plan.

### C.    Exculpation

Except as otherwise specifically provided in the Plan, none of the Exculpated Parties shall have or incur, and are hereby released from, any obligation, Cause of Action or liability to one another or to any Creditor, holder of an Interest or any other party in interest, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the negotiation or execution of the Plan Support Agreement, the negotiation and pursuit of confirmation of the Plan, the consummation of the Plan or any contract, instrument, release or other agreement or document created in connection with the Plan, or the administration of the Estate or the property to be distributed under the Plan, except for their gross negligence or willful misconduct as determined by a Final Order of a court of competent jurisdiction, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under the Plan.

### D.    Discharge of Debtor

US_ACTIVE-107697579.42

Except to the extent otherwise provided in the Plan, the treatment of all Claims against or

Interests in the Debtor under the Plan shall be in exchange for and in complete satisfaction,

discharge and release of, all Claims against and Interests in the Debtor of any nature whatsoever,

known or unknown, including any interest accrued or expenses incurred thereon from and after

the Petition Date, or against its Estate or properties or interests in property.  Except as otherwise

provided in the Plan, upon the Effective Date, all Claims against and Interests in the Debtor shall

be satisfied, discharged and released in full.  Except as otherwise provided in the Plan, all entities

shall be precluded from asserting against the Debtor, the Reorganized Debtor, or their respective

properties or interests in property, any other Claims or Interests based upon any act or omission,

transaction or other activity of any kind or nature that occurred prior to the Effective Date.

### E.    Waiver of Avoidance Actions

Notwithstanding any other provision of the Plan, effective as of the Effective Date, the

Debtor shall be deemed to have waived the right to prosecute, and to have settled and released

for fair value, any avoidance or recovery actions under Sections 545, 547, 548, 549, 550, 551,

and 553 of the Bankruptcy Code or other applicable law that belong to the Debtor as against the

Plan Support Parties.

### F.    Compromise, Global Settlement, Injunction and Related Provisions

#### 1.    Compromise and Settlement

Notwithstanding anything to the contrary contained in the Plan or the Confirmation

Order, the allowance, classification and treatment of all Allowed Claims, and their respective

distributions and treatments hereunder, takes into account and conforms to the relative priority

and rights of the Claims and the Interests in each Class in connection with any contractual, legal

and equitable subordination rights relating thereto whether arising under general principles of

equitable subordination, Section 510 of the Bankruptcy Code, or otherwise to the extent such

US_ACTIVE-107697579.42

subordination is enforceable under applicable law.  As of the Effective Date, any and all such

rights described in the preceding sentence are settled, compromised, discharged and released

pursuant hereto.  The Confirmation Order will constitute the Bankruptcy Court's finding and

determination that the settlements reflected in the Plan are (i) in the best interests of the Debtor,

its Estate and all holders of Claims, (ii) fair, equitable and reasonable, (iii) made in good faith,

and (iv) approved by the Bankruptcy Court pursuant Bankruptcy Rule 9019.   The Confirmation

Order shall approve the releases by all Entities of all such contractual, legal and equitable

subordination rights or Causes of Action that are satisfied, compromised and settled pursuant

hereto.  In accordance with the provisions of the Plan, and pursuant to Bankruptcy Rule 9019,

without any further notice to or action, order or approval of the Bankruptcy Court, after the

Effective Date the Reorganized Debtor may, in its sole and absolute discretion and with the

consent of the Requisite Consenting Lenders, compromise and settle Claims against the Debtor.

2.        Satisfaction of Claims and Termination of Interests

Pursuant to Section 1141(d) of the Bankruptcy Code, and except as otherwise specifically

provided in the Plan or in any contract, instrument, or other agreement or document created

pursuant to the Plan, the distributions, rights, and treatments that are provided in the Plan are in

complete discharge, settlement, satisfaction and release, effective as of the Effective Date, of

Claims (excluding Intercompany Claims), Interests and Causes of Action of any nature

whatsoever, including any interest accrued on Claims or Interests from and after the Petition

Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against,

and Interests in, the Debtor or any of its assets or properties, regardless of whether any property

shall have been distributed or retained pursuant to the Plan on account of such Claims and

US_ACTIVE-107697579.42

Interests.  The Confirmation Order shall be a judicial determination of the discharge of all

Claims and Interests subject to the Effective Date occurring.

        3.      <u>Releases by the Debtor</u>

Pursuant to Section 1123(b) of the Bankruptcy Code, for good and valuable

consideration, on and after the Effective Date, the Plan Support Parties and their respective

Affiliates, members, officers, directors, shareholders, employees, representatives, advisors,

attorneys, financial advisors, investment bankers and agents are each deemed released and

discharged by the Debtor, the Reorganized Debtor and the Estate from any and all Claims,

obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever,

whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise,

including any derivative Claims asserted or that could possibly have been asserted on behalf of

the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising,

in law, equity, or otherwise, that the Debtor or the Reorganized Debtor would have been legally

entitled to assert in its own right (whether individually or collectively) or on behalf of the holder

of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in

whole or in part, the Debtor or its Non-Debtor Affiliates, the Chapter 11 Case, the purchase, sale,

or rescission of the purchase or sale of any security, the subject matter of, or the transactions or

events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual

arrangements between any Debtor and any Plan Support Party, the restructuring of Claims and

Interests prior to or in the Chapter 11 Case, the negotiation, formulation, or preparation of the

Plan and related Disclosure Statement, or related agreements, instruments, or other documents,

upon any other act or omission, transaction, agreement, event, or other occurrence taking place

on or before the Effective Date of the Plan.  Entry of the Confirmation Order shall constitute the

Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the provisions of this

US_ACTIVE-107697579.42

provision of the Plan and further, shall constitute the Bankruptcy Court's finding that the provisions hereof are:  (i) in exchange for the good and valuable consideration provided by the Plan Support Parties; (ii) a good faith settlement and compromise of the Claims released; (iii) in the best interests of the Debtor and all holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after due notice and opportunity for hearing; and (vi) a bar to any of the Debtor, the Reorganized Debtor or their successors asserting any claim or Claim or Cause of Action against any of the Plan Support Parties.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

4.      Mutual Releases by the Plan Support Parties

Each Plan Support Party, on behalf of itself and its officers, directors, employees, representatives, advisors, attorneys, financial advisors, investment bankers, and agents, releases and discharges as of the Effective Date, each other Plan Support Party and their respective officers, directors, employees, representatives, advisors, attorneys, financial advisors, investment bankers, agents and affiliates, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including any derivative Claims asserted or that could possibly have been asserted on behalf of the releasing party against the released party, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the releasing party would have been legally entitled to assert in its own right or on behalf of another Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor or its direct or indirect subsidiaries, the Chapter 11 Case, the business or contractual arrangements between the Debtor and any other Plan Support

- 75 -

Party, the negotiation, formulation, or preparation of the Plan Support Agreement, the Plan and the Disclosure Statement, or related agreements, instruments, or other documents, and based upon or relating to, in each case, an act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that the release described in section 12.4 of the Plan shall not apply to the Plan or any related documents or the ability of any party to enforce any rights under the Plan or any related documents.

      5.    <u>Injunctions</u>

Except as otherwise specifically provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims, rights, Causes of Action, liabilities or any Interests based upon any act or omission, transaction or other activity of any kind or nature related to the Debtor that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, regardless of the filing, lack of filing, allowance or disallowance of such a Claim or Interest and regardless of whether such Entity has voted to accept the Plan and any successors, assigns or representatives of such Entities shall be precluded and permanently enjoined on and after the Effective Date from (i) the commencement or continuation in any manner of any claim, action or other proceeding of any kind with respect to any Claim, Interest or any other right or claim against the Debtor, which they possessed or may possess prior to the Effective Date, (ii) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any Claim, Interest or any other right or claim against the Debtor, which such Entities possessed or may possess prior to the Effective Date, (iii) the creation, perfection or enforcement of any encumbrance of any kind with respect to any Claim, Interest or any other right or claim against the Debtor,  or any of its assets, which they possessed or may posses, (iv) the assertion of any Claim that is released under the Plan, and (v) asserting any right of setoff, subrogation or recoupment of any

- 76 -

kind against any obligation due from the Reorganized Debtor, or against the property or interests in property of the Reorganized Debtor with respect to any Claim.

## XII.    RETENTION OF JURISDICTION

### A.    Post Effective-Date Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over the Chapter 11 Case to the fullest extent legally permissible, including jurisdiction to take the actions specified in Article 13 of the Plan.

### B.    Jurisdiction Prior to the Effective Date

Prior to the Effective Date, the Bankruptcy Court shall retain jurisdiction with respect to each of the foregoing items and all other matters over which it may exercise jurisdiction pursuant to 28 U.S.C. § 1334.

## XIII.    MISCELLANEOUS PROVISIONS

### A.    Modification of the Plan

Subject to the restrictions on Plan modifications set forth in Section 1127 of the Bankruptcy Code and subject to the consent of the Requisite Consenting Lenders, the Debtor reserves the right to alter, amend, abandon, revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtor withdraws the Plan, or if Confirmation or consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases effected under the Plan and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or

- 77 -

Interests; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission.

### B.    Release of the Liens of the Bridge Lenders

Upon satisfaction of the Bridge Lien Claims pursuant to section 5.2 of the Plan, the Debtor or the Reorganized Debtor, as applicable, may take such action and file such documents, including UCC termination statements, as may be necessary or appropriate to evidence the termination of the Liens granted to the Bridge Lenders pursuant to the Bridge Loan Documents.

### C.    Filing of Additional Documents

The Debtor or the Reorganized Debtor, as applicable, with the reasonable consent of the Requisite Consenting Lenders, may file agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### D.    No Admissions

If Confirmation or the Effective Date does not occur, nothing contained in the Plan or this Disclosure Statement shall be deemed as an admission by the Debtor with respect to any matter set forth in the Plan or Disclosure Statement including, liability on any Claim or the propriety of any Claims classification

### E.    Severability of Plan Provisions

If prior to Confirmation any term or provision of the Plan that does not govern the treatment of Claims or Interests is held by the Bankruptcy Court to be invalid, void or unenforceable, at the request of the Debtor and subject to the consent of the Requisite Consenting Lenders, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such

US_ACTIVE-107697579.42

holding, alteration or interpretation, the remainder of the terms and provisions of the Plan shall

remain in full force and effect and shall in no way be affected, Impaired or invalidated by such

holding, alteration or interpretation.   The Confirmation Order shall constitute a judicial

determination and shall provide that each term and provision of the Plan, as it may have been

altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its

terms.

### F.    Exemption from Certain Transfer Taxes

Pursuant to Section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer, or

exchange of notes or equity securities, (ii) the creation of any mortgage, deed of trust, lien,

pledge, or other security interest, (iii) the making or assignment of or surrender of any lease or

sublease, or (iv) the making of or delivery of any deed or other instrument of transfer under, in

furtherance of, or in connection with the Plan, and any merger agreements, agreements of

restructuring, disposition, liquidation or dissolution, any deeds, bills of sale, transfers of tangible

property, or assignments executed in connection with any disposition of assets contemplated by

the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or

other similar tax or similar lien recording fees.

### G.    Preservation of Rights of Setoffs

The Debtor, may, but shall not be required to, set off against any Claim and the payments

or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any

nature whatsoever that the Debtor may have against the holder of such Claims; but neither the

failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by

the Debtor of any such claim that the Debtor may have against such holder; provided, however,

that the Debtor shall not set off any obligations or claims arising under the DIP Facility.

US_ACTIVE-107697579.42

**H.**    **Defenses with Respect to Unimpaired Claims**

Except as otherwise provided in the Plan, nothing shall affect the rights and legal and equitable defenses of the Debtor with respect to any Unimpaired Claim, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

**I.**    **No Injunctive Relief**

Except as otherwise provided in the Plan or Confirmation Order, no Claim or Interest shall under any circumstances be entitled to specific performance or other injunctive, equitable, or other prospective relief.

**J.**    **Governing Law**

Unless a rule of law or procedure is supplied by the Bankruptcy Code or the Bankruptcy Rules or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan except as otherwise set forth in those agreements, in which case the governing law as set forth in such agreement shall control.

**K.**    **Computation of Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**L.**    **Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

US_ACTIVE-107697579.42

### M.    Closing of the Chapter 11 Case

The Reorganized Debtor may seek the entry of a Final Decree at any time after the Plan has been substantially consummated provided that all required fees due under 28 U.S.C. § 1930 have been paid.

### N.    Waiver or Estoppel

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtor or any other Entity, if such agreement was not disclosed in the Plan, this Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

### O.    Section 1125(e) of the Bankruptcy Code

As of the Confirmation Date, the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtor, the Plan Support Parties, and their respective successors, predecessors, control persons, members, affiliates, agents, directors, officers, employees, financial advisors, accountants, attorneys, and other professionals have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities under the Plan. Accordingly, such entities and individuals shall not be liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the securities under the Plan.

### P.    Expedited Tax Determination

The Reorganized Debtor may request an expedited determination of taxes under 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtor for any and all taxable periods ending after the Petition Date through, and including, the Effective Date.

US_ACTIVE-107697579.42

Q.    **Fees and Expenses of Plan Support Parties**

On the Effective Date, the Debtor shall pay all fees and expenses of the Plan Support

Parties in accordance with the terms of the Plan Support Agreement.

## XIV.  FEASIBILITY OF THE PLAN AND THE BEST INTERESTS TEST

At the Confirmation Hearing, the Bankruptcy Court will determine whether the

requirements of Section 1129 of the Bankruptcy Court have been satisfied.  If so, the Bankruptcy

Court will enter the Confirmation Order.  The Debtor believes that the Plan satisfies or will

satisfy the applicable requirements, as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as Plan proponent, will have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after the confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

- With respect to each Class of Impaired Claims or Interests, either each holder of a Claim or Interest of such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code.

US_ACTIVE-107697579.42

- Each Class of Claims that is entitled to vote on the Plan will either have accepted the Plan or will not be impaired under the Plan, or the Plan may be confirmed without the approval of each voting Class pursuant to Section 1129(b) of the Bankruptcy Code.

- Except to the extent that the holder of a particular Claim will agree to a different treatment of such Claim, the Plan provides that Allowed Administrative, Allowed Priority Tax Claims and Allowed Other Priority Non-Tax Claims will be paid in full on the Effective Date, or as soon thereafter as practicable.

- At least one Class of Impaired Claims or Interests will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class.

- Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the United States Trustee, will be paid as of the Effective Date.

The Debtor believes that (i) the Plan satisfies or will satisfy all of the statutory requirements of Chapter 11 of the Bankruptcy Code, (ii) it has complied, or will have complied, with all of the requirements of Chapter 11 and (iii) the Plan has been proposed in good faith.

As a result, the Debtor believes that the Plan does not unfairly discriminate against the holders of any Claims.

US_ACTIVE-107697579.42

A.    <u>Feasibility of the Plan</u>

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. This requirement is imposed by Section 1129(a)(11) of the Bankruptcy Code and is referred to as the "feasibility" requirement. The Debtor believes that it will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible. On the Effective Date, the Exit Funders shall commit to provide financing in the amount of up to $81 million less the outstanding balance under the DIP Facility, to be funded in accordance with the terms of the Equity Commitment Agreement, pursuant to which the Reorganized Debtor will issue to the Exit Funders shares of the New Preferred Stock.

To demonstrate the feasibility of the Plan, the Debtor has prepared and relied upon the financial projections, which are annexed to this Disclosure Statement as <u>Exhibit 3</u> (the "<u>Projections</u>"), the Liquidation Analysis, which is annexed hereto as <u>Exhibit 4</u> (the "<u>Liquidation Analysis</u>"), the historical financials as of September 30, 2012  (the "<u>Historical Financials</u>") annexed hereto as <u>Exhibit 5</u>, and the *pro forma* balance sheet at exit (the "<u>Balance Sheet</u>") annexed hereto as <u>Exhibit 6</u>.  **EXHIBITS 3, 4, 5 and 6 AND THE NOTES THERETO ARE AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT AND SHOULD BE READ IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT AND THE PLAN.**

The projections indicate that the Reorganized Debtor should have sufficient cash flow to pay and service its debt obligations and to fund its operations. Accordingly, the Debtor believes that the Plan satisfies the feasibility requirement of Section 1129(a)(11) of the Bankruptcy Code. As noted in the projections, however, the Debtor cautions that no representations can be made as to the accuracy of the projections or as to the Reorganized Debtor's ability to achieve the protected results. Many of the assumptions upon which the projections are based are subject to

US_ACTIVE-107697579.42

uncertainties outside the control of the Debtor.  Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the projections were prepared may be different from those assumed or may be unanticipated, and may adversely affect the Debtor's financial results.  As disclosed in the projections, these estimates have not been audited and may not comply with the requirements of GAAP.  The Debtor's management believes these estimates are reasonable and are the best estimate of the future operations of the Reorganized Debtor.  However, the actual results can be expected to vary from the projected results and the variations may be material and adverse.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, THE PRACTICES RECOGNIZED TO BE IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES, OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS.  FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY ANY INDEPENDENT ACCOUNTANTS.  ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR.  CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTOR, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED.**

US_ACTIVE-107697579.42

**ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE**

**PROJECTIONS.**

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION

REFORM ACT OF 1995:  This Disclosure Statement and the financial projections contained

herein and in the Projections include "forward-looking statements" within the meaning of

Section 27A of the Securities Act and Section 21E of the Exchange Act.  All statements other

than statements of historical fact included in this Disclosure Statement are forward-looking

statements, including, without limitation, financial projections, the statements, and the

underlying assumptions, regarding the timing of, completion of and scope of the current

restructuring, the Plan, debt and equity market conditions, the cyclicality of the Debtor's

industry, current and future industry conditions, the potential effects of such matters on the

Debtor's business strategy, results of operations or financial position, the adequacy of the

Debtor's liquidity and the market sensitivity of the Debtor's financial instruments.  The forward-

looking statements are based upon current information and expectations.  Estimates, forecasts

and other statements contained in or implied by the forward-looking statements speak only as of

the date on which they are made, are not guarantees of future performance and involve certain

risks, uncertainties and assumptions that are difficult to evaluate and predict. Although the

Debtor believes that the expectations reflected in the forward-looking statements are reasonable,

parties are cautioned that any such forward-looking statements are not guarantees of future

performance, and involve risks and uncertainties, and that actual results may differ materially

from those contemplated by such forward-looking statements.  Certain important factors that

could cause actual results to differ materially from the Debtor's expectation or what is expressed,

implied or forecasted by or in the forward-looking statements include developments in the

US_ACTIVE-107697579.42

Chapter 11 Case, adverse developments in the timing or results of the Debtor's business plan

(including the time line to emerge from Chapter 11), the timing and extent of changes in

economic conditions, industry capacity and operating rates, the supply-demand balance for the

Debtor's services, competitive products and pricing pressures, federal and state regulatory

developments, the Debtor's financial leverage, motions filed or actions taken in connection with

the bankruptcy proceedings, the availability of skilled personnel, the Debtor's ability to attract or

retain high quality employee and operating hazards attendant to the industry.  Additional factors

that could cause actual results to differ materially from the Projections or what is expressed,

implied or forecasted by or the forward-looking statements are stated herein in cautionary

statements made in conjunction with the forward-looking statements or are included elsewhere in

this Disclosure Statement.

**B.**    **Best Interests Test**

1.    Generally

The Bankruptcy Code requires the bankruptcy court to determine that a plan is in the

"best interests" of all holders of claims and interests that are impaired by the plan and that have

not accepted the plan.  The "best interests" test, as set forth in Section 1129(a)(7) of the

Bankruptcy Code, requires a bankruptcy court find that each holder of a claim or interest in an

impaired class either (i) has accepted the plan or (ii) will receive or retain under the plan property

of a value, as of the effective date of the plan, that is not less than the amount that such holder

would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

Since the Plan has been unanimously accepted by each Creditor holding a Claim in an

Impaired Class, the Plan meets the "best interests" test with respect to Classes 3, 4 and 5.

Holders of Interests in Class 7 have not accepted the Plan.  However, the Plan can be

confirmed, notwithstanding the deemed rejection by Class 7 if the Court determines that the

US_ACTIVE-107697579.42

Holders of Interests will receive, or retain, under a plan property of a value, as of the effective

date of the Plan, that is not less than the amount that such Holder would recover if the Debtor

were liquidated under Chapter 7.  Here, the sole Impaired Class that has not voted to accept the

Plan is Class 7.  Under the Plan, the Holders of Interests in Class 7 will not receive or retain any

property.  If the Court determines that the Holders of Interests in Class 7 would not receive or

retain any property if the Debtor were to be liquidated in a Chapter 7 proceeding, then the test

would be satisfied with respect to Class 7.

To calculate the probable distribution to members of each impaired class of interests if

the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the

aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case

were converted to a Chapter 7 case under the Bankruptcy Code.  This "liquidation value" would

consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by,

first, the claims of secured creditors to the extent of the value of their collateral and, second, by

the costs and expenses of liquidation, as well as by other administrative expenses and costs of

both the Chapter 7 case and the Chapter 11 case.  A liquidation under Chapter 7 does not affect

the priority of several holders of claims to be paid first.  Costs of liquidation under Chapter 7 of

the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and

other professionals retained by the trustee, asset disposition expenses, all unpaid expenses

incurred by the debtor in its bankruptcy case (such as compensation of attorneys, financial

advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation costs,

and claims arising from the operations of the debtor during the pendency of the bankruptcy case.

The liquidation itself would trigger certain priority payments that otherwise would be due in the

US_ACTIVE-107697579.42

ordinary course of business.  Those priority claims would be paid in full from the liquidation

proceeds before the balance would be made available to pay general unsecured claims or to make

any distribution in respect of equity interests.  The liquidation also would prompt the rejection of

a large number of executory contracts and unexpired leases and thereby create a significantly

higher number of unsecured claims.

Once the court ascertains the recoveries in liquidation of secured creditors and priority

claimants, it must determine the probable distribution to general unsecured creditors and equity

security holders from the remaining available proceeds in liquidation.  If such probable

distribution has a value greater than the distributions to be received by such creditors and equity

security holders under a debtor's plan, then such plan is not in the "best interests" of creditors

and equity security holders.

2.    Best Interests of Creditors Test: Liquidation Analysis

For purposes of the best interests test and in order to determine the liquidation value

available to Creditors, the Debtor has prepared the Liquidation Analysis annexed to this

Disclosure Statement as Exhibit 4.

The information in the Liquidation Analysis that is annexed as Exhibit 4 has been

calculated by the Debtor and also assumes that the liquidation will occur in Chapter 7 beginning

on or about January 27, 2012.  The Liquidation Analysis sets forth the estimated balance and

low/high recovery amounts for each of the Debtor, EnerDel, EnerFuel, Ener1 Korea, and

Emerging Power.  Based upon this analysis, the Debtor believes that the Court will determine

that the Holders of Interests in Class 7 would not receive any distribution in a liquidation under

Chapter 7.  Further, upon such a determination, the Court would conclude that the Plan satisfied

the best interest test with respect to Class 7.

C.    **Feasibility: Projections**

US_ACTIVE-107697579.42

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor.  This standard is referred to as "feasibility."  In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, management for the Debtor has analyzed the ability of the Debtor to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct their businesses.

The Projections should be read in conjunction with the assumptions, qualifications and footnotes to tables containing the Projections (which include projected statements of operations, projected balance sheets, and projected statements of cash flows) set forth in <u>Exhibit 3</u> to this Disclosure Statement, and the historical consolidated financial information (the "<u>Historical Financials</u>") set forth in <u>Exhibit 6</u> to this Disclosure Statement.

The Projections assume that the Plan will be confirmed and consummated as of March 31, 2012 with Allowed Claims and Allowed Interests treated as described in the Plan. Except as otherwise provided in the Plan, expenses incurred as a result of the Chapter 11 Case are assumed to be paid on the day on the Effective Date.

It is important to note that the Projections and estimates of equity values for the Reorganized Debtor after the Effective Date may differ from actual performance and are highly dependent on significant assumptions concerning the future operations of the Reorganized Debtor. These assumptions include, among other things, growth of business, the automotive volumes, labor and other operating costs, regulatory environment, inflation, and the level of investment required for capital expenditures and working capital.  Please refer to

US_ACTIVE-107697579.42

Article I.D. of this Disclosure Statement for a discussion of many of the factors that could have a material effect on the information provided in this section.

The estimates of equity value for the Reorganized Debtor are not intended to reflect the equity values that may be attainable in public or private markets. They also are not intended to be appraisals or reflect the value that may be realized if assets are sold.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTOR'S INDEPENDENT ACCOUNTANT HAS NOT REVIEWED THE ACCOMPANYING PROJECTIONS TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

THE DEBTOR DOES NOT, AS A MATTER OF COURSE, PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS. ACCORDINGLY, THE DEBTOR DOES NOT INTEND TO, AND DISCLAIMS ANY OBLIGATION TO, (I) FURNISH UPDATED PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO HOLDERS OF THE NEW EQUITY INTERESTS OR ANY OTHER PARTY AFTER THE EFFECTIVE DATE, (II) INCLUDE SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SEC, OR (III) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.

THE PROJECTIONS PROVIDED IN CONNECTION WITH THIS DISCLOSURE STATEMENT HAVE BEEN PREPARED EXCLUSIVELY BY THE

US_ACTIVE-107697579.42

DEBTOR'S MANAGEMENT. THE PROJECTIONS, WHILE PRESENTED WITH

NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF

ESTIMATES AND ASSUMPTIONS, WHICH, THOUGH CONSIDERED REASONABLE

BY MANAGEMENT, AFTER CONSULTATION WITH THE DEBTORS' FINANCIAL

ADVISORS, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO

SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND

CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL.

THE DEBTOR CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE AS TO THE

MATERIAL ACCURACY OF THESE FINANCIAL PROJECTIONS OR TO THE DEBTOR'S

ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS

INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND

CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE

PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR,

ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED AND, THUS, THE

OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A

MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS,

THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER

ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. FINALLY, THE

PROJECTIONS INCLUDE ASSUMPTIONS AS TO THE ENTERPRISE VALUE OF THE

DEBTOR, THE FAIR VALUE OF ITS ASSETS, AND ITS ACTUAL LIABILITIES AS OF

THE EFFECTIVE DATE.

## XV.    CONFIRMATION WITHOUT ACCEPTANCE BY ALL IMPAIRED CLASSES: THE 'CRAMDOWN' ALTERNATIVE

US_ACTIVE-107697579.42

The votes of Holders of Interests in Classes 7 are not being solicited because such Holders are not entitled to receive or retain under the Plan any interest in property on account of their Claims and Equity Interests.  Such Classes therefore are deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Accordingly, the Debtor will seek confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to Class 7.

### A.    Cram Down of Interests Generally

The Bankruptcy Court may confirm a plan at the request of a debtor notwithstanding the plan's rejection (or deemed rejection) by an impaired class as long as the plan "does not discriminate unfairly" and is "fair and equitable" as to any impaired class that has not accepted the plan.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receives or retains on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

Notwithstanding the deemed rejection of the Plan by Class 7, the Debtor believes that Interests in Classes 7 are being treated fairly and equitably under the Bankruptcy Code.  The Debtors therefore believe the Plan may be confirmed despite the deemed or actual rejection by these Classes.

US_ACTIVE-107697579.42

In addition, although Class 7 will not receive or retain any property, this proposed treatment is fair and equitable as to those Interests because it equal to the value of such interest. To establish that the Interests have no value, the Debtor will rely upon the Valuation that was performed by Houlihan Lokey.

### B.    Cram Down of Interests and Valuation

In conjunction with formulating the Plan, the Debtor determined that it would be necessary to estimate the post-confirmation going concern enterprise value for the Reorganized Debtor. The Debtor requested that Houlihan Lokey advise it with respect to the reorganization value of the Reorganized Debtor on a going concern basis.

This valuation is premised on approximately $88 million[11] of new capital being contributed beginning in 2012 through the projection period. Solely for purposes of the Plan, the estimated range of reorganization value of the Reorganized Debtor was assumed to be $73.9 million to $102.8 million (with a midpoint value of $88.4 million) as of March 31, 2012, which assumes the new capital contributions were made in accordance with the terms under the Equity Commitment Agreement.

Houlihan Lokey's estimate of a range of enterprise values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ESTIMATED RANGE OF THE REORGANIZATION VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF MARCH 31, 2012, REFLECTS WORK PERFORMED BY HOULIHAN LOKEY ON THE BASIS OF INFORMATION IN

---

[11] This capital will be provided pursuant to the Equity Commitment Agreement, which provides for the capital purchases of up to $81 million. In addition, Bzinfin commits to make available a working capital line of credit for an additional $6.9 million. Equity Commitment Agreement § 8.

US_ACTIVE-107697579.42

RESPECT OF THE BUSINESSES AND ASSETS OF THE COMPANY AVAILABLE TO

HOULIHAN LOKEY AS OF JANUARY 13, 2012. IT SHOULD BE UNDERSTOOD

THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT HOULIHAN

LOKEY'S CONCLUSIONS, HOULIHAN LOKEY DOES NOT HAVE ANY OBLIGATION

TO UPDATE, REVISE, OR REAFFIRM ITS ESTIMATE.

As set forth in the valuation prepared by Houlihan Lokey, the enterprise value of the

Debtor is between $73.9 million and $102.8 million less assumed total net debt of $61.2 million

(which includes the debt of the Debtor's subsidiaries).    Houlihan Lokey has estimated the range

of total equity value for the Reorganized Company, after Confirmation, between approximately

$12.7 million and $41.6 million, with a midpoint total equity value of $27.2 million.  This equity

value will be comprised of the New Preferred Stock and the New Common Stock of the

Reorganized Debtor.

The foregoing estimate of the reorganization value of the Reorganized Debtor is based on a

number of assumptions, including a successful implementation of the Debtor's business plan,

the achievement of the forecasts reflected in the Projections (including contracts on hand to date

and management's assessment of the likelihood of the continuation of such contracts and the

successful renewal or securing of new contracts), access to the funding made available under the

terms of the Equity Commitment Agreement, the continuing leadership of the existing

management team, market conditions as of January 13, 2012 continuing through the assumed

Effective Date of March 31, 2012, and the Plan becoming effective in accordance with the

estimates and other assumptions discussed herein.

With respect to the Projections, Houlihan Lokey assumed that such Projected Financial

Information has been reasonably prepared in good faith and on a basis reflecting the best

US_ACTIVE-107697579.42

currently available estimates and judgments of the Debtor as to the future operating and

financial performance of the Reorganized Debtor and its debt at exit.  Houlihan Lokey's

estimate of a range of reorganization values assumes that the Debtor's Projections will be

achieved by the Reorganized Debtor in all material respects, including revenue growth and

improvements in operating margins, earnings and cash flow. Certain of the results forecasted

by the management of the Debtor are significantly better than the recent historical results of

operations of the Debtor.  As a result, to the extent that the estimate of enterprise values is

dependent upon the Reorganized Debtor performing at the levels set forth in the Projections,

such analysis must be considered speculative.  If the business performs at levels below those

set forth in the Projected Financial Information, such performance may have a material impact

on the Projections and on the estimated range of values derived therefrom.

IN ESTIMATING THE RANGE OF THE REORGANIZATION VALUE AND

EQUITY VALUE OF THE REORGANIZED DEBTOR, HOULIHAN LOKEY:

- REVIEWED CERTAIN HISTORICAL FINANCIAL INFORMATION OF ENER1 FOR RECENT YEARS AND INTERIM PERIODS;

- REVIEWED CERTAIN INTERNAL FINANCIAL AND OPERATING DATA OF THE DEBTOR, INCLUDING THE PROJECTIONS, WHICH WERE PREPARED AND PROVIDED TO HOULIHAN LOKEY BY THE DEBTOR'S MANAGEMENT AND WHICH RELATE TO THE DEBTOR'S BUSINESSES AND ITS PROSPECTS;

- MET WITH CERTAIN MEMBERS OF SENIOR MANAGEMENT OF THE DEBTOR TO DISCUSS THE DEBTOR'S OPERATIONS AND FUTURE PROSPECTS;

US_ACTIVE-107697579.42

- REVIEWED PUBLICLY AVAILABLE FINANCIAL DATA AND CONSIDERED THE MARKET VALUE OF PUBLIC COMPANIES THAT HOULIHAN LOKEY DEEMED GENERALLY COMPARABLE TO THE OPERATING BUSINESSES OF THE DEBTOR;

- CONSIDERED RELEVANT PRECEDENT TRANSACTIONS IN THE MISCELLANEOUS ELECTRICAL MACHINERY INDUSTRY;

- CONSIDERED CERTAIN ECONOMIC AND INDUSTRY INFORMATION RELEVANT TO THE OPERATING BUSINESSES; AND

- CONDUCTED SUCH OTHER STUDIES, ANALYSIS, INQUIRIES, AND INVESTIGATIONS AS IT DEEMED APPROPRIATE.

ALTHOUGH HOULIHAN LOKEY CONDUCTED A REVIEW AND ANALYSIS OF THE DEBTOR'S BUSINESSES, OPERATING ASSETS AND LIABILITIES AND REORGANIZED THE DEBTOR'S BUSINESS PLAN, IT ASSUMED AND RELIED ON THE ACCURACY AND COMPLETENESS OF ALL FINANCIAL AND OTHER INFORMATION FURNISHED TO IT BY THE DEBTOR, AS WELL AS PUBLICLY AVAILABLE INFORMATION.  IN ADDITION, HOULIHAN LOKEY DID NOT INDEPENDENTLY VERIFY MANAGEMENT'S PROJECTIONS IN CONNECTION WITH SUCH ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTOR WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.

ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES

US_ACTIVE-107697579.42

THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.

IN THE CASE OF THE REORGANIZED DEBTOR, THE ESTIMATES OF THE REORGANIZATION VALUE PREPARED BY HOULIHAN LOKEY REPRESENT THE HYPOTHETICAL REORGANIZATION VALUE OF THE REORGANIZED DEBTOR. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION AND NEGOTIATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER. SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTOR THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS.  AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTOR SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY

US_ACTIVE-107697579.42

MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. SUCH

ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES AND ACTUAL

OUTCOMES AND RESULTS MAY DIFFER MATERIALLY FROM THOSE SET FORTH

HEREIN. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS

SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF

WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH

SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS,

PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL

MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION

CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT

RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH

GENERALLY INFLUENCE THE PRICES OF SECURITIES.

i.    *Valuation Methodology*

Houlihan Lokey performed a variety of analyses and considered a variety of factors

in preparing the valuation of the Reorganized Debtor.  Several generally accepted valuation

techniques for estimating the Reorganized Debtor's enterprise value were used.  Houlihan

Lokey conducted a consolidated valuation of the Debtor and relied primarily on three

methodologies: comparable public company analysis, discounted cash flow analysis, and

precedent transactions analysis.  Houlihan Lokey's valuation must be considered as a whole,

and selecting just one methodology or portions of the analyses, without considering the

analyses as a whole, could create a misleading or incomplete conclusion as to the Reorganized

Debtor's enterprise value.

US_ACTIVE-107697579.42

In preparing its valuation estimate, Houlihan Lokey performed a variety of analyses and considered a variety of factors, some of which are described herein. The following summary does not purport to be a complete description of the analyses and factors undertaken to support Houlihan Lokey's conclusions. The preparation of a valuation is a complex process involving various determinations as to the most appropriate analyses and factors to consider, as well as the application of those analyses and factors under the particular circumstances. As a result, the process involved in preparing a valuation is not readily summarized.

ii.    *Comparable Public Company Analysis.*

A comparable public company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. It establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common variable such as revenues, earnings, and cash flows. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet, and cash flow statement.  In addition, each company's performance, profitability, margins, leverage and business trends are also examined.  Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses, business risks, supply base, location of markets, growth prospects, market presence, size, and scale of operations.  The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative

US_ACTIVE-107697579.42

value, which, when coupled with other approaches, presents a foundation for determining firm value.

In performing the Comparable Public Company Analysis, the following publicly traded companies in the automotive industry were deemed generally comparable to the Debtor in some or all of the factors described above and were selected:  A123 Systems, Inc., Altair Nantoechnologies, Inc., China BAK Battery, Inc., EnerSys, Highpower International, Inc., Exide Technologies, Ultralife Corp., and Valence Technology Inc.

Houlihan Lokey excluded several companies that were deemed not comparable because of size and status of comparable companies, among other things. Houlihan Lokey analyzed the current and historical trading value for the comparable companies as a multiple of the last twelve months ending September 30, 2011, and projected fiscal year 2011 and projected fiscal year 2012 earnings. The derived multiples were applied to the Company's earnings to determine the range of Enterprise Value.

(a)    *Discounted Cash Flow Approach*. The discounted cash flow ("DCF") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate determined by calculating the average cost of debt and equity for publicly traded companies that are similar to consolidated Ener1.  The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows. The terminal value was derived by using the Gordon Growth Rate which incorporates assumptions regarding the Debtor's estimated growth rate for periods beyond the end of the

US_ACTIVE-107697579.42

Debtor's projection period to determine a suitable value of the firm at the Debtor's terminal date. Houlihan Lokey's discounted cash flow valuation is based on the business plan Projections of the Debtor's operating results. Houlihan Lokey discounted the projected cash flows and terminal value using the Debtor's estimated weighted average cost of capital.

This approach relies on the company's ability to project future cash flows with some degree of accuracy.  Because the Debtor's Projections reflect significant assumptions made by the Debtor's management concerning anticipated results, the assumptions and judgments used in the Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. Houlihan Lokey cannot and does not make any representations or warranties as to the accuracy or completeness of the Debtor's Projections.

(b)    *Precedent Transactions Analysis.* Precedent transactions analysis estimates value by examining publicly announced merger and acquisition transactions.  An analysis of the disclosed purchase price as a multiple of various operating statistics reveals industry acquisition multiples for companies in similar lines of businesses to the Debtor. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Debtor.

Unlike the comparable public company analysis, the valuation in this methodology includes a "control" premium, representing the purchase of a majority or controlling position in a company's assets.  Thus, this methodology generally produces higher valuations than the comparable public company analysis.  Other aspects of value that manifest itself in a precedent transaction analysis include the following:

- 102 -

US_ACTIVE-107697579.42

- Circumstances surrounding a sale transaction may introduce "diffusive quantitative results" into the analysis (e.g., an additional premium may be extracted from a buyer in the case of a competitive bidding contest).

- The market environment is not identical for transactions occurring at different periods of time.

- Circumstances pertaining to the financial position of a company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis.

THE ESTIMATES OF THE REORGANIZATION VALUE AND EQUITY VALUE DETERMINED BY HOULIHAN LOKEY REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF THE REORGANIZED DEBTOR ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE

US_ACTIVE-107697579.42

OF THE POST-REORGANIZATION MARKET VALUE. ANY SUCH VALUE MAY BE

MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE

REORGANIZATION EQUITY VALUE RANGE FOR THE REORGANIZED DEBTOR

ASSOCIATED WITH HOULIHAN LOKEY'S VALUATION ANALYSIS.

The foregoing conclusions are premised upon the assumptions set forth in <u>Exhibit 3</u> and

<u>Exhibit 4</u>, which the Debtor believes are reasonable.

C.      **Application of the "Best Interests" Test to the Liquidation Analysis and the Valuations**

Notwithstanding the difficulty in quantifying recoveries with precision, the Debtor

believes that the financial disclosures and projections contained herein imply a recovery as least

as great as holders of Claims and Interests would receive in a Chapter 7 liquidation.

Accordingly, the Debtor believes that the "best interests" test of Section 1129 of the Bankruptcy

Code is satisfied.

## XVI.   IMPORTANT CONSIDERATIONS AND RISK FACTORS

A.      **The Debtor Has No Duty To Update**

The statements contained in this Disclosure Statement are made by the Debtor as of the

date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after

that date does not imply that there has been no change in the information set forth herein since

that date.  The Debtor has no duty to update this Disclosure Statement unless otherwise ordered

to do so by the Court.

US_ACTIVE-107697579.42

**B.**     **No Representations Outside This Disclosure Statement Are Authorized**

No representations concerning or related to the Debtor, the Chapter 11 Case or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance, or rejection, of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to Debtor's counsel.

**C.**     **Information Presented Based On Debtor's Books And Records; No Audit Performed**

While the Debtor has endeavored to present information fairly in this Disclosure Statement, because of Debtor's financial difficulties, as well as the complexity of Debtor's financial matters, the Debtor's books and records upon which this Disclosure Statement is based might be incomplete or inaccurate.  The financial information contained herein, unless otherwise expressly indicated, is unaudited.

**D.**     **All Information Was Provided By Debtor And Was Relied Upon By Professionals**

All counsel and other professionals for the Debtor have relied upon information provided by the Debtor in connection with preparation of this Disclosure Statement.  Although counsel for the Debtor has performed certain limited due diligence in connection with the preparation of this Disclosure Statement, counsel has not verified independently the information contained herein and no Creditors or Interest holders should rely upon any statements or representations of counsel or other professionals engaged by the Debtor in connection with this case.

**E.**     **Projections And Other Forward-Looking Statements Not Assured**

US_ACTIVE-107697579.42

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various classes that might be allowed.

       1.    <u>Projections</u>

While the Debtor believes that its projections are reasonable, there can be no assurance that they will be realized, resulting in recoveries that could be significantly less than projected.

**F.    <u>No Legal Or Tax Advice Is Provided By This Disclosure Statement</u>**

The contents of this Disclosure Statement should <u>not</u> be construed as legal, business or tax advice. Each holder of a Claim or Interest should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is <u>not</u> legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

**G.    <u>No Admissions</u>**

If Confirmation or the Effective Date does not occur, nothing contained in the Plan or the related Disclosure Statement shall be deemed as an admission by the Debtor with respect to any matter set forth herein or therein including, liability on any Claim or the propriety of any Claims classification.

US_ACTIVE-107697579.42

H.    **Risk Factors**

1.    Business Factors And Competitive Conditions

In its financial projections, the Debtor has assumed that the general economic and market conditions of the United States and other foreign economies will improve over the next several years.  An improvement of economic and market conditions is subject to many factors outside the Debtor's control, including interest rates, inflation, unemployment rates, consumer spending, war, terrorism and other such factors.  Any one of these or other economic factors could have a significant impact on the operating performance of the Reorganized Debtor.  There is no guarantee that economic or market conditions will improve in the near term.

The Debtor believes that it will succeed in implementing and executing its restructuring for the benefit of all constituencies.  However, there are risks that the goals of the Debtor's going-forward business plan and operational restructuring strategy will not be achieved.  In such event, the Debtor may be forced to sell all or parts of its business, develop and implement further restructuring plans not contemplated herein or become subject to further insolvency proceedings.  In addition to uncertain economic and business conditions, the Reorganized Debtor will likely face competitive pressures and other third party actions and changes in market conditions.  The Reorganized Debtor's anticipated performance will be impacted by these and other unpredictable activities.

Other factors that holders of Claims should consider are potential regulatory and legal developments that may impact the Reorganized Debtor's businesses.  Although these and other such factors are beyond the Debtor's control and cannot be determined in advance, they could have a significant impact on the Reorganized Debtor's operating performance.

US_ACTIVE-107697579.42

The Debtor's operations are dependent on the availability and cost of working capital financing and trade terms provided by vendors and may be adversely affected by any shortage or increased cost of such financing and trade vendor support.  In particular, the Debtor depends on a limited number of customers for a significant portion of its revenue.  The loss of its most significant or several of its smaller customers would materially adversely affect the Reorganized Debtor's business and results of operation, and the Reorganized Debtor may not be able to obtain contractual commitments for minimum volume orders with respect to the sale of its products.

The Debtor's post-petition operations will be financed largely from the Exit Funding that will be available under the Equity Commitment Agreement.  The Debtor believes that substantially all of its need for funds necessary to consummate the Plan and for post-Effective Date working capital financing will be met by this Exit Funding.  However, if the Reorganized Debtor requires working capital and trade financing greater than that provided by the Exit Funding, it may be required either to (i) obtain other sources of financing or (ii) curtail operations.

No assurance can be given, however, that any additional financing will be available, if at all, on terms that are favorable or acceptable to the Reorganized Debtor.  The ability to obtain additional financing will be subject to a number of factors, including the development of the market for HEVs and EVs, commercial acceptance of the Reorganized Debtor's products, its operating performance, the terms of the Reorganized Debtor's existing indebtedness and the credit and capital markets.  The terms of any additional indebtedness may include restrictive financial and operating covenants that would limit the Reorganized Debtor's ability to compete and expand or limit the Reorganized Debtor's flexibility in paying its indebtedness.

US_ACTIVE-107697579.42

Both the credit and capital markets have experienced extreme volatility in recent periods. Credit markets have remained generally illiquid despite injections of capital by the United States and foreign governments. Banks and other lenders, such as true equipment leasing companies, have significantly increased credit requirements and reduced financing available to borrowers. In the capital markets, institutional investors have experienced large losses resulting in reductions of and restrictions on funds available for investment. As a result, the market for offerings of the Reorganized Debtor's debt and equity securities may be limited.

Furthermore, the Reorganized Debtor's ability to obtain financing from government grants is subject to the availability of funds under the applicable government programs as well as the approval of our applications to participate in such programs. No assurance can be given that the Reorganized Debtor's efforts to obtain such funds from these government sources will be successful. If adequate short-term working capital and permanent financing is not obtained, whether through credit or capital markets or through government programs, the Reorganized Debtor would have to curtail its development and production activities and adopt an alternative operating model to continue as a going concern. The Reorganized Debtor's failure to obtain any required future financing would materially and adversely affect our business, our financial condition and its prospects.

The Debtor believes that it is important to its forward business plan that its performance meets projected results in order to ensure continued support from vendors and others. There are risks to the Reorganized Debtor in the event such support erodes after emergence from Chapter 11 that could be alleviated by remaining in Chapter 11. Chapter 11 affords a debtor the opportunity to close facilities and liquidate assets relatively expeditiously, tools that will not be available to the Reorganized Debtor upon emergence. However, the Debtor believes that the

US_ACTIVE-107697579.42

benefits of emergence from Chapter 11 at this time outweigh the potential costs of remaining in

Chapter 11, and that emergence at this time is in the long-term operational best interests of the

Debtor and its Creditors.

2.      <u>Impact of Interest Rates</u>

Changes in interest rates and foreign exchange rates may affect the fair market value of the

Debtor's assets.

**I.      Bankruptcy Law Risks and Considerations**

1.      <u>Confirmation of the Plan is Not Assured</u>

Although the Debtor believes that the Plan will satisfy all requirements necessary for

confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will

reach the same conclusion.  There can also be no assurance that modifications to the Plan will

not be required for confirmation or that such modifications would not necessitate resolicitation of

votes.

2.      <u>The Plan May Be Confirmed Without the Approval of All Classes
Through So-Called "Cramdown"</u>

If one or more Impaired Classes of Claims or Interests does not accept the Plan, the

Bankruptcy Court may nonetheless confirm the Plan if all other conditions for confirmation have

been met and at least one impaired Class of Claims has accepted the Plan (without including the

vote of any insider in that Class) and, as to each Impaired Class that has not accepted the Plan,

the Bankruptcy Court determines that the Plan does not discriminate unfairly and is fair and

equitable.

Holders of Interests in Class 7 will not receive any distribution nor retain any property

under the Plan on account of such Interests and, pursuant to section 1126(g) of the Bankruptcy

Code, Class 7 is conclusively deemed to reject the Plan.  Accordingly, the Debtor will not solicit

US_ACTIVE-107697579.42

acceptance or rejections of the Plan from holders of Interests in Class 7 and will seek to confirm

the Plan notwithstanding the deemed rejection of Class 7 pursuant to the provisions of Section

1129(b)(1) and (2)(C) of the Bankruptcy Code.  The Debtor therefore believes the Plan may be

confirmed despite its deemed rejection by Class 7.

3.        <u>The Effective Date Might Be Delayed or Never Occur</u>

There can be no assurance as to the timing of the Effective Date or that it will occur.  If

the conditions precedent to the Effective Date set forth in the Plan have not occurred or been

waived, the Confirmation Order shall be vacated in accordance with the Plan and such

Confirmation Order.  In that event, no distributions would be made, and the holders of Claims

and Interests would be restored to their previous position as of the moment before confirmation,

and the Debtor's obligations for Claims and Interests would remain unchanged.

**J.    <u>Tax Considerations</u>**

There are significant tax consequences to the Debtor and holders of Claims and Interests.

These are discussed below in the section entitled "Certain U.S. Federal Income Tax

Consequences of the Plan."  You should consult your own tax advisor about your particular

circumstances.

**XVII.  CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion is directed to the holders in Voting Classes and is a summary of

certain U.S. federal income tax consequences of the Plan which is for general information

purposes only and does not purport to be a complete analysis or listing of all potential tax

consequences.  Moreover, such summary should not be relied upon for purposes of determining

the specific tax consequences of the Plan - with respect to a particular holder in a Voting Class.

This summary assumes that the various indebtedness and other arrangements to which a Debtor

is a party will be respected for U.S. federal income tax purposes in accordance with their form.

US_ACTIVE-107697579.42

The following summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder ("Regulations"), judicial decisions and published administrative rulings and pronouncements of the Internal Revenue Service (the "IRS"), as in effect on the date hereof.  Legislative, judicial or administrative changes or interpretations enacted or promulgated hereafter could alter or modify the analysis and conclusions set forth below.  Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below.

No ruling has been requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been sought or obtained with respect thereto.  No representations or assurances are being made to the holders in Voting Classes with respect to the U.S. federal income tax consequences described herein.  This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan. Additionally, this summary does not purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions thrifts, small business investment companies, regulated investment companies, tax exempt organizations, certain expatriates, pass-through entities or investors in pass-through entities).

THE TAX CONSEQUENCES TO HOLDERS IN VOTING CLASSES MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED

US_ACTIVE-107697579.42

HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE

SUSTAINED. ACCORDINGLY, EACH HOLDER IN A VOTING CLASS IS URGED TO

CONSULT ITS OWN TAX ADVISOR REGARDING THE, FEDERAL, STATE, LOCAL

AND, TO THE EXTENT APPLICABLE, FOREIGN TAX CONSEQUENCES OF THE PLAN.

**TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE
CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF
THE U.S. FEDERAL INCOME TAX ISSUES IN THIS DISCLOSURE STATEMENT IS
NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY
PERSON FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES
THAT MAY BE IMPOSED ON SUCH PERSON; (2) ANY DISCUSSION OF U.S.
FEDERAL INCOME TAX ISSUES IN THIS DISCLOSURE STATEMENT IS WRITTEN
IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE
TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT;
AND (3) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR
CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

      A.      <u>**Federal Tax Consequences to the Debtor**</u>

          1.      <u>Cancellation of Indebtedness Income Generally</u>

Pursuant to the Tax Code and subject to certain exceptions, a taxpayer generally must

recognize income from the cancellation of indebtedness ("<u>COD Income</u>") to the extent that such

taxpayer's indebtedness is discharged for an amount less than the indebtedness' adjusted issue

price determined in the manner described below.  Generally, the amount of COD Income, subject

to certain statutory and judicial exceptions, is the excess of (i) the adjusted issue price of the

discharged indebtedness less (ii) the sum of the fair market value (determined at the date of the

exchange) of the consideration, if any, given in exchange for such discharged indebtedness

US_ACTIVE-107697579.42

including cash and property and the issue price of any new indebtedness.  The adjusted issue price of the discharged indebtedness would generally be the amount paid for such indebtedness upon original issuance, subject to any appropriate adjustments under the Tax Code.  If a new debt instrument is issued to the creditor, then the issue price of such debt instrument is determined under either Section 1273 or Section 1274 of the Tax Code.  Generally, these provisions treat the fair market value of a publicly-traded debt instrument on its issue date as its issue price and the stated principal amount of any other debt instrument as its issue price if its terms provide for adequate stated interest.  An instrument will be treated as publicly traded if it is traded on an established market at any time during the 30 day period ending after the issue date.  A non publicly-traded debt instrument has adequate stated interest if the interest exceeds the applicable federal rate under the Tax Code.

2.        <u>Bankruptcy Exception and the Reduction of Tax Attributes Generally.</u>

Section 108(a)(l)(A) of the Tax Code provides an exception to the recognition of COD Income, however, where a taxpayer discharging indebtedness is under the jurisdiction of a court in a case under title 11 of the Bankruptcy Code and where the discharge is granted, or is effected pursuant to a plan approved by a U.S. Bankruptcy Court (the "<u>Bankruptcy Exception</u>").  Under the Bankruptcy Exception, instead of recognizing COD Income, the taxpayer is required, pursuant to Section 108(b) of the Tax Code, to reduce certain of that taxpayer's tax attributes to the extent thereof by the amount of COD Income.  The attributes of the taxpayer are generally reduced in the following order: net operating losses ("<u>NOLs</u>"), general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets  (including stock in subsidiaries), and finally, foreign tax credit tax carryforwards (collectively, "<u>Tax Attributes</u>").  In addition, to the extent that the basis of the taxpayer in the stock of a subsidiary member of an affiliated group filing a consolidated U.S. federal income tax return has been

US_ACTIVE-107697579.42

reduced under the Tax Attribute reduction rules, complex "push down" rules under the

applicable Regulations would require the subsidiary member to reduce its own Tax Attributes.  If

the amount of the COD Income is sufficiently large, it can eliminate these favorable Tax

Attributes.  To the extent the amount of COD Income exceeds the amount of Tax Attributes

available to be reduced, such excess is excluded from income.  Pursuant to Section 108(b)(4)(A)

of the Tax Code, the reduction of Tax Attributes does not occur until the end of the taxable year

after such Tax Attributes have been applied to determine the tax in the year of discharge or, in

the case of asset basis reduction, the first day of the taxable year following the taxable year in

which the COD Income is realized.

As a result of the Bankruptcy Exception, it is expected that any COD Income realized by

the Debtor will not be recognized.  Under the attribute reduction rules described above, it is

anticipated that the COD Income will result in a substantial reduction of the Debtor's NOLs.   It

is not anticipated that any Tax Attribute of the Debtor other than NOLs would be reduced under

the Plan because the Debtor's own substantial NOLs  will greatly exceed the amount of expected

COD Income.

Section 108(e)(2) of the Tax Code provides a further exception to the recognition of COD

Income upon the discharge of debt, providing that a taxpayer will not recognize COD Income to

the extent that the taxpayer's satisfaction of the debt would have given rise to a deduction for

United States federal income tax purposes.  Unlike Section 108(b) of the Tax Code, Section

108(e)(2) does not require a reduction in the taxpayer's Tax Attributes as a result of the non-

recognition of COD Income.  Thus, the effect of Section 108(e)(2) of the Tax Code, where

applicable, is to allow a taxpayer to discharge indebtedness without recognizing income and

without reducing its Tax Attributes.

US_ACTIVE-107697579.42

3.        Net Operating Losses – Section 382.

As a result of the issuance of the New Common Stock and New Preferred Stock pursuant to the Plan, it is anticipated that the Debtor will experience an "ownership change" (within the meaning of Section 382 of the Tax Code) (the "Ownership Change") on the Effective Date. Under Section 382 of the Tax Code, the Debtor's ability to use any pre-Effective Date NOLs or certain other tax attributes to offset its income in any post-Effective Date taxable year (and in the portion of the taxable year of the ownership change following the Effective Date) to which such a carryforward is made generally (subject to various exceptions and adjustments, some of which are described below) will be subject to an annual limitation.  Subject to the discussion below, the annual limitation under Section 382 of the Tax Code is generally equal to the product of (i) the "long-term tax exempt rate" (for example, 3.55% for ownership changes occurring during the month of December 2011) and (ii) the fair market value of the stock of the corporation immediately before the ownership change occurs (but note the potentially larger base amount described below).  The annual limitation under Section 382 of the Tax Code would be increased to the extent of the recognition of "net unrealized built-in gains," if any, during the five year period beginning on the change date.  Section 382 of the Tax Code may also limit the Debtor's ability to use "net unrealized built-in losses," if any, to offset future taxable income.  Moreover, the Debtor's loss carryforwards will be subject to further limitations if the Debtor experiences additional future ownership changes.

An exception to the foregoing annual limitation rules generally applies where qualified (so-called "old and cold") creditors and existing shareholders of a debtor receive, in respect of their claims or equity interests, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to certain confirmed bankruptcy reorganizations.  The Debtor does not anticipate that it would qualify for this

- 116 -

US_ACTIVE-107697579.42

exception. However, because the Debtor is in a bankruptcy proceeding and will not meet the old

and cold creditors exception, it is likely that the Debtor will be able to utilize a higher base for

the above-described annual limitation that would include in the value of the corporation's stock

the amount of any increase resulting from the surrender or cancellation of creditors' claims in the

bankruptcy proceeding.

### B.    Federal Tax Consequences to the Holders in Voting Classes

#### 1.    Exchange of Voting Class Instruments under the Plan

Generally, and subject to the recapitalization discussion below, a holder in a Voting Class

should in most, but not all, circumstances recognize gain or loss equal to the difference between

the "amount realized" by such holder in exchange for its Voting Class instrument and such

holder's adjusted tax basis in the Voting Class instrument. The "amount realized" is equal to the

sum of the cash, the issue price of any New Notes and the fair market value of any other

consideration received in respect of a holder's Voting Class instrument (other than amounts

attributable to accrued and unpaid interest, if any, which will be includible in income to the

extent not previously included). The tax basis of a holder in a Voting Class will generally be

equal to the holder's cost therefor, subject to applicable adjustments in the event that the Voting

Class instrument has accrued Original Issue Discount ("OID"), market discount or bond

premium. Pursuant to the Plan, the Debtor intends to allocate all amounts distributed to the

Voting Classes first to principal and then, to the extent the consideration exceeds the principal

amount of the Voting Class instruments, to accrued but unpaid interest for U.S. federal income

tax purposes. It is unclear whether such allocation will be respected for tax purposes, and,

accordingly, distributions may be treated as allocated first to accrued but unpaid interest with

respect to the Voting Class instruments.

US_ACTIVE-107697579.42

In the event that any of the Voting Class instruments is determined to be a "security" for U.S. federal income tax purposes, the exchange of such a Voting Class instrument for New Notes or New Common Stock could be treated as a "recapitalization" to such holder, in which case such holder would not recognize gain or loss with respect to its receipt of securities in the Company in the recapitalization. To the extent that a holder in a Voting Class receives cash, gain would be recognized to the extent of the lesser of the cash received or the holder's realized gain with respect to the Voting Class instrument. Although the term "security" isn't defined in the Tax Code, a debt instrument due more than ten years from the date of issuance is generally considered to be a security. However, the law is unclear in this area. Depending on the facts, an instrument with an original term of as little as five years (or even less) may also qualify as a security.

To the extent applicable, the character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Voting Class instrument in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period of the Voting Class instrument, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Voting Class instrument. Generally, if the Voting Class is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Voting Class instrument for more than one year. It should be noted that with respect to any Voting Class instrument which is a "contingent payment debt instrument" as defined under the OID rules, gain or loss from the disposition of that Voting Class instrument may be ordinary instead of capital.

    2.    <u>Consequences of Holding New Notes and New Common Stock Received under the Plan.</u>

US_ACTIVE-107697579.42

The following is a discussion of certain U.S. federal income tax consequences that may be relevant with respect to the ownership and disposition of New Common Stock and/or New Notes. This discussion addresses only the U.S. federal income tax considerations of holders that will receive New Common Stock and/or New Notes under the Plan and that will hold such New Common Stock and/or New Notes as capital assets.

a.    *New Common Stock*

The gross amount of any distribution by the Debtor of cash or other property with respect to New Common Stock, other than certain distributions, if any, of New Common Stock distributed pro rata to all shareholders, will be includible in income by a shareholder as dividend income to the extent such distributions are paid out of the current or accumulated earnings and profits of the Debtor, as determined under U.S. federal income tax principles. Individual holders may be taxed on such distributions made in taxable years beginning before January 1, 2013 at the lower rates applicable to long term capital gains.   A U.S. corporation that holds New Common Stock may be eligible for the dividend received deduction with respect to dividends received from the Debtor.  To the extent, if any, that the amount of any distribution by the Debtor exceeds its current and accumulated earnings and profits as determined under U.S. federal income tax principles, such distribution will be treated first as a tax-free return of the holder's adjusted tax basis in the New Common Stock and thereafter as-gain.

A holder of New Common Stock generally will recognize gain or loss on its sale or exchange of New Common Stock equal to the difference between the amount realized on such sale or exchange and the holder's adjusted tax basis in the relevant shares of New Common Stock. In the case of a noncorporate holder, such gain currently is subject to tax at a maximum rate of 15% if the holder's holding period for the New Common Stock is more than one year at the time of disposition.  However, under Section 108(e)(7) of the Tax Code, gain on stock which

- 119 -

is received in satisfaction of a corporation's indebtedness may be subject to ordinary income recapture to the extent that the holder had previously claimed an ordinary bad debt deduction or an ordinary loss on the exchange of the indebtedness for stock. The deductibility of capital losses is subject to limitations.

b.      *New Notes*

Stated interest paid on a New Note will be includible in a holder's gross income as ordinary interest income in accordance with the holder's usual method of tax accounting to the extent such stated interest is "qualified stated interest."   Stated interest is "qualified stated interest" if it is payable in cash or property (other than debt instruments of the issuer) at least annually. The Notes (or a portion thereof) may be considered to be issued with OID depending on the issue price of such Notes. A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its issue price by more than a *de minimis* amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the Notes, other than qualified stated interest. See above for a discussion regarding the determination of issue price.

Upon the sale, exchange or retirement of a Note, a holder generally will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or retirement, other than accrued but unpaid interest which will be taxable as such, and such holder's adjusted tax basis in the relevant Note. Such gain or loss generally will be capital gain or loss. In the case of a noncorporate holder, such gain currently is subject to tax at a maximum rate of 15% if the holder's holding period for the Note is more than one year at the time of disposition.

C.      **Information Reporting and Backup Withholding**

US_ACTIVE-107697579.42

Certain distributions and exchanges made with respect to Voting Classes pursuant to the

Plan may be subject to information reporting by the Debtor to the IRS. Moreover, such

reportable distributions and exchanges may be subject to backup withholding (currently at a rate

of 28%) under certain circumstances. Backup withholding is not an additional tax. Amounts

withheld under the backup withholding rules may be credited against a holder's U.S. federal

income tax liability, and a holder may obtain a refund of any excess amounts withheld under the

backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a

U.S. federal income tax return).

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL

PURPOSES ONLY. ALL HOLDERS IN VOTING CLASSES ARE URGED TO CONSULT

THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND, TO THE

EXTENT APPLICABLE, FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE

PLAN.

## XVIII. ALTERNATIVES TO THE PLAN

The Debtor believes that if the Plan is not confirmed, or is not confirmable, the

alternatives to the Plan include: (i) the commencement of, or conversion to, a Chapter 7 case and

accompanying liquidation of the Debtor's assets on a "forced sale" basis; (ii) dismissal of the

case(s); or (iii) an alternative plan of reorganization.

### A.    Liquidation Under Chapter 7

If no plan can be confirmed, the Chapter 11 Case may be converted to Chapter 7 of the

Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the

Debtor for distribution to Creditors in accordance with the priorities established by the

Bankruptcy Code. For the reasons previously discussed above, the Debtor believes that

confirmation of the Plan will provide holders of Interests in Class 7  under the Plan with a

US_ACTIVE-107697579.42

recovery that is not less than the recovery that the Holders of such Interests would receive in a liquidation under Chapter 7 of the Bankruptcy Code.

### B.    Dismissal

Dismissal of the Chapter 11 Case would leave the secured creditors in a position to exercise their legal rights under their existing security interests, including foreclosure of such liens.  The Debtor believes that in a dismissal scenario the unsecured creditors would not receive any distribution.

### C.    Alternative Plan

The Debtor believes that any alternative plan would not result in as favorable treatment of Claims as proposed under the Plan.  If the Plan is not accepted by the requisite amount of the Debtor's Creditors and confirmed according to the terms and expedited timelines set forth therein, there is no assurance that the Debtor would be able to obtain an alternate source of financing.

## XIX.   DEFINITIONS AND INTERPRETATION

### A.    Scope of Definitions.  Any term used in the Plan or the Disclosure Statement that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.  Whenever the context requires defined terms shall include the plural as well as the singular and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and neutral.

### B.    Definitions.  In addition to such other terms as are defined in other sections of this Disclosure Statement or the Plan, the terms set forth in Schedule 1 (which appear in the Plan as in Article 1) have the meanings ascribed there.

US_ACTIVE-107697579.42

C.    **Rules of Interpretation**

1.    In the event of an inconsistency, the provisions of the Plan shall control over the contents of this Disclosure Statement.  The provisions of the Confirmation Order shall control over the contents of the Plan.

2.    For the purposes of the Plan: any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; provided, however, that any change to such form, terms or conditions that is material to a party to such document shall not be modified without such party's written consent unless such document expressly provides otherwise;

(a)    any reference in the Plan to an existing document, exhibit or schedule Filed or to be Filed means such document, exhibit or schedule, as it may have been or may be amended, modified or supplemented as of the Effective Date unless otherwise specified, all references in the Plan to "sections," "Articles," "Exhibits" and "Schedules" are references to sections, Articles, Exhibits and Schedules of or to the Plan, as the same they be amended, waived, supplemented or modified from time to time;

(b)    any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns;

(c)    unless otherwise specified, all references in the Plan to "sections," "Articles," "Exhibits" and "Schedules" are references to sections, articles, exhibits and schedules of , or to, the Plan;

US_ACTIVE-107697579.42

(d)     the words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(e)     captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be part or to affect interpretations of the Plan;

(f)     all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time and as applicable to the Debtor, the Reorganized Debtor, or the Chapter 11 Case unless otherwise stated;

(g)     the rules of construction set forth in section 102 of the Bankruptcy Code shall apply, except to the extent inconsistent with the provisions of this Article of the Plan; and

(h)     the word "including" means "including without limitation."

3.     Whenever a distribution of property is required to be made on a particular date, the distribution shall be made on such date or as soon as reasonably practicable thereafter.

4.     All schedules and exhibits to the Plan are incorporated into the Plan and shall be deemed to be included in the Plan, regardless of when they are Filed.

5.     Subject to the provisions of any contract, certificate, bylaws, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules.

6.     The Plan is the product of extensive discussions and negotiations between and among, *inter alia*, the Debtor, the Plan Support Parties, and the DIP Lender.  Each of the

US_ACTIVE-107697579.42

foregoing was represented by counsel who either (i) participated in the formulation and

documentation of or (ii) was afforded the opportunity to review and provide comments on, the

Plan, this Disclosure Statement, and the documents ancillary thereto.

## XX.    CONCLUSION

The Debtor believes that the Plan maximizes recoveries to all Creditors and, thus, is in

their best interests.  The Plan as structured, among other things, allows Creditors to participate in

distributions in excess of those that would be available if the Debtor were liquidated under

Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to all Creditors.

**THE DEBTOR THEREFORE URGES CREDITORS TO <u>ACCEPT</u> THE PLAN
AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR PROPERLY
COMPLETED BALLOT(S) SO THAT THEY WILL BE ACTUALLY RECEIVED, AS
INSTRUCTED ABOVE PRIOR TO THE VOTING DEADLINE.**

**Dated:  January 26, 2012**

**Ener1, Inc.**

US_ACTIVE-107697579.42

**SCHEDULE 1**

GLOSSARY OF DEFINED TERMS USED IN THIS DISCLOSURE STATEMENT IN

CONNECTION WITH THE PREPACKAGED PLAN OF REORGANIZATION UNDER

CHAPTER 11 OF THE BANKRUPTCY CODE

All capitalized terms not defined in the Introduction or elsewhere in the text of this

Disclosure Statement have the meanings ascribed to them in Article 1 of the Plan, a copy of

which is annexed to the Disclosure Statement as Exhibit 1.  For ease of reference, a summary of

the most commonly utilized defined terms appears below, and is deemed incorporated into this

Disclosure Statement.  In the event that definitions in this Disclosure Statement are inconsistent

with definitions in the Plan, the definitions in the Plan shall govern.

As used in this Disclosure Statement, all capitalized terms not otherwise defined shall

have the meanings ascribed to herein and any term used that is not defined herein, but is defined

in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to that term in

the Bankruptcy Code or the Bankruptcy Rules, respectively.  Whenever the context requires,

capitalized terms shall include the plural as well as the singular number, the masculine gender

shall include the feminine and the feminine gender shall include the masculine.

**Administrative Claim**:  A Claim for any cost or expense of administration

(including Professional Claims) of the Chapter 11 Case asserted or arising under sections 503,

507(a)(2) or 507(b) of the Bankruptcy Code, including any (i) actual and necessary cost or

expense of preserving the Debtor's Estate or operating the business of the Debtor arising on or

after the Petition Date, (ii) payment to be made under the Plan to cure a default on an executory

contract or unexpired lease that is assumed pursuant to section 365 of the Bankruptcy Code, (iii)

obligations validly incurred or assumed by the Debtor in the ordinary course of business arising

on or after the Petition Date, (iv) compensation or reimbursement of expenses of Professionals

arising on or after the Petition Date, to the extent allowed by the Bankruptcy Court under section 330(a) or section 331 of the Bankruptcy Code, (v) fees or charges of the Debtor's Estate under section 1930 of title 28 of the United States Code, and (vi) costs and expenses incurred by the DIP Lender in accordance with the provisions of the DIP Facility.

**Affiliate**:  Has the meaning ascribed thereto in section 101(2) of the Bankruptcy Code.

**Allowed [ ] Claim**:  An Allowed Claim in the particular category or Class identified.

**Allowed Claim**: Claim against the Debtor or any portion thereof (i) arising on or before the Effective Date as to which a proof of claim has been filed and (a) no objection to allowance has been interposed within the time period set forth in section 8.3 of the Plan or (b) an objection has been adjudicated by a Final Order to the extent such objection is determined in favor of the relevant holder, (ii) any Claim as to which the liability of the Debtor and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, (iii) any Claim that is expressly allowed by a provision of the Plan, or (iv) any Claim that has been scheduled by the Debtor in the Schedules filed with the Bankruptcy Court pursuant to Rule 1007(b) of the Federal Rules of Bankruptcy Procedure.

**Avoidance Action**:  Any actual or potential Claims to avoid a transfer of an interest in property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including, all claims under Chapter 5 of the Bankruptcy Code.

**Bankruptcy Code**:  Title 11 of the United States Code, as in effect on the Petition Date and as thereafter amended, as applicable in the Chapter 11 Case.

**Bankruptcy Court**:  The United States Bankruptcy Court for the Southern

US_ACTIVE-107697579.42

District of New York acting in, and exercising its jurisdiction over, the voluntary Chapter 11 Case of the Debtor.

**Bankruptcy Rules**:  The Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York, as in effect on the Petition Date and as thereafter amended, as applicable from time to time in the Chapter 11 Case.

**Bridge Loan Agreement**:  The Loan Agreement dated November 16, 2011, by and among the Debtor, Bzinfin S.A., Goldman Sachs Palmetto State Credit Fund, L.P., and Liberty Harbor Special Investments, LLC, as may be amended or supplemented from time to time.

**Bridge Loan Claims**:  Claims arising under the Bridge Loan Documents, including all reasonable costs and expenses incurred by the Bridge Loan Lenders and all reasonable expenses of the Bridge Loan Lenders in connection with the restructuring of the Debtor, the Chapter 11 Case, and the negotiation, administration, monitoring, and enforcement of the Bridge Loan Documents and/or any related agreements, documents or instruments.

**Bridge Loan Documents**:  Shall have the meaning ascribed to the term "Loan Documents" in the Bridge Loan Agreement.

**Bridge Loan Lenders**:  The lenders under the Bridge Loan Documents.

**Business Day**:  Any day other than a Saturday, Sunday, a "legal holiday", as such term is defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

**Cash**:  Legal tender accepted in the United States of America for the payment of

US_ACTIVE-107697579.42

public and private debts, denominated in United States dollars.

**Cause of Action**:  Any: (i) Claims, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses and offsets; (ii) all rights of setoff, counterclaim or recoupment and Claims on contracts or for breaches of duties imposed by law; (iii) rights to object to Claims or Interests; (iv) Avoidance Actions; and (v) Claims and defenses such as fraud, mistake, duress and usury and any other defenses available to the Debtor under section 558 of the Bankruptcy Code or otherwise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date including through the Effective Date, in contract, sounding in tort, at law, in equity, or pursuant to any other theory of law.

**Chapter 11 Case**:  The Chapter 11 case of the Debtor to be commenced in the Bankruptcy Court.

**Claim**:  A claim as defined in section 101(5) of the Bankruptcy Code.

**Class**:  A group of Claims or Interests as classified in a particular class under the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**Confirmation**:  Entry of the Confirmation Order by the Bankruptcy Court.

**Confirmation Date**:  The date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

**Confirmation Hearing**:  The hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, including any adjournments or continuances thereof.

**Confirmation Order**:  The order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

US_ACTIVE-107697579.42

**Convertible Note Claims**:  Claims arising under the Convertible Notes.

**Convertible Note Claims New Common Stock Amount**:  $8,906,459.61.

**Convertible Notes**:  The 6% Senior Convertible Notes, due August 27, 2015, issued by the Debtor pursuant to the Note Purchase Agreement, dated August 27, 2010, in the aggregate principal amount of $10,000,000, plus accrued and unpaid interest, fees and costs.

**Creditor**:  Any Entity holding a Claim against the Debtor.

**Debtor**:  Shall have the meaning ascribed in the Introduction to the Plan.

**DIP Agreement**:  The Debtor in Possession Loan Agreement by and among the Debtor, as debtor and debtor-in-possession, and Bzinfin, as lender and as agent for the lenders, to be entered into on or shortly after the commencement of the Chapter 11 Case, pursuant to which the DIP Lenders will make post-petition loans and advances to the Debtor consisting of a debtor-in-possession credit facility in an aggregate principal amount not to exceed $20,000,000, as may be amended or supplemented from time to time.

**DIP Facility**:  The facility provided to the Debtor by the DIP Lenders, as evidenced by the DIP Agreement.

**DIP Facility Orders**:  Any interim order and Final Order of the Bankruptcy Court authorizing the Debtor to enter into the DIP Facility.

**DIP Lenders**:  Bzinfin and any other person that may become a lender under the DIP Agreement pursuant to section 13.2(a) thereof, in their respective capacities as lenders under the DIP Facility.

**Disclosure Statement**:  The written disclosure statement dated January 26, 2012 relating to the Plan, including all schedules and exhibits attached thereto, as it may be amended, modified or supplemented from time to time.

US_ACTIVE-107697579.42

**Disputed Claim**:  Any Claim, to the extent neither Allowed nor disallowed under the Plan or a Final Order, or for which a proof of claim has been timely Filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtor or any party in interest has interposed a timely objection in accordance with section 8.2 of the Plan, which objection has not been withdrawn or determined by a Final Order.

**Effective Date**:  A date selected by the Debtor with the consent of the Requisite Consenting Lenders that is not more than five (5) Business Days following the first date on which all conditions to the Effective Date set forth in section 10.2 of the Plan have been satisfied or, if waivable, waived.

**Entity**:  An entity as defined in section 101(15) of the Bankruptcy Code.

**Estate**:   The estate of the Debtor created pursuant to section 541 of the Bankruptcy Code by the commencement of the Chapter 11 Case.

**Exculpated Parties**:  Each of the Debtor, the DIP Lenders, the Exit Funders, all creditors who executed the Plan Support Agreement, and any of such parties' respective members, officers, directors, affiliates, employees, representatives, advisors, attorneys, financial advisors, investment bankers or agents.

**Exit Funding**:  The commitment of the Exit Funders to provide financing in an amount of up to $81 million less the principal amount outstanding under the DIP Facility as of the Effective Date on the terms set forth in the Equity Commitment Agreement, substantially in the form annexed as Schedule 4 to the Plan, to be entered into as of the Effective Date.

**Exit Funders**:  Each of Bzinfin S.A (or its Affiliate), Goldman Sachs Palmetto State Credit Fund, L.P., Liberty Harbor Special Investments, LLC, Whitebox Multi Strategy Partners, L.P., Whitebox Concentrated Convertible Arbitrage Partners L.P., Pandora Select

US_ACTIVE-107697579.42

Partners, L.P., Whitebox Credit Arbitrage Partners, L.P., and Whitebox Special Opportunities Fund LP, Series B, in each case, in its capacity as a provider of a portion of the Exit Funding, in accordance with the terms of the Equity Commitment Agreement.

**File or Filed**:  To file, or to have been filed, with the Clerk of the Bankruptcy Court in the Chapter 11 Case.

**Final Decree**:  A Final Order of the Bankruptcy Court entered pursuant to section 350(a) of the Bankruptcy Code closing the Chapter 11 Case.

**Final Distribution**:  The final payment made to any holders of Claims in Class 6 (General Unsecured Claims).

**Final Distribution Date**:  The date upon which the Final Distribution is made.

**Final Order**:  An order or judgment of the Bankruptcy Court or other court of competent jurisdiction, as entered on its docket, that has not been reversed, stayed, vacated, modified or amended, and as to which (i) the time to appeal, petition for certiorari or move for a stay, reargument, rehearing or a new trial has expired and no appeal, petition for certiorari or motion for stay, reargument, rehearing or a new trial, respectively, shall then be pending, or (ii) any appeal, any petition for *certiorari* or any motion for stay, reargument, rehearing or a new trial that has been timely filed has been resolved by the highest court (or any other tribunal having appellate jurisdiction over the order or judgment) to which the order or judgment was appealed or from which certiorari or stay, reargument, rehearing or a new trial was sought, and the time to take any further appeal, petition for *certiorari* or move for stay, reargument, rehearing or a new trial shall have expired without such actions having been taken, provided, however, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the

US_ACTIVE-107697579.42

Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

**General Unsecured Claims**:  All Claims against the Debtor other than DIP Claims, Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, Bridge Loan Claims, Senior Note Claims, Convertible Note Claims, and Line of Credit Claims.

**Governmental Unit**:  Shall have the meaning ascribed to such term in section 101(27) of the Bankruptcy Code.

**Impaired**:  When used with reference to a Claim, an Interest or a Class of Claims or Interests, "Impaired" shall have the meaning ascribed to it in section 1124 of the Bankruptcy Code.

**Intercompany Claim**:  Any Claim held by the Debtor against a Non-Debtor Affiliate or by a Non-Debtor Affiliate against the Debtor.

**Interest**:  When used in the context of holding an equity interest (and not used to denote (i) the compensation paid for the use of money for a specified time and usually denoted as a percentage rate of interest on a principal sum of money or (ii) a security interest in property), the term "Interest" means "equity security", as defined in section 101(16) of the Bankruptcy Code, and includes all issued shares of common stock and preferred stock of the Debtor as of the Petition Date, all Warrants, options, or other rights, contractual or otherwise, to acquire any such equity interest in the debtor, or the right to purchase, sell, or subscribe to a share, security, or interest specified in subparagraph (A) or (B) of section 101(16) of the Bankruptcy Code, and any subordinated claim which arises pursuant to section 510(b) of the Bankruptcy Code.

**Lien**:  Shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

US_ACTIVE-107697579.42

**Line of Credit Agreement**:  The Line of Credit Agreement dated June 29, 2011, as amended, by and between the Debtor and Bzinfin S.A., that established a line of credit for the Debtor in the aggregate principal amount of $15,000,000, as may be amended or supplemented from time to time, provided, however, that pursuant to the terms of the Subordination Agreement the indebtedness under the Line of Credit Agreement is subordinated to the indebtedness under the Senior Notes Agreement.

**Line of Credit Claims**:  The Claims arising under the Line of Credit Agreement.

**Line of Credit Claims New Common Stock Amount**:  $12,081,177.28.

**New Board of Directors**:  The board of directors of the Reorganized Debtor on and after the Effective Date.

**New Common Stock**:  The common stock, par value $0.01 per share, to be issued by the Reorganized Debtor on the Effective Date to the holders of Claims in Classes 3, 4, and 5 pursuant to sections 5.3, 5.4, and 5.5 of the Plan and reserved for issuance upon the conversion of New Preferred Stock into New Common Stock.

**New Directors**:  The persons identified in the Plan Supplement who will serve as directors of the Reorganized Debtor on and after the Effective Date.

**New Notes**:  The notes to be issued to the holders of Claims in Class 3, pursuant to the New Notes Loan Agreement and section 5.3 of the Plan.

**New Notes Loan Agreement**:  The Loan Agreement, substantially in the form annexed as Schedule 1 to the Plan, to be entered into on the Effective Date by and among the Debtor, and as lenders, Goldman Sachs Palmetto State Credit Fund, L.P.; Liberty Harbor Special Investments, LLC; Whitebox Multi Strategy Partners, L.P.; Whitebox Concentrated Convertible Arbitrage Partners L.P.; Pandora Select Partners, L.P.; Whitebox Credit Arbitrage Partners, L.P.;

US_ACTIVE-107697579.42

and Whitebox Special Opportunities Fund LP, Series B, as may be amended or supplemented from time to time.

**New Organization Documents**:    The Amended and Restated Articles of Incorporation and the Amended and Restated Bylaws of the Reorganized Debtor, substantially in the form annexed as Schedule 5.

**New Preferred Stock**:  The Series A Cumulative Convertible Preferred Stock to be issued by the Reorganized Debtor on the Effective Date.

**Non-Debtor Affiliates**:  All Entities that are, directly or indirectly, owned or controlled by the Debtor.

**Person**:  A "person" as defined in section 101(41) of the Bankruptcy Code.

**Petition Date**:  The date on which the Debtor's voluntary petition commencing the Chapter 11 Case is filed with the Bankruptcy Court.

**Plan**:    This Prepackaged Plan of Reorganization under Chapter 11 of the Bankruptcy Code, and all schedules annexed hereto or referenced herein, as it may be amended, modified or supplemented from time to time in accordance with the provisions of the Plan, the Bankruptcy Code or the Bankruptcy Rules.

**Plan Supplement**:    The compilation of documents, forms of documents, schedules, or exhibits to the Plan to be Filed by the Debtors no later than five (5) Business Days prior to the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest.  With the prior consent of the Requisite Consenting Lenders, the Debtors shall have the right to amend the documents contained in the Plan Supplement, through and including the Effective Date.

**Plan Support Agreement**:  The Plan Support Agreement entered into as of

US_ACTIVE-107697579.42

January 26, 2012, by and among the Debtor and the Plan Support Parties, attached to the Disclosure Statement, as amended or supplemented from time to time.

**Plan Support Parties**:  Collectively, Bzinfin S.A.; ITOCHU Corporation; Liberty Harbor Special Investments, LLC; Goldman Sachs Palmetto State Credit Fund, L.P.; Whitebox Multi Strategy Partners, L.P.; Whitebox Concentrated Convertible Arbitrage Partners L.P.; Pandora Select Partners, L.P.; Whitebox Credit Arbitrage Partners, L.P.; and Whitebox Special Opportunities Fund LP, Series B.

**Priority Non-Tax Claim**:  Any Claim of any Creditor entitled to priority in payment as specified in section 507(a)(4), (5), (6) or (7) of the Bankruptcy Code.

**Priority Tax Claim**:  Any Claim of a Government Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Professional**:  A Person (i) employed in the Chapter 11 Case pursuant to a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330, 331 and 363 of the Bankruptcy Code or (ii) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

**Professional Claim**:  A Claim of a Professional (i) for compensation or reimbursement of actual and necessary costs and expenses relating to services incurred after the Petition Date and prior to and including the Effective Date or (ii) for compensation and reimbursement that has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

**Registration Rights Agreement**:    The Registration Rights Agreement,

US_ACTIVE-107697579.42

substantially in the form annexed as Schedule 6 to the Plan, to be entered into by the Reorganized Debtor and the holders of the New Common Stock and the New Preferred Stock as of the Effective Date.

**Rejection Damage Claim**:  Any Claim arising from the rejection, whether under section 365 of the Bankruptcy Code or under the Plan, of an executory contract or unexpired lease of the Debtor that has not been assumed.

**Rejection Damage Claim Bar Date**:  The thirtieth (30th) day following the later of (i) the Effective Date or (ii) the date on which the Debtor serves a written notice of entry of an order granting a motion to reject that has been entered by the Bankruptcy Court prior to the Confirmation Date in accordance with section 6.1 of the Plan.

**Reorganized Debtor**:  The Debtor, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

**Requisite Consenting Lenders**:  The "Requisite Consenting Lenders" as such term is defined in the Plan Support Agreement.

**Senior Notes**:  Consists of (i) the Tranche A 8.25% Senior Notes, due July 1, 2013, in the principal amount of $28,094,214, and (ii) the Tranche B 8.25% Senior Notes, due July 1, 2013, in the principal amount of $29,250,000, which were issued pursuant to the Senior Notes Agreement, in each case plus all accrued interest thereon and all other obligations due under the Senior Notes Agreement.

**Senior Notes Agreement**:  The Waiver, Amendment, and Exchange Agreement, dated September 9, 2011, by and among the Debtor, Liberty Harbor Special Investments, LLC, Goldman Sachs Palmetto State Credit Fund, L.P., Whitebox Multi Strategy Partners, L.P., Whitebox Concentrated Convertible Arbitrage Partners L.P., Pandora Select Partners, L.P.,

US_ACTIVE-107697579.42

Whitebox Credit Arbitrage Partners, L.P., and Whitebox Special Opportunities Fund LP, Series B, as may be amended or supplemented from time to time.

**Senior Note Claims**: Claims arising under the Senior Notes Agreement.

**Senior Note Claims New Common Stock Amount**: $15,516,807.58.

**Stockholders Agreement**: The Stockholders Agreement, substantially in the form annexed as Schedule 3 to the Plan, to be entered into by the Reorganized Debtor and the holders of the New Common Stock and the New Preferred Stock as of the Effective Date.

**Subordination Agreement**: The Letter Agreement, dated September 12, 2011, by and between the Debtor and Bzinfin S.A., providing, among other things, that the indebtedness under the Line of Credit Agreement is subordinated to the indebtedness under the Senior Notes Agreement, as may be amended or supplemented from time to time.

**Taxes**: All income, gaming, franchise, excise, sales, use, employment, withholding, property, payroll or other taxes, assessments, or governmental charges, together with any interest, penalties, additions to tax, fines, and similar amounts relating thereto, imposed or collected by any federal, state, local or foreign Governmental Unit on or from the Debtor.

**Total New Common Stock Calculation Amount**: The Total New Common Stock Calculation Amount is equal to the sum of the Convertible Note Claims New Common Stock Amount, the Line of Credit Claims New Common Stock Amount, the Senior Note Claims New Common Stock Amount, and the Total New Preferred Stock Amount.

**Total New Preferred Stock Amount**: The Total New Preferred Stock Amount is the aggregate liquidation value of the New Preferred Stock to be issued on the Effective Date in an amount equal to the sum of the principal amount outstanding under the DIP Facility on the Effective Date and the amount of the Exit Funding provided as of the Effective Date.

US_ACTIVE-107697579.42

**Unimpaired**:  Any Claim or Class of Creditors that is not Impaired.

**United States Trustee**:   The United States Trustee appointed under section 581(a)(3) of title 28 of the United States Code to serve in the Southern District of New York.

**Voting Classes**:   The Impaired Classes entitled to vote to accept or reject the Plan.

**Warrants**:  All warrants, issued at any time by the Debtor, to acquire any stock of the Debtor including, but not limited to, (i) warrants to purchase up to 2,882,775 shares of the Debtor's common stock issued pursuant to the September 2, 2010, Securities Purchase Agreement, (ii) warrants to purchase up to 1,019,353 shares of the Debtor's common stock issued pursuant to the December 31, 2010, Securities Purchase Agreement, and (iii) warrants to purchase up to 1,400,000 shares of the Debtor's common stock issued pursuant to the Senior Notes Agreement.

US_ACTIVE-107697579.42