**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

    ENER1, INC.,

        Reorganized Debtor.

**NOT FOR PUBLICATION**

Case No. 12-10299 (MG)

(Jointly Administered)

**MEMORANDUM OPINION AND ORDER SUSTAINING IN PART AND
OVERRULING IN PART OBJECTION TO CREDITOR'S PROOF OF CLAIM AND
<u>SUSTAINING DEBTOR'S DEFENSE OF RECOUPMENT</u>**

*A P P E A R A N C E S:*

TEITELBAUM LAW GROUP, LLC
*Special Counsel for the Reorganized Debtor*
1 Barker Avenue, Third Floor
White Plains, N.Y. 10601
By:    Jay Teitelbaum, Esq.

BERGER SINGERMAN LLP
*Counsel for Charles Gassenheimer*
1450 Brickell Ave., Suite 1900
Miami, FL 33131
By:    James Gassenheimer, Esq. (Admitted *Pro Hac Vice*)

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

        Charles Gassenheimer ("Gassenheimer"), the former chief executive officer ("CEO") of Ener1, Inc. ("Ener1," or the "Debtor"), filed a proof of claim ("the Claim") against the Debtor, seeking compensation for unused vacation time (the "Vacation Pay Claim") and for a contractual severance payment arising from Gassenheimer's termination of his employment "without cause" (the "Severance Claim"). Ener1 argues that the Vacation Pay Claim should be expunged because Ener1's policy did not permit executives to accrue unused vacation pay to future years; and it argues that the Severance Claim is subject recoupment because Gassenheimer's 2010 bonus should not have been paid (the "2010 Bonus Payment"). Ener1 also argued that is entitled

to recoupment for damages arising from Ener1's post-confirmation breach of contact claim against Gassenheimer for breach of a covenant not to compete, but the Court concluded in an earlier Opinion that the Court lacks subject matter jurisdiction to adjudicate that claim.

On January 26, 2012, Ener1 filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A disclosure statement and plan were filed with the "pre-packaged" bankruptcy case. The disclosure statement and the plan were approved on February 28, 2012, and Ener1 emerged as a reorganized debtor. The plan authorized Ener1 to object to creditor claims.

The Claim and Objection raised a contested matter. The Court conducted a one-day trial on September 19, 2016. This Opinion contains the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this contested matter by Fed. R. Bankr. P. 7052. The findings of fact include the Court's assessment of credibility regarding disputed issues of fact. The Court concludes below that the Objection to Gassenheimer's Claim is **SUSTAINED IN PART; DENIED IN PART; AND SUBJECT TO A DEFENSE OF RECOUPMENT.** Gassenheimer's claim is **ALLOWED** in the amount of $150,000.00 as a general unsecured claim.

## I. BACKGROUND

### A. Prior Opinion

In a September 15, 2016 Opinion, the Court dismissed Ener1's post-confirmation breach of contract claim for lack of subject matter jurisdiction. *See In re Ener1, Inc.*, 2016 WL 4919952 (Bankr. S.D.N.Y. Sept. 15, 2016).

Therefore, only the following issues were tried:

1) Whether unpaid vacation pay at Ener1 carried over to future years, and if so, whether Gassenheimer is entitled to recover accrued and unpaid vacation pay?

2

2) Whether Gassenheimer is entitled to recover any part of his Severance Claim, and if so, whether Ener1 may assert a defense of recoupment based upon Gassenheimer's failure to meet the required metrics to receive the 2010 Bonus?

B.      **Relevant Factual Background**

Ener1 is a holding company headquartered in New York and incorporated in Florida that, through foreign and domestic subsidiaries, designs, develops, manufactures, and markets high-performance lithium-ion batteries and battery pack systems. Ener1's 2010 Form 10-K (PX–13) identified Gassenheimer as a Director, Chief Executive Officer, and Chairman of the Board. He worked at Ener1 from 2006 until September 2011. Gassenheimer and Ener1 signed an employment agreement (the "Employment Agreement," PX-21) that contained provisions relating to compensation, termination of employment, and compensation upon termination. Gassenheimer was entitled to accrue three weeks of vacation each year pursuant to Ener1's paid-time off policy (the "PTO Policy," PX-22), but he did not take vacation in 2008, 2009, or 2010. From August 2008 through December 2009, Gassenheimer's annual base compensation was $500,000.00; from January 2010 through September 2011, Gassenheimer's annual base compensation was $600,000.00.

Beginning in 2009, Gassenheimer also served as a director of Think Global AS ("Think"), a Norwegian limited liability company, that manufactured electric automobiles. From June 2010 through June 2011, Gassenheimer was the Charmain of the Board of Think. From September through December 2010, Gassenheimer "supported and recommended" four transactions for Ener1 to provide financial support to Think. On June 22, 2011, Think filed for bankruptcy protection in Norway.

On or about March 7, 2011, Ener1 filed a Form 10-K for the year ending December 31, 2010; it reflected that Think accounted for (i) 24% of Ener1's total sales of $18.8 million; (ii) $13.6 million of Ener1's accounts receivable; (iii) $14 million of Ener1's loans receivable; and

3

(iv) a $58.6 million equity investment by Ener1 in Think. The 2010 Form 10-K also disclosed that annual cash bonuses paid to Ener1 employees are linked to a "company-wide financial performance measure." (Form 10-K at 114.) In or about March 2011, Ener1 paid Gassenheimer the Bonus Payment of $450,000.00.

On June 22, 2011, in a Form 8-K executed by Gassenheimer and filed with the SEC (the "June 2011 Form 8-K," PX-19), Ener1 reported that it would take a material charge, estimated to be $34.5 million, as a result of the Think bankruptcy filing. Then, on or about August 16, 2011, Ener1 filed a Form 8-K with the SEC (the "August 2011 Form 8-K," PX-20) announcing adjustments related to Think in the December 31, 2010 financial statements included in the 2010 Form 10-K as follows:

    a) Accounts receivable reduced by $17.4 million;

    b) Loans receivable reduced by $14 million;

    c) Net Sales reduced by $18.9 million;

    d) Gross profit reduced by $18.9 million, resulting in a loss of $5.08 million;

    e) Investment in Think written off in the amount of $58.6 million; and

    f) Losses from operations increased by $86.245 million.

On September 26, 2011, Ener1 removed Gassenheimer from the board of directors and terminated his employment as CEO "without cause." (PX–23, the "Termination Letter.") Section 5(b)(i) of the Employment Agreement provided that if Gassenheimer's employment was terminated without cause and if he complied with previously signed nondisclosure and confidentiality agreements, then Ener1 "shall pay [Gassenheimer] an amount equal to 1.0 times [Gassenheimer's] then annual [b]ase [s]alary." (Employment Agreement at § 5(b).) Additionally, Section 5(a) of the Employment Agreement provides that upon termination, Ener1 "shall pay or provide to [Gassenheimer] . . . any earned but unpaid [b]ase [s]alary, incentive

compensation earned but not yet paid, unpaid expense reimbursements, accrued but unused vacation and any vested benefits the [e]xecutive may have had under any employee benefit plan." (*Id.* at § 5(a).)

### C. The Parties' Contentions and Arguments

Gassenheimer originally argued that he is entitled to his accrued and unused vacation days in the amount of $73,074.00, but he reduced his Vacation Pay Claim at trial to $38,460.00, based on 4 weeks for the period of August 2008 through December 2009 at the rate of $500,000.00 a year, or $9,615.00 a week.[1] Gassenheimer claims that there was no policy against carrying over unused vacation days from prior years, and that other executives—including the former CFO—were paid their accrued and unused vacation days upon resignation or termination. Gassenheimer wants the same treatment.

Regarding the Severance Claim and Bonus Objection, Gassenheimer asserts that his bonus was not based on the financial performance of Ener1 and as such, the 2010 Bonus objection is without merit. Gassenheimer argues that his bonus was based on the amount of funds raised by the New York office of Ener1. The parties agree that if the applicable metric was, as Gassenheimer terms it, the "funds raised," then Gassenheimer was entitled to the full Bonus Payment without any recoupment.

Gassenheimer also asserts that under Florida law Ener1 has no right to assert a right of recoupment against the Severance Claim. In the alternative, Gassenheimer contends that the 2010 Bonus Objection must proceed as an adversary proceeding under the Fed. R. Bankr. P. 7001, because Ener1 cannot assert a right of setoff under section 553(a) of the Bankruptcy Code.

---

[1] The earlier Vacation Pay Claim included a request for an additional 3 weeks for the period January 2010 through December 31, 2010, at the rate of $600,000.00 a year, or $11,538.00 a week. In May 2011, Gassenheimer agreed voluntarily to contribute his accrued 2011 vacation pay to assist Ener1 in funding payroll. That portion of the Vacation Pay Claim was dropped at trial.

5

Ener1 argues the Vacation Pay Claim should be disallowed in full. Ener1 argues that under the Employment Agreement, Gassenheimer is subject to the same vacation and paid time off policies as all other executive employees. At the time of his termination in 2011, Gassenheimer had been employed by Ener1 for more than 3 years, but less than 5 years. Ener1 contends that under Ener1's vacation policy, vacation days accrued at 1.25 days per month for a maximum of 15 days (3 weeks); but executives could not carry over vacation time from year to year or accrue vacation time in excess of the maximum annual accrued vacation. Therefore, Ener1 reasons that Gassenheimer is not entitled to recover for any unpaid vacation time from 2008 and 2009.

Ener1 does not dispute that Gassenheimer is contractually entitled to his Severance Claim. However, Ener1 argues that the $450,000.00 Bonus Payment that Gassenheimer received was erroneously paid before the 2010 financial results were restated; after the restatement Ener1 argues Gassenheimer was not entitled to receive any bonus and, therefore, recoupment should apply to reduce the Severance Payment that Gassenheimer is now entitled to receive.[2]

The 2010 Form 10-K described the metrics for bonus payments as the following financial targets: i) the cash management target, ii) the customer base target, and iii) the gross revenue target. The 2010 year-end financial statements, certified by Gassenheimer as a Sarbanes-Oxley certifying officer, were materially false and misleading because of the failure to properly account for transactions with Think. Gassenheimer's 2010 Bonus Payment was paid in March 2011 based on Ener1's materially false financial statements.

In June 2011, Think filed for bankruptcy protection. In August 2011, Ener1 reported that its 2010 financial statements could no longer be relied upon and would be restated. The

---

[2] Ener1 refers to the 2010 Bonus Objection as a setoff and a defense (recoupment) and states that under either theory, $450,000.00 should reduce any recovery by Gassenheimer.

6

adjustments to the 2010 financials were attributable to Ener1's transactions with Think, including: (i) accounts receivable were reduced by $17.4 million; (ii) loans receivable were reduced by $14 million; (iii) net sales were reduced by $18.9 million; (iv) gross profit was reduced by $18.9 million; (v) equity investment in Think was written off in the amount of $58.6 million; and (vi) losses from operations were increased by $86.245 million.  (*Id.*)  After the Think write-offs were reflected in Ener1's 2010 financial statements, Ener1 argues that Gassenheimer's was not entitled to receive any Bonus Payment for 2010.  Ener1 argues that under section 558 of the Bankruptcy Code, Ener1 should be allowed to assert a defense of recoupment based on unjust enrichment.

## II.    LEGAL STANDARD

Correctly filed proofs of claim "constitute prima facie evidence of the validity and amount of the claim . . . .  To overcome this prima facie evidence, an objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim."  *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 773 (2d Cir. B.A.P. 2000) (internal citations omitted).  By producing "evidence equal in force to the prima facie case," an objector can negate a claim's presumptive legal validity, thereby shifting the burden back to the claimant to "prove by a preponderance of the evidence that under applicable law the claim should be allowed."  *Creamer v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, No. 12 Civ. 6074 (RJS), 2013 WL 5549643, at *3 (S.D.N.Y. Sept. 26, 2013) (internal quotation marks omitted).  If the objector does not "introduce[] evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim."  4 COLLIER ON BANKRUPTCY ¶ 502.02[f] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2014).

7

Section 502(b)(1) of the Bankruptcy Code provides that claims may be disallowed if "unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). To determine whether a claim is allowable by law, bankruptcy courts look to "applicable nonbankruptcy law." *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006).

Section 558 of the Bankruptcy Code provides:

> The estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses. A waiver of any such defense by the debtor after the commencement of the case does not bind the estate.

11 U.S.C. § 558

Courts have held that Section 558 preserves to the debtor defenses it would have had prepetition. *In re PSA, Inc.*, 277 B.R. 51 (Bankr. D. Del. 2002) (holding that debtor, under Section 558, was entitled to exercise a state law right of setoff); *In re Papercraft*, 127 B.R. 346 (Bankr. W. D. Pa.1991) (finding that either setoff or recoupment is available as a defense under Section 558 and, if established, results in netting out of what each party owes the other). *In re e.Spire Commc'ns, Inc.*, 293 B.R. 639, 648 (Bankr. D. Del. 2003) (allowing debtors to assert a right of recoupment even where that amount exceeded the claimant's proof of claim, because recoupment was permissible under State law.) Florida law plainly allows for recoupment. Florida Rule of Civil Procedure 1.170; *see also Allie v. Ionata*, 503 So. 2d 1237, 1239 (Fla. 1987). In Florida, "a recoupment seeks to diminish or exceed the damages sought by the plaintiff." *Maynard v. Household Fin. Corp. III*, 861 So. 2d 1204, 1207 (Fla. Dist. Ct. App. 2003).

### III.   DISCUSSION

#### A.   Gassenheimer Is Not Entitled To The Vacation Claim

*1. Ener1's Policy Did Not Allow Executives to Carryover Vacation Time*

Gassenheimer's Claim set forth a *prima facie* right to recovery. Ener1 had the burden to rebut the claim, and because it did so, Gassenheimer had the burden to overcome Ener1's evidence. The Court finds that Ener1 introduced evidence establishing that Ener1's vacation pay policy did not permit executives to carry over unpaid vacation time. Gassenheimer failed successfully to rebut this evidence.

Gassenheimer's Employment Agreement states that "[t]he Executive [Gassenheimer] shall be entitled to paid vacation days in each calendar year in accordance with the company's then current vacation policy." The plain language means that Gassenheimer was entitled to be paid for days in accordance with the *then* existing [*i.e.,* at the date of termination] vacation policy. Ener1 introduced the *then existing* policy, which reads in part, "Exempt employees . . . are not eligible to sell unused PTO back to the company." (PTO Policy at 2.) The PTO Policy also provided that "[this policy] supersedes any and all earlier policies. A separate document will provide transition guidance for current employees from earlier policies to this policy." Neither party produced a separate document providing transition guidance. However, based on the testimony at trial, the Court finds that Ener1 has shown that Gassenheimer was subject to this same policy for the years for which he seeks to recover vacation pay. Therefore, the objection to the Vacation Pay Claim is **SUSTAINED** and the claim is **EXPUNGED.**

Ener1 also introduced additional evidence rebutting the *prima facie* validity of the Vacation Pay Claim. The trial testimony established that Ener1's books and records contain no record that any amount was due to Gassenheimer because of accrued vacation pay. The testimony of Debbie Heck, a human resources employee, also supported Ener1's position. Heck

9

testified that she worked in personnel and had (non-exclusive) access to Gassenheimer's employment records; she testified that no vacation pay policy was found in Gassenheimer's employee records.

Ener1 rebutted the validity of the Vacation Pay Claim. *See* Fed. R. Evid. 301; *see Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 713 (6th Cir. 1975) ("[A statutory] presumption has no independent evidentiary value, however, but only serves to place the burden of proof on a party who asserts invalidity."); s*ee also In re Tran*, 351 B.R. 440, 445 (Bankr. S.D. Tex. 2006), *aff'd*, 369 B.R. 312 (S.D. Tex. 2007) ("A prima facie presumption casts upon the person against whom it is applied the duty of going forward with his evidence on the particular point to which the presumption relates.") (quoting *Western & A.R.R. v. Henderson*, 279 U.S. 639, 642 (1929)). Once Ener1 rebutted the presumption of the validity of the Claim, the burden shifted to Gassenheimer. *See O'Brien v. Equitable Life Assur. Soc. of U.S.*, 212 F.2d 383, 386 (noting that while the burden of going forward with evidence may frequently shift during course of trial, the burden of proof remains upon plaintiff to establish his substantive case).

Gassenheimer testified that the non-accrual policy did not apply to the years for which he seeks payment. The Court rejects Gassenheimer's testimony. He argued that Ener1 failed to produce the "transition policy" applicable to prior years. While that is true, it does not alter the result here. Gassenheimer failed to show that Ener1 had exclusive custody and control of any "transition policy," or that as a practical matter the document was unavailable to him, and so, no presumption arose. *See United States v. Mahone*, 537 F.2d 922, 926 (7th Cir. 1976) ("The first thing that must be shown before a party can raise to the jury the possibility of drawing an inference from the absence of a witness is that the absent witness was peculiarly within the other party's power to produce. This requirement is met both when a witness is physically available

10

only to the opposing party and when the witness has a relationship with the opposing party that would in a pragmatic sense make his testimony unavailable to the opposing party regardless of physical availability."); *Schoenberg v. C.I.R.*, 302 F.2d 416, 420 (8th Cir. 1962) (internal citations omitted) ("We have serious doubt whether in a situation such as is presented here, where the witness was apparently equally available to both parties, any presumption should flow from the failure of either party to call such witness. Any rule creating a presumption from failure to produce a witness must be applied with caution.").

The cases cited by Gassenheimer arise from different procedural postures, namely, the availability of Rule 56(f) in proceedings on summary judgment, and are, therefore, inapposite. This case differs from *In re Colonial Bakery, Inc.*, 108 B.R. 13 (Bankr. D. R.I. 1989), cited by Gassenheimer, where the debtor offered an unsubstantiated and "bizarre" version of the facts—and notably failed to produce a record within its exclusive control. Here, Ener1's recitation of the facts is hardly bizarre, and those facts are supported by multiple pieces of evidence discussed above. Nothing in this decision contradicts the principles that a party must produce evidence to support its position and that an inference will be negatively drawn against a party who fails to produce a material witness or other evidence exclusively within its control.[3]

Ener1 introduced in evidence the vacation policy of one of its affiliates, EnerDel. While the EnerDel policy (the "EnerDel Policy," PX–45) did not by its terms apply to Ener1, the Court finds that the EnerDel Policy effectively impeaches Gassenheimer's testimony that pre-2011 policies within Ener1 and its corporate structure allowed executives to cash out their unpaid vacation time. Gassenheimer testified that Ener1's former CFO, Herlihy, was paid his accrued vacation time when he was terminated. Nevertheless, the September 17, 2010 Form 8-K (PX–

---

[3] Because Gassenheimer does not allege (and the Court does not find) that Ener1 intentionally destroyed access to the transition policy, cases involving spoliation of evidence are inapposite.

11

44) effectively rebuts Gassenheimer's testimony that Herlihy cashed out his vacation time as a matter of policy. As part of an overall settlement and release of a variety of claims, Herlihy was paid an amount attributed in part to vacation time, but this evidence cannot overcome the evidence introduced by Ener1 that the company's policy did not permit executives to be paid for unused vacation time from prior years. The Court finds Gassenheimer's testimony that executives were subject to a policy allowing them to "cash out" their vacation time was not credible. As a result, the Vacation Claim is **DISALLOWED**.

### B. Severance Claim and 2010 Bonus Payment Objection

*1. The Severance Claim Is Allowable*

The parties have stipulated that Gassenheimer's termination was "without cause." (Pre-Trial Order at 22). According to the Employment Agreement, upon termination "without cause," Gassenheimer was to receive a severance payment totaling 100% of his annual salary, or $600,000.00 (the "Severance Payment"). (*Id.*) Neither Ener1 nor Gassenheimer dispute the applicability of this provision of the Employment Agreement. Therefore, although the Severance Claim will be allowed, as explained below, Ener1 may assert a defense of recoupment and reduce the amount of severance payable to Gassenheimer.

*2. Gassenheimer Was Not Entitled to the 2010 Bonus Payment; Ener1 May Assert a Right of Recoupment and Reduce the $600,000 Severance Claim by $450,000.00*

The parties dispute whether Gassenheimer was entitled to receive the $450,000 Bonus Payment, and if not, whether Ener1 may assert a defense of recoupment. The Court finds that Gassenheimer was not entitled to receive the Bonus Payment, and that Ener1 may assert a defense of recoupment because Gassenheimer would be unjustly enriched if he is allowed to retain the Bonus.

12

      a. <u>The Performance Metrics for the Bonus Stated in the 2010 Form 10-K Are the Applicable Metrics, Not "Funds Raised," and, Based on the Restatement, Were Not Satisfied</u>

  The parties dispute the applicable metrics for Gassenheimer's 2010 Bonus Payment. Gassenheimer contends that "funds raised" was the exclusive applicable metric for his bonus, which he contends he satisfied. Ener1 contends the financial performance metrics stated in the Form 10–K were the applicable metrics, which after the restatement, Gassenheimer did not satisfy. If Gassenheimer is correct, he was properly paid the $450,000 bonus and Ener1 is not entitled to recoupment. If Ener1 is correct, the issue then becomes whether Florida law (which governs the Employment Agreement) permits recoupment. As the Court finds below, the financial performance metrics set forth in the Form 10–K were applicable to Gassenheimer. Gassenheimer's testimony to the contrary described below is expressly rejected. The Court also concludes below that Florida law entitles Ener1 to recoupment in these circumstances.

  Ener1's evidence was straightforward. The 2010 Form 10–K plainly lists three factors—and only three factors—used to compute bonus payments. These are: 1) cash management; 2) customer base; and 3) gross revenue. While the original 2010 Form 10–K—which included Gassenheimer's signature and certification—disclosed and supported Gassenheimer's 2010 Bonus Payment, the restated financial statements—which again included Gassenheimer's signature and certification—no longer supported any Bonus Payment. In short, the bonus should not have been paid. As a result of the Think bankruptcy, Ener1 filed a Form 8–K in August 2011 concluding that Ener1's 2010 Form 10–K could no longer be relied upon.[4] The Court finds that

---

[4]  The parties spent time arguing about who was to blame for the restatement. Ener1 contended the restatement resulted from Gassenheimer's management (he was the chairman of both companies) and pointed to an administrative finding by the SEC finding that Gassenheimer was responsible for a lack of adequate internal controls. Gassenheimer argued the restatement resulted from mistakes by Ener1's accounting firm, pointing to a lawsuit Ener1 filed against that firm. The Court finds that it is irrelevant who was responsible for the restatement—because of the restatement, the financial performance metrics were not met.

13

the resulting changes meant that Gassenheimer did not meet the three metrics,[5] and that a bonus should not have been paid. Whether Ener1 is entitled to recoupment depends on Florida law.

In support of his theory, Gassenheimer introduced an e-mail from Ener1's Accountants (the "Funds Raised E-mail," DX–3). Gassenheimer testified that the Funds Raised E-mail was applicable in determining bonuses for the "New York Ener1 team" only, and established a different metric, "Equity Raising," as part of the gross revenue metric listed above. He testified that for purposes of the New York team, the amount of funds raised would determine whether a bonus should be paid; if the team raised $150 million, then the gross revenue metric would be satisfied. Gassenheimer testified that the fundraising metric was important; breaking the $150 million "funds raised" metric would result in a matching grant by the U.S. Department of Energy in the amount of $118.5 million. The parties do not dispute that Gassenheimer raised over $150 million.

Gassenheimer argues that Ener1's failure to call any of the five independent witnesses who were present at the compensation committee's meeting in February 2011 (where it was decided by that committee how much his bonus should be) and by calling only Alex Sorokin, a negative inference should be drawn against Ener1. Those witnesses were equally available to Gassenheimer to testify in person, or by deposition if they were otherwise unavailable. No negative inference against Ener1 should be drawn in the circumstances.

Ener1's evidence and argument is more plausible and persuasive. The public disclosure of the bonus metrics in the Form 10–K is more credible than the ambiguous internal e-mail. The Form 10–K was issued after the Funds Raised E-mail, which may have been a draft of proposed metrics that were rejected in favor of the disclosure in the Form 10–K. No board minutes or

---

[5] Accounts receivable reduced by $17.4 million; loan receivable reduced by $14.0 million; net sales reduced by $18.9 million; gross profit reduced by $18.9 million; investment in Think written off in the amount of $58.6 million; and losses from operations increased by $86.245 million. (PX–19 and 20.)

14

resolutions were offered by either party that would support Gassenheimer's contention. Finally, the Funds Raised E-mail contradicts other portions of the Form 10–K—the description of the adjustments of the payout factor and the bonuses for Messrs. Seidel, Ota and Grape. Gassenheimer signed the Form 10–K and certified it as accurate. The Court finds that the metrics in the Form 10–K were applicable and were not satisfied.

Gassenheimer argues that, at most, 40% of the Bonus Payment should be allowed in recoupment because Ener1 paid 100% of bonuses to all employees even though the client acquisition metric was not met. The 150% of the cash management metric was met and "became" 60% of the bonus calculation. Gassenheimer also argues that the "actual cash used" metric meant the cash on deposit spent in operations, and was, in fact, satisfied.

Ener1 introduced the testimony of Alex Sorokin, Ener1's chief restructuring officer, who testified that "actual cash used" should be compared to "net cash from operations," which is an accrual based accounting metric. Sorokin relied on the methodology in the Form 10–K, and concluded that the cash management metric was not satisfied based on the "net cash from operations." The Court credits Sorokin's testimony and rejects Gassenheimer's testimony. The Court finds that Ener1 presented more credible evidence of what "actual cash used" means in the context of this case. Therefore, the "net cash from operations" metric was not met. The Court finds that Gassenheimer is not entitled to 60% of the Bonus Payment.

b. Ener1 Has A Right Of Recoupment Under Florida Law

Gassenheimer contends that Florida law is applicable and that under Florida law Ener1 cannot recoup the Bonus Payment assuming it was erroneously paid. Ener1 contends that whether Florida or New York law applies, Ener1 may assert a right of recoupment and recover under unjust enrichment.

15

The Second Circuit has acknowledged that circuits are split over which choice of law rules a bankruptcy court should use when adjudicating claims based on state law. *In re Gaston & Snow*, 243 F.3d 599, 605 (2d Cir. 2001). While some circuits have extended the rule in *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487 (1941), to bankruptcy cases, other circuits have held that federal choice of law rules will always apply. *Compare, e.g., In re Merritt Dredging Co.,* 839 F.2d 203, 205–06 (4th Cir.1988) (applying *Klaxon* on the basis that because property interests are determined by state law, state choice of law rules apply), *with In re Lindsay,* 59 F.3d 942, 948 (9th Cir.1995) (holding that in federal question cases, such as bankruptcy, federal choice of law rules apply, even where federal law incorporates matters which are the subject of state law.). The Second Circuit took a balancing approach, holding that bankruptcy courts should apply the choice of law rules of the forum state unless an important federal policy is implicated. *In re Gaston & Snow*, 243 F.3d at 602.

Here, no important federal policy is implicated, so New York choice of law rules apply. New York gives effect to contractual choice of law provisions. *Welsbach Elec. Corp. v. MasTec N. Am., Inc.*, 7 N.Y.3d 624, 629 (2006). This means that the Florida law governs,[6] unless Florida would not allow it.[7] Florida courts have held that "[t]t is well established that when the parties to a contract have indicated their intention as to the law which is to govern, it will be governed by such law in accordance with the intent of the parties." *Dep't of Motor Vehicles for Use & Benefit of Fifth Ave. Motors, Ltd. v. Mercedes-Benz of N. Am., Inc.*, 408 So. 2d 627, 629 (Fla. Dist. Ct. App. 1981) (quoting *Hirsch v. Hirsch*, 309 So. 2d 47 (Fla. Dist. Ct. App. 1975)). Ener1

---

[6] It is true Florida prohibits outright a choice of law provision in an employment contract. FL ST § 685.101(2)(b). However, as an officer of a corporation Gassenheimer is not considered an "employee" under Florida law. FL ST § 440.02(8), (16). Thus, there is no "employment." FL ST § 440.02(17)(a).

[7] This issue arises because the parties did not provide that Florida law governs *without regard* to conflict-of-laws principles.

16

was incorporated in Florida, appears to have maintained offices there, but had its executive offices in New York. The Employment Agreement contained a Florida governing law clause. Gassenheimer argued that Florida law controls. Ener1 initially argued that New York law applies, but dropped its insistence at trial. The Court will apply Florida law as the Severance Claim arose under the Florida contract, and recoupment of the Bonus Payment—which was paid during the course of his employment—is asserted as defense to that claim.[8] The Court concludes that Florida law permits recoupment in this case.

In Florida "[t]he distinguishing feature of a claim for recoupment is the same as a compulsory counterclaim—it must spring from the same transaction or occurrence as the underlying claim." *Maynard*, 861 So. 2d at 1207 (Fla. Dist. Ct. App. 2003). Recoupment "is a defensive mechanism, which does not seek affirmative relief but merely seeks to defeat or reduce the claim by the entity who seeks recoupment." *In re Jones*, 289 B.R. 188, 191 (Bankr. M.D. Fla. 2002).

Further, the defense of recoupment need not be asserted in an adversary proceeding, as Gassenheimer argues. In *In re Worldcom*, 372 B.R. 159, 164 (Bankr. S.D.N.Y. 2007), the court permitted a counterclaim for indemnification to be asserted in a contested proceeding, applying Bankruptcy Rule 7013. As recoupment is procedurally comparable—that is, they are both defensive counterclaims—Ener1 need not begin a new adversary proceeding. In addition to *Worldcom*, other courts have followed this same line of reasoning. *See In re ADI Liquidation, Inc.*, No. 14-12092 (KJC), 2015 WL 4638605, at *4 (Bankr. D. Del. May 5, 2015) (quoting *In re Prince Sports, Inc.,* 2013 WL 6906717, *2 (Bankr. D. Del. Dec. 11, 2013) ("[C]ourts have

---

[8] Because New York and Florida law are substantially similar in the areas of recoupment and unjust enrichment, the choice of New York or Florida law is not determinative.

concluded that a debtor may exercise its setoff rights that arose prepetition against post-petition claims.").)

### c. The Elements of Unjust Enrichment Are Met

In Florida, "[t]he elements of an unjust enrichment claim are: 'a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof.'" *See Kopel v. Kopel*, 117 So. 3d 1147, 1152 (Fla. Dist. Ct. App. 2013) (quoting *Fla. Power Corp. v. City of Winter Park,* 887 So. 2d 1237, 1241 n.4 (Fla. 2004)).

Here, Ener1 properly showed all three elements of an unjust enrichment claim. The first two elements are manifest. Gassenheimer received a $450,000.00 Bonus Payment from Ener1. Further, the third element is met, as it would be unfair to allow Gassenheimer to retain the benefit of the Bonus Payment, as the metrics were not satisfied. It would be inequitable to allow Gassenheimer to reap the benefits of a bonus which was not actually performed.

While neither party raised this issue, this Court notes that under Florida law, "where there is an express contract between the parties, claims arising out of that contractual relationship will not support a claim for unjust enrichment." *Moynet v. Courtois*, 8 So. 3d 377, 379 (Fla. Dist. Ct. App. 2009). Still, the Bonus Payment was not payable out of an express contract, as it was subject to discretion by the Compensation Committee based on metrics that were not contained in the contract. *See Parrish v. Gen. Motors Corp.,* 137 So. 2d 255, 257 (Fla. Dist. Ct. App. 1962) (noting that where a bonus payment was not interwoven with the employment agreement, a bonus payment could not be said to be a contract.) Here, the Bonus Payment was subject to discretion and plainly not interwoven in the Employment Agreement, as the two were executed

18

at different times in different documents. Therefore, Ener1 may recover the Bonus Payment in recoupment under a theory of unjust enrichment.

## IV. CONCLUSION

For the reasons explained above, the Court finds that Gassenheimer is not entitled to be compensated for unused accrued vacation time. Additionally, Gassenheimer's $600,000 Severance Claim is allowed, but recovery is reduced by recoupment of the $450,000 Bonus Payment that he received.

Therefore, Ener1's Objection is to the Vacation Pay Claim is **SUSTAINED** and that part of the Claim is disallowed and expunged. Ener1' Objection to the the Severance Claim is **OVERRULED**, but the Claim is reduced by recoupment of $450,000 because of the erroneously paid 2010 Bonus Payment. Therefore, the Claim is **ALLOWED** in the amount of $150,000.00 as a general unsecured claim.

**IT IS SO ORDERED.**

Dated:   October 20, 2016
         New York, New York

*Martin Glenn*
\_\_\_\_*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge

19